## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**Name** Patrick                    Scott        **2 0 7 - CV - 0 5 8 2  GEB  GGH  HC**

_____
      **(Last)**                      **(First)**                **(Initial)**

**Prisoner Number** P-31664

**Institutional Address** California Medical Facility – North / H-310,
P.O. Box 2000, Vacaville, CA 95696

**FILED**

UNITED STATES DISTRICT COURT

EASTERN    DISTRICT OF CALIFORNIA

MAR 26 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

Scott Patrick                         **Case No.** _____
**Full Name of Petitioner**                     (To be supplied by the Clerk,
                                    United States District Court)

     **vs.**

R.K. Wong, Warden            **PETITION FOR A WRIT OF HABEAS CORPUS**
**Name of Respondent**
**(Warden or jailor)**

_____

### Read Comments Carefully Before Filling In

### When and Where to File

You should file in the Northern District if you were convicted
and sentenced in one of these counties: Alameda, Contra Costa, Del
Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito,
Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You
should also file in this district if you are challenging the manner in
which your sentence is being executed, such as loss of good time
credits, and you are confined in one of these counties.  Habeas L.R.
2254-3(a).

If you are challenging your conviction or sentence and you were
not convicted and sentenced in one of the above-named fifteen
counties, your petition will likely be transferred to the United
States District Court for the district in which the state court that
convicted and sentenced you is located.  If you are challenging the
execution of your sentence and you are not in prison in one of these
counties, your petition will likely be transferred to the district
court for the district that includes the institution where you are
confined.  Habeas L.R. 2254-3(b).

### Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

### A.   INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.   What sentence are you challenging in this petition?

(a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| Sacramento County Superior Court | 720 Ninth St., Sac., CA 95814 |
|---|---|
| Court | Location |

(b)   Case number, if known   05F07685

(c)   Date and terms of sentence   360 years to life

(d)   Are you now in custody serving this term?  (Custody means being in jail, on parole or probation, etc.)  Yes __X__  No ____

Where? California Medical Facility - North / H-310, P.O. Box 2000, Vacaville, CA
      (Name of Institution)             (Address)   95696

2.   For what crime were you given this sentence?  (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Fifty-four counts of lewd acts upon a minor with force (two counts of aggra-

vated sexual assault on a child by act of forcible oral copulation and two

counts of aggravated sexual assault on a child by force of sexual intercourse.

3.   Did you have any of the following?

Arraignment:  Yes __x__  No ____    Preliminary Hearing: Yes __X__  No ____

Motion to Suppress:  Yes __X__  No ____

2

4.    How did you plead?

Guilty _____    Not Guilty __x__    Nolo Contendere _____

Any other plea (specify) __None_____

5.    If you went to trial, what kind of trial did you have?

Jury _X____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?    Yes _____    No X_____

7.    Did you have an attorney at the following proceedings:

(a)   Arraignment    Yes __x__    No _____
(b)   Preliminary hearing    Yes _X__    No _____
(c)   Time of plea    Yes _____    No N/A___
(d)   Trial    Yes __x__    No _____
(e)   Sentencing    Yes _x___    No _____
(f)   Appeal    Yes _x___    No _____
(g)   Other post-conviction proceeding    Yes _____    No __X__

8.    Did you appeal your conviction?    Yes _X___    No _____

(a)   If you did, to what court(s) did you appeal?

| | | | (Year) | (Result) |
|---|---|---|---|---|
| Court of Appeal | Yes _X__ | No 98F02647 | May 5, 1999 | Denial |
| Supreme Court of California | Yes _X__ | No S0877998 | July 12, 2000 | Denial |
| Any other court | Yes _X__ | No 98F02647 Permission to refile. | March 28, 2006 | Denied |

(b)   If you appealed, were the grounds the same as those that you are raising in this petition?    Yes _x___    No _____

(c)   Was there an opinion?    Yes _x___    No _____

(d)   Did you seek permission to file a late appeal under Rule 31(a)?    Yes _x___    No _____

If you did, give the name of the court and the result:

Yes, above.

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes _____    No _x___

3

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.  Name of Court __None__

    Type of Proceeding __N/A__    //    //    //

    Grounds raised (Be brief but specific):

    a. _____

    b. _____

    c. _____

    d. _____

    Result _____  Date of Result _____

II. Name of Court _____

    Type of Proceeding _____

    Grounds raised (Be brief but specific):

    a. _____

    b. _____

    c. _____

    d. _____

    Result _____  Date of Result _____

III. Name of Court _____

    Type of Proceeding _____

    Grounds raised (Be brief but specific):

    a. _____

4

b. _____

c. _____

d. _____

Result _____   Date of Result _____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?   Yes _____   No _No_

N/A   //              //              //              //

(Name and location of Court)

## B.   GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to support each claim.  For example, what legal right or privilege were you denied?  What happened?  Who made the error?  Avoid legal arguments with numerous case citations. Attach extra paper if you need more space.  Answer the same questions for each claim.

_Note_:  You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: Ineffective assistance of counsel: _____

_____

Supporting Facts: _____ Trial attorney Michael D. Long was wholly deficient

in his performance, causing irreparable prejudice and an unreliable outcome.

Please see  Exhibit A, state court petition. (Claim 1)

_____

Claim Two: Declarant's claim that petitioner sexually assaulted her on at least 50 occasions is constitutionally vague and lacks sufficient specificity to meet due process requirements.

Supporting Facts: Please see Exhibit A, state petition; McBoyle v.

United States (1931) 285 U.S. 25, 51 S. Ct. 340.  (Exhibit A, Claim 2 )

_____

_____

5

Claim Three: _____

Trial Court's definition of "substantial" in response to an inquiry by the

jury was unconstitutionally vague. (Claim 3 in state petition).
Supporting Facts: _____

The use of the vague word "substantial" lowered burden of proof for prosecu-

tion, and messed all elements of case into an illegal "catch-all" for

jury to convict.  See Exhibit A, state court petition: McBoyle v. U.S.
Supra.

If any of these grounds was not previously presented to any other
court, state briefly which grounds were not presented and why:

All of these issues, plus those added on additional sheets were raised and

responded to in state court.

_____

_____

_____

List, by name and citation only, any cases that you think are
close factually to yours so that they are an example of the error you
believe occurred in your case.  Do not discuss the holding or
reasoning of these cases:

Cases cited above and in Exhibit A or at end of each claim.

_____

_____

Do you have an attorney for this petition?   Yes _____   No  x
If you do, give the name and address of your attorney:

_____//_____//_____//_____//_____

WHEREFORE, petitioner prays that the Court grant petitioner
relief to which s/he may be entitled in this proceeding.  I verify
under penalty of perjury that the foregoing is true and correct.

Executed on  3/21/07                    Scott Patrick
              Date                      Signature of Petitioner

(rev. 5/96)

6

CLAIM FOUR: Petitioner was charged with California PC 288(b), that petitioner

assaulted declarant by "use of force," "violence," "duress," "menace," and

threat of great bodily harm.

SUPPORTING FACTS: The multi-faceted charged with unseparated charges and
elements is unconstitutionally vague.  There is no way for jury to dis-
tinquish them in the verdict form or for petitioner to know what he is being
convicted of.  The multi-faceted list of charges is a catch-all that is
wholly unfair and deprives petitioner of a fair opportunity to responsd to
this "shot-gun" attack of charges.   See Exhibit A, state court petition and
McBoyle v. U.S. Supra.  (Claim 4 in state petition)


CLAIM FIVE: Sentence of 360 years to life is unconstitutionally dispro-

portionate in offense to petitioner's equal protection rights.


SUPPORTING FACTS: Petitioner is a first-time offender who has an extraordinary
social positive social, family and community history.  Petitioner was partici-
pating in the armed services and was father of loving family.  See Exhibit A,
state court petition. See also Gregg v. Georgia (1976) 428 US 153, 173.
(Claim 6 in state petition)

CLAIM SIX: The use of spouse's testimony was an abridgement of petitioner's

rights.

SUPPORTING FACTS: It has been long settled in federal law that there are
certain privileges concerning confessions and statements made under privileged
communications.  California has undermined this established law by making
provisions to circumvent the privileges of a spouse to be compelled to testify
against the other (Prelim. trans., 152, 153).   See Exhibit A. (Claim 7 in state
petition).
U.S. Constitution, Amendment 6, Trammel v. U.S. (1980) 455 US 40, U.S. v.
Yeradi, (1999) 192 F. 3d 14.


CLAIM SEVEN: Petitioner has the right to be at every critical stage of the
trial process.


Petitioner was not allowed or made present during jury's inquiry of meaning
of "substantial." See Exhibit A; Stover v. Carlson DC Conn. (1976) 413
F. Supp. 718.

See Exhibit A, claim 8)

7

CLAIM EIGHT: Petitioner is improperly sentenced according to Penal Code § 1203
.066 (a). and Equal Protection.

State must follow its own rules.  Petitioner was sentenced to prison in step
with P.C. §1203.066, but it was excluded from him though he met all of the
requirements.

U.S. Constitution, Amendment 8, Equal protection. See Exhibit A. claim 9


CLAIM NINE:   Court abused its discretion when it dismissed jurors, or allowed
them to be dismissed because they held unique views and experiences as a
result of experiences with "the system."


SUPPORTING FACTS: The courts dismissed jurors, simply because they held
unique views  and experiences.  This was illegal by virtue of U.S.
Constitution, Amendment 5 and 6, U.S. v. Ellenbogen, 365 F. 2d 982.  See
also Exhibit A. Claim 10


CLAIM TEN: Petitioner was deprived of his due process rights when he his coun-
sel worked in a position of conflicting interest.
  SUPPORTING FACTS:
Michael D. Long, petitioner's trial counsel worked vigorously in the criminal
trial that proceeded his.  Long drqastically toned down his efforts to defend
him by failing to object to a host of objectionable conduct by the D.A.,
he conceeded to a constitutionally infirm jury instruction and failed
to follow sound advice by prior attorney who was paid directly by petitioner
Long had a conflict of interest due to a prior accusation of impropriety that
caused him to "give" petitioer's case away.  See Exhibit A; Fonda v. Gray, 707
F. 2nd 435 (9th Cir 1983), Burton v. Wilmington Park Authority, 365 U.S. 175,
81 S. Ct. 856, 6 L. Ed 2d 45 (1961), West v. Atkins (1988), 487 U.S. 42, 101
L. Ed 2d 40, 108 S. Ct. 2250.

See Exhibit A, claim 12


CLAIM ELEVEN: Petitioner was subject to malicious prosecution such that
it deprived him of his right to due process and a fair trial.


SUPPORTING FACTS: Petitioner has no criminal priors.  He was described during
trial as an asset to his community.  He was recommended for treatment and it
was projected that he was a good candidate for rehabilitation.  Sheila Balkan,
a sociologist and criminologist, suggested he would do "very well" in treat-
ment.  However, the D.A., Molly Steber, declined to allow petitioner to
participate in treatment via the Child Family Institute, for which he was
recommended; nor would Steber allow for individual counselling for help to
reverse an obvious and admitted problem.  She misrepresented the facts
regarding the desire of petitioner's wife to participate in the rehabilitation
process before the court.    See Exhibit A, Alternative Energy, Inc. v. St.
Paul Fire and maine Insurance co. 267 F. 3d 30, Goodley v. Mobil Oil Corp.,
851 F. 2d 513 (1988). (claim 13 in state petition)

CLAIM TWELVE: Petitioner was exposed to multiple punishments for a set of offenses rising out of the same conduct.

SUPPORTING FACTS: Petitioner was charged with fifty-four ambiguous different charges for a course of continuous conduct that stemmed and flowed as a whole of a continuous activity. The D.A. then took the whole and arbitrarily divided it all up into unconstitutional bits and pieces to lower the burden; resulting in 360 years to life for petitioner by stacking the charges. This resulted in an egregious abuse of power and a violation of his due process rights. Horn O'Cheskey, DC NM  (1974), 378 F. Supp. 1280, 296 U.S. 1015,  115 S. Ct 1830, 514 U.S. 1099.  See Exhibit A, Claim 14 in state petition).

CLAIM THIRTEEN: Constant and consistent judicial interference prejudiced the petitioner and deprived him of a fair trial and due process.

SUPPORTING FACTS: The trial court raadically limited the voir dire process and deprived petitioer of the right to a fair cross-section of the community and the ability to have a fair minded selection of jurors of his peers examine the case against him.  See Exhibit A, Horn O'Cheskey, 396 U.S. 1015, 115 S. Ct. 1830, 514 U.S. 1099.  (Claim 15 in state petition)

CLAIM FOURTEEN: The court allowed petitioner to unnecessarily be exposed to prejudiced  as a result of admission of inflamatory pictures.

SUPPORTING FACTS: The court allowed petitioner to unnecessarily be exposed to prejudice as a result of admission of imflammatory pictures introduced to jury.  The pictures were of teh declarant's genitals.  The probative value of this evidence was substantially outweighed by the danger of unfair prejudice to petitioner.  The pictures of this child's gentials did not prove anythingh -- as the court recognized after the fact.  And the use of Nurse Boyle's notes would have been sufficient to show the very same thing, that force was not apparent or intially documented.

See Exhibit A, U.S. v. Hilt, 981 F. 2d 422 (1992).     (claim 16 in state petition)


Closing: The failures of trial counsel, the court and the District or the District attorney's and court's abuses resulted in (a) decisions that are contrary to clearly established federal law, as determined by the U.S. Supreme Court, 28 U.S.C. § 2254 (d)(1), and the failure to apply or comply with these legal principles resulted in an unreasonable application(s) of Supreme Court precedent (David v. Kramer, 167 F. 3d 494, 500 (9th Cir. 1999).

PRAYER FOR RELIEF

Petitioner is without remedy save by Writ of Habeas Corpus.  Petitioner
seeks the following relief for this honorable court:

1. Petitioner acknowledges that he has altered the Northern District Court
   habeas form, explaining to this honorable court that the prison library
   could not provide petitioner with the eastern District court form.  Pe-
   titioner seeks forgiveness for his desperation and lacking.

2. Petitioner is desperate to file the enclosed habeas corpus because
   petitioner believes he may be tardy in his filing due to a string of
   extraordinary circumstances.  Petitioner was recently transfered
   from CSP-LAC to CSP-Vacaville and the orientation process, a restric-
   tion of movement and access to the prison library made it impossible
   for petitioner to file at a more timely date.  Petitioner was given a
   reprieve to re-file his petition in the Sacramento County Superior
   court after being grossly defrauded by his former private counsel.
   Petitioner was denied eventually by the same court and continued his
   pursuit through the state courts.  His last denial was from the
   Third Appellate District Court of California on January 25, 2007.

3. Petitioner has not included the In Forma Pauperis form because it
   is in the process of being completed by state officials.  Petitioner
   will send these documents, along with documents verifying extraordinary
   circumstances and state inhibitions to file more timely.

4. Petitioner requests the appointment of competent counsel by virtue of
   Cal. R. Ct Rule 4.551 (C)(2).  With this request petitioner also asks
   that the court consider the extraordinary circumstances involved in his
   litigation efforts.  The california prisons are experiencing a severe
   staff shortage that causes unpredictable and extensive lockdowns an
   and inability to get to the prison library.

Date: _3/21/07_

_Scott Patrick_
Scott Patrick

**EXHIBIT A**

**STATE PETITION GROUNDS**

Trial attorney Michael D. Long was grossly ineffective.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Trial attorney Michael D. Long was wholly deficient in his performance,

causing irreparable prejudice and an unreliable outcome. Long failed to call

critical witness, like Barbara Burks, petitioner's hostile mother-in-law who

had an axe to grind and, who initiated petitioner's arrest. Burkes was caught

lying on petitioner when she told detective Bayles that petitioner hit the

declarant (preliminary transcripts, pages 96-97). The impeachment of the

witness was crucial to show jury her hateful disposition towards petitioner —

a disposition so biased she was willing to lie to authorities about

petitioner. The outcome of the case could have been drastically different if

the jury knew these facts.

The question of force was inadequately addressed when Long failed to call

the main witness, Detective Bayles. Petitioner sits in prison with

sixty-years to life due to the elements of force charged. However, it was

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

U.S. Constitution, Amendments 6 and 8, The People v. Lightfoot (1998) No.

97F06520, Quartraro v. Fogg (1998), 679 F. Supp. 212, Cooper v. Fitzharris,

586 F. 2d 1325, 1339, Gideon v. Wainwright, 372 U.S. 335, Bellemy v. Cogdell,

952 F. 2d 302, People v. Coffey, 60 Cal. Rptr 457, Bryant v. Peyton, 270 F. 2d

Detective Bayles who introduced descriptive words to the declarant like
"make," and "oral copulation (Preliminary transcripts, pages 123-124, 159).
The introduction of these words contradicted earlier notes of his, and Nurse
Boyle's, that did not indicate force (Preliminary transcripts, page 141 and
Exhibit B).  Bayles tacitly admitted that he put words in the
child-declarant's mouth.  Bayles admitted that "force" was his word
(preliminary transcripts, pages 79, 101 and 142); yet Long failed to call him
in to impeach this highly prejudicial activity.

Long failed to have Detective Bayles' notes admitted into evidence, as
previous counsel, Brad Wishek, did in the preliminary hearing.  Such a showing
would have revealed that Detective Bayles influenced the declarant's claims of
force that were previously absent (see Ground 2).

Long also failed to call Detective Bayles to show how a pretext call to
petitioner on February 9, and 10, 1998, were full of suggestions of force,
according to the detective's notes and a comparison of his notes and
subsequent transcripts reveals that heightened testimony (see Exhibit B, and
also see Exhibit C where Dr. Lee Stewart Coleman questions if declarant's
statements could have evolved as they did in the instant case, at page 133).
Such reasonable action could have opened the door for rebuttal of expert
witnesses on the tactic of suggestibility as is commonly done in
child-declarant trials.  In comparison, petitioner's previous counsel, during
the preliminary hearing, exposed this type of suggestibility in the case of
Lightfoot (see case citation below), in which Paula Christiansen of the
Multi-Disciplinary Interview Center (the same interviewer in the instant case)
interviewed the declarant "Rose Abner."  Wishek specifically challenged

Christiansen's techniques through expert witness Dr. Coleman who, with 21
years of experience and author of 41 articles and two books, could possibly
have netted an acquittal on the charges of force. (Coleman goes on to
estimate that in his expert opinion "95 percent of the interviews that he has
seen in the past 15 years are filled with ... potential contaminant techniques
... [used] not to find out whether or not the child was sexually molested, but
to get statements which corroborate a prior assumption that they had been
sexually abused," Exhibit C, page 143.)

Long also failed to call interviewer Paula Christiansen to impeach her
method of questioning and suggestibility, much like attorneys tactic of
leading a witness to get the desired answer before the court. According to
Coleman "you can't get to the truth if you do not present the people who
decide the truth with all the information ...." (see Exhibit C. page 42, 43).
These witnesses were crucial to the state's case against the petitioner and it
was unreasonable for Long to fail to counter their testimony by testing the
evidence they offered to the jury. In comparison, Wishek, a reasonable
attorney, acting as a reasonable professional, acted in stark distinction of
Long's lacking.

Furthermore, Long failed to present before the jury initial notes of
Nurse Boyle of February 10, 1998 to show no force or trauma appeared in the
physical examination of declarant. These notes would have given the jury yet
another reason to discredit the issue of force (see Exhibit D).

Precedent suggests that "a lawyer performing at any given stage can only
be evaluated in the context of his overall performance, the case which he has
undertaken to try and the tools at his disposal." Yet, in comparison to the
performance of Wishek in petitioner's preliminary hearing and the case of

Lightfoot, any just comparison naturally draws a line between night and day.

Long allowed and conceded to an erroneous and prejudicial definition of the word "substantial" during a jury inquiry. The court responded with a definition that lowered the burden of proof for the state.

Long also failed to have petitioner present during all critical stages of the trial process. On February 4, 1999, the jury requested clarification of the words "menace," "force" (as it pertains to [PC] 269), "substantial force," and "physical force" (see Exhibit E). Petitioner was not present and thus was unable to disagree or otherwise consent, contribute or intervene regarding the answers to these fundamental questions. The jury obviously placed great weight (see Exhibit D) in regard to the judicial answers to their inquiry, as consented to by Long, and in the end they convicted the petitioner on every charge carrying an indeterminate sentence.

Long also failed to object to the use and admission of inflamatory photographs of declarant's genitals, though it was shown the photographs added no value to the trial. The simple admission of Nurse Boyle's February 10, 1998 notes would not only would have negated the photograph's purported claim of proof, but would also have shown the jury that no initial claim of force was made (see Exhibit D).

Moreover, Long failed to challenge disproportionate sentencing, despite petitioner's exemplary record and Penal Code, Section 1203.066 (a).

Continuing with his accumulated failings, Long failed to challenge petitioner's sentence under Penal Code, Section 667.5(6), which applies strictly to recidivists. Petitioner is a first time offender. The most surface investigation would have revealed this fact.

Long also failed to object to a skewed jury selection process whereby jurors with unique experiences with the "the system," that is, those with a

unique perspective as a result of experiences with "the system" are automatically excused despite their affirmation of an intrafamilial molest ability to be fair and impartial.

Furthermore, Long failed to protect petitioner's due process rights by objecting to the vagueness of the specific acts charged. The declarant described, at best, two incidents of sexual contact with petitioner (see Exhibit G), and within them made guesses in a round number to indicate the number of assaults that may have occurred.

Long also failed to question many instances of judicial misconduct or abuses of discretion from the bench; like the court questioning witnesses on behalf of the DA, or arbitrary limiting voir dire, or citing time and court costs in front of the jury over petitioner's due process and fair trial rights.

Long also failed to interview witnesses like Greg Bogert, of the Sacramento County Probation Department; to contest or otherwise counter the scathing merciless report he authored, basically throwing the book at petitioner.

Long could have cited in rebuttal that, despite the DA having repeatedly stated that she wanted to put the petitioner away for 400 years, she attempted to showed a portrait of leniency by offering to plea bargin. She offered 42-years to life. There were also several mitigating factors that, if Long had responded to, would have greatly benefited petitioner: Petitioner admitted guilt to non-forceful encounters with the declarant. Petitioner followed all of the court orders, enrolled in parenting classes, took part in the reunification process and was willing to do whatever was required to make amends, restore his family and repent.

Long could also have pointed out that petitioner fits all of the criteria

for Penal Code, Section 1203.066 (a), had he taken an active roll and interest in the case.  Unlike any other attorney meeting minimum standards of professionalism, Long failed to cite the evaluation of Dr. Sheila Balkan, a crimonologist and sociologist (see Exhibit F).  In her report she cited petitioner's circumstances growing up that apparently had some bearing on his adult behavior.  She also cited his ability to overcome a somewhat jaded upbringing and become the most successful person in his family; practicing medicine.  The introduction of her report would also have elucidated the fact that there are various types of offenders.  Petitioner's circumstances were that of an intrafamilia molest, the least likely to reoffend or pose a risk to the public, witnesses or his family. (See Exhibit J.)

The tragedy and injustice for petitioner in this easiest of tasks (to simply call the probation officer back and memorialize positive information for the record) is that neither the courts, staff at the Department of Corrections and Rehabilitation or, eventually, the Board of Parole Hearing will ever be able to balance these mitigating factors for decisions ranging from housing and programming to eligibility for rehabilitation in the near and distant future.

Long's acts or omissions were not the result of professional judgement, especially in comparison to the effectiveness of Brad wishek at the preliminary hearing or in Lightfoot (See Exhibit C). Long's actions or omissions were not based on strategy, particularly in that witnesses Burkes, Detective Bayles and Christiansen could do no further harm to petitioner by presenting them in front of the jury. Long's failings here were exacerbated by his failure to adequately investigate the witnesses or circumstances surrounding the case. Long's acts or omissions had a direct bearing on the

judgement of the case and severely prejudiced petitioner's defense. Looking at the totality of the evidence, but for the errors of counsel a much more favorable outcome would most likely have occurred.

353, Harris v. Towers, 405 F. Supp. 497, McNolty v. Chm, 652 F. 2d 1369, Miles v. Scully, 826 F. 2d 1192, Harry v. Towers, 405 F. Supp. 497, Strickland v. Washington, 466 US 668, In re William A Greenfield, 89 Cal Rptr 847, Brady v. Maryland, 373 US 83, Glover v. U.S., 531 US 198, Bell v. Lane, 535 US 685.

Case 2:07-cv-00582-GEB-GGH   Document 1   Filed 03/26/07   Page 19 of 121

Declarant's claim that petitioner sexually assaulted her on at least fifty

occasions is constitutionally vague and lacks sufficient specificity to meet

due process requirements.

a. Supporting facts:

When declarant was asked by the Multi-Disciplinary Interview Center

interviewer, Paula Christiansen, how many instances she was assaulted by

petitioner, she unequivocally stated she did not know. When pressed she

estimated a number of occurrences with very imprecise words like "about" or

"probably" while supplying vague dates that reach back years, according to her

estimation (preliminary transcripts, page 93, 94). The declarant's other

accusations were also described in this non-specific, vague and indefensible

manner.

The court abused its discretion by allowing this speculation to go forth

without insisting that some parameters be set to specify dates and times.

Petitioner's due process was denied due to the vagueness of the accusations,

which hindered his ability to proffer alibis for dates and counter evidence.

His defense was substantially impaired due to the lack of specificity to which

he could not in good faith respond.

The declarant only described two specific and detailed accounts of

molestation, still decorated with vague time periods (see Exhibit G).

The declarant is compelled by law to describe the number of acts with

sufficient certainty to support each count in the allegation.

b. Supporting cases, rules, or other authority:

U.S. Constitution, Amendments 6 and 14, people v. Jones (1990) 51 Cal 3rd 294,

Birt v. Superior Court, 34 Cal App. 3d 934, Woodall v. Superior Court, 185 Cal

app 3d 399, People v. Jones (1990) 270 Cal Rptr 611, People v. Morales, 211

Cal App. 3rd, at 792.

**PETITION FOR WRIT OF HABEAS CORPUS**   Page ten of thirtysix

In petitioner's case the charges read: "...on or about and between the 1st day of August, 1993, and the 31st day of January, 1998 ..." Considering the margin of time this description of criminal accusation covers, petitioner could not conceivably respond with evidence as to his whereabouts, produce witnesses to confirm his alibis or other evidence because no particular dates were given him to respond to.  By the very nature of this vagueness petitioner was dealt a bad, unfair and incredibly defective hand.

Precedent dictates that the case cannot be based on speculation and guess work, yet even the court had to ask how it could avoid speculating on the number of counts (preliminary transcripts, page 173). Unfortunately, the court participated in this arbitrary manner of speculative calculation (preliminary transcripts, page 177-179).

Petitioner was thus arbitrarily convicted on all fifty-four counts because the burden of proof was substantially lowered for the state and skewed heavily in a drastic shift towards the petitioner that he could not overcome.  Due to the blanket of ambiguity placed over both the jury and petitioner, at the constitutional detriment of petitioner, the court should reverse the conviction and grant petitioner a new trial with real due process protections afforded to him.

GROUND 3    State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

The trial court's definition of "substantial" in response to an inquiry by the jury was unconstitutionally vague and incorrect causing prejudice.

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

The trial court's definition if "substantial" was unconstitutionally vague and lowered the burden of proof for the state.   There were many elements to the various counts charged in this case.   The state was responsible for proving beyond a reasonable doubt the elements of the counts charges, individually. Instead, the state used vague language and statutes involving multiple elements for the jury to choose from without any specificity. The harm in vague laws is that they may have a double negative in that they fail to provide for a fair warning to the defendant and create an atmosphere where law enforcement fails to administer consistent standards in the enforcement of laws.   According to precedent, the reviewing court must reverse if it cannot determine which theory the defendant was convicted of.   And though petitioner's trial counsel failed to initially object, petitioner can raise issues that affect substantial rights even if no objection was raised by counsel.

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

U.S. Constitution, Amendments 5 and 6, Penal Code 1259, Gayned v. City of Rockford, 408 US 104, Pryor v. Municipal Court (1979) 25 Cal. 3d 238, People v. Weider, 39 Cal. 3d 836, Keeler v. Superior Court (1972) 2 Cal. 3d 619, 632, In re Winship, 397 US 358, Francis v. Franklin, 471 US 307, People v. Green (1980)

"The instruction had the effect of shifting the burdened f proof on the issue of
purpose ... to the defense and that such was impermissible in terms of due
process of law under the federal Constitution."

"Trial court's error in giving the instruction was prejudicial unless there were
affirmative indications that the heightened potential for prejudice arising from
the instruction was not realized."

Furthermore, the courts say "there is a sua sponte duty that arises when there
is substantial evidence to support a defense theory of the case." Moreover,
"justices must consider if defense counsel's acquiescence of instruction derived
from neglect, mistake or intention rather than from tactical decision [making]."
In light of this gross injustice the court should reverse the conviction
and remand for a new trial.

27 C 3d 1, People v. Guiton (1983) 17 CR 2d 365, People v. Walker (1973) 32 CA
3d 897, People v. Bush (1978) 84 CA 3d 294, People v. Anderson (1965) 63 C 2d at
360, Sandstrom v. Montana (1979) 442 US 510, People v. Graham (1969) 71 Cal. 2d
303, People v. Baraza (1979) 153 Cal Rptr 459, People v. Mosher (1969) 1 Cal 3d
379.

GROUND  4  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Petitioner was charged with PC 288(b) that petitioner assaulted declarant by

"use of force," "violence," "duress," "menace" and threat of great bodily harm.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner submits to the court that PC 288(b) is unconstitutionally vague.  The

statute presents for the jury an array of possible descriptive actions to

convict a defendant without having to pinpoint, in particular, which element of

the array they are convicting him of. Petitioner submits that it is likened to

giving the jury a handful of pancake batter and asking the jury to target the

defendant with a wild sling of the hand.  Whatever sticks is a bingo!

In the instant case the use of force was a pillar to the state's case violence

was not at issue, according to the petitioner's point of view, because the

declarant never claimed petitioner hit or harmed her in any way (Preliminary

transcript, pages 105, 106).  The preliminary hearing judge was left to

speculate that duress was involved because, as the court put it, "perhaps,"

petitioner's age, size, or relationship with petitioner weighed against her.

The court makes the petitioner's point more vivid with his own speculation based

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

on an array. Nothing specific was said by declarant or shown by the DA to
specify any of these elements the court put forth, yet the court also generously
sprayed the defendant with the same pancake batter the jury was given.
Being that no clarity or distinction was given to differentiate the elements or
pin then down to specific actions of petitioner, the DA's burden of proof was
drastically reduced and shifted over to the petitioner (Preliminary transcripts,
page 194).

Then there's the element of menace which is inapplicable because petitioner
never threatened her, according to her own testimony (Preliminary transcripts,
pages 87-89). At most, he told the declarant that he "would lose his job and
everything he worked so hard for (preliminary transcripts, page 30). On another
occasion he told the declarant that if she told on him "it would tear the family
apart" (preliminary transcripts, page 158). The declarant specifically said
petitioner never threatened her with great bodily harm, or any other type of
harm, and, in fact, she testified that she at times countered his advances with
equally aggressive maneuvers that prevailed. Speculation and guess work cannot
be a part of the due process foundation, according to precedent.
Petitioner had "a right to know which theory the jury convicted him on. Vague
laws may trap the innocent by not providing fair warning and vague statutory
language creates an atmosphere of arbitrary and discriminatory enforcement of
the law." Based on the above a complete reversal is the only remedy.


U.S. Constitution, Amendments 5, 6 and 14, People v. Pittman, 170 App 3rd 38,
Birt v. Superior Court, 185 Cal App 3d 399, Gayed v. City of Rickford (1972) 408
US 104, Pryor v. Municipal Court (1979) 25 Cal 3d 238, Connecticut v Johnson
(1983) 460 US 573, Cap v. Naught (1973) 94 S. Ct. 396, Bollenbach v. US (1946)
325 US 607, Carpenters v. US

**Ground** _5_ _(if applicable):_

Penal Code 677.5(6) is inapplicable to petitioner as he is a first time

offender, not a recidivist.

a.   Supporting facts:
Upon sentencing petitioner suffered the enhancement of PC 667.5(6) in error.

Petitioner is a first time offender, not a recidivist.  PC Section 667.5(6)

applies to recidivists who have went on to commit new crimes.

Petitioner's sentence should be modified to reflect the absence of this

enhancement in the interest of justice.

b.  Supporting cases, rules, or other authority:

U.S. Constitution, Amendments 5 and 6.

**PETITION FOR WRIT OF HABEAS CORPUS**  Page sixteen of thirty-six

GROUND 6   State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Sentence of 360 years to life is unconstitutionally disproportionate in offense

to petitioner's equal protection rights.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. If necessary, attach additional pages. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner is a first time offender who has an extraordinary history in his

family and community.  Petitioner was practicing the field of medicine, had

plans of participating in the armed services and was and father of his loving

family.

Petitioner is convicted of continuous sexual acts with a minor.  Though

petitioner does not mean to minimize the seriousness of the charges, the

declarant in this case is alive and expected to fully recover after counseling

and other proven methods of intervention.  Petitioner was sentenced to four

counts of 15-years to life for each count of PC 269 (two counts of sexual

intercourse with a child and two counts of oral copulation with a chld under the

age of 14 by use of force).  Petitioner was also convicted of fifty counts of

sexual contact with a child.

Petitioner invites the court to compare, specifically, the four counts that

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

U.S. Constitution, Amendment 14, People v. Almodovar (1987), 235 Cal. Rptr 616,

People v. Weedle (1991) 2 Cal. Rptr 2d 714, Harmelin v. Michigan (1991) 501 US

11, People v. Dillon, 194 Cal. Rptr 390, People v. Campos (1991) 45 Cal. Rptr 2d

706, Ewing v. California (2003) 123 S. Ct 1179, Lockyer v. Andrade (2003) 123 S

GROUND 6 continuation

carry indeterminate sentences of 15-years to life, each, as compared to that of
the charge of attempted murder, which also carries an indeterminate term of
15-years to life.  In the latter cases the average victim is left maimed or
disfigured with physical scars never to go away.  Still, even the force involved
in an average robbery, car-jacking or stranger-victim rape are much more grave
than that involved in petitioner's case.  The petitioner does not slight the
emotional scars done, but in comparison to the types of crimes mention,
petitioner is grossly over charged.

Courts are recommended by precedent to compare punishments for more severe
crimes in the same jurisdiction.  The fact that lesser penalties are available
for those who commit more serious crimes is indicative that sentence is
disproportionate, say precedents.  The petitioner invites the courts to view his
case in light of this claim.

Furthermore, precedent suggests that the court look at the nature of the
offender and whether the prescribed penalty would hinder his rehabilitation.  In
the instant case petitioner was set to join the armed services a few months into
his future.  Petitioner has no criminal record.  According to Dr. Sheila Balkan,
a criminologist and sociologist, petitioner was a positive asset to his
community.  He suffered from a troubled upbringing, yet she describes petitioner
as having maintained an eight year marriage with his wife, who valued their
union such that she was willing to work through his problem and need for
treatment.  Dr. Balkan also described petitioner as ambitious and the most
successful person in his family until the unfortunate incident of molestation.
Dr. Balkan sees petitioner as receptive to treatment and his chances for success
"very good." (See Exhibit I, pages 189-194.

Petitioner asks that the court compare his offense to other crimes as precedent

GROUND 6 continuation

suggests and reduce his sentence commensurate with proportion to his acts.

Ct. 1166, Gregg v. Georgia (1976) 428 US 153, 173.

Page nineteen of thirty-six

Ground   7_____   (if applicable):

_____The use of spouse's testimony was an abridgement of petitioner's rights._____

_____

_____

_____

a. Supporting facts:

It has been long settled in federal law that here are certain privileges

concerning confessions and statements made under privileged communications.

California has undermined this established law by making provisions to

circumvent the privilege of a spouse to not be compelled to testify against the

other (Preliminary transcripts 152, 153).

"The privilege against adverse spousal testimony gives witness-spouse right not

to testify against the defendant-spouse in a criminal or related proceeding."

"the privilege against spousal testimony should be construed strictly."  "the

main concerns of the privilege are the threat to marital harmony and the

arguable unseemingless of requiring one spouse to assist in the criminal

conviction or incarceration of the other spouse."

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

U.S. Constition, Amendment 6, Trammel v. U.S. (1980) 455 US 40, U.S. v. Yeradi

(1999) 192 F. 3d 14

_____

_____

_____

Ground  8 ____ (*if applicable*):

Petitioner has the right to be at every critical stage of the trial process.

_____

_____

_____

a. Supporting facts:

In petitioner's case the jury was confused about the definition of words

supporting the most serious elements of the charges against him.  The jury

requested definitions of the words "substantial" in context to the phrase

"substantial sexual conduct" as pertains to PC Section 1203.66 (a)(8) "menace"

and "substantial force."  These elements made the distinct difference between

indeterminate sentences for petitioner and perhaps probation along with the

continuation of family reunification efforts (see Exhibit E).  Yet petitioner

was not present, for no other reason that convenience of the court, at this

critical stage, to wit, questioning by the jury of definitions to the very

foundation of the state's case.  Had petitioner been present he would have

chimed in to get an understanding of the distinction of the various definitions

given and debated over and disallowed any acquiesence by his attorney to such a

substantial right.  Petitioner participated in the trial process throughout and

contributed to his defense, though his attorney was not always pursuaded to

listen. _____

Petitioner was denied access to a portion of his own trial that was the crux of

the state's case -- the accusation of force, which he has repeatedly and

consistently denied. _____

b. Supporting cases, rules, or other authority:

U.S. Constitution, Amendments 5 and 6, Penal Code 1138, People v. Medina (1990),

51 C 3d 870, People v. Rubaclava (1998) 200 CA 3d 295, People v. Hogan (1982) 31

C 3d 815, People v. Bearslee (1991) 53 C 3d 68, People v. Gonzales (1999), 74 CA

4th 382, 390, People v. Dagnino (1978) 80 CA 3d 891, People v. Hannon (1977) 19

C 3d 588, People v. Steward (1983) 145 CA 3d 967, People v Hedgecock (1990) 51 C

GROUND 8 continued

It is clear from the weight given to these questions by the jury that had he been able to intervene on his own behalf the outcome of his trial could have been drastically more favorable.  It is for this reason and others that California statutes say the defendant should be present at each and every critical stage of the trial process and must waive his right to be present if circumstances are to sway from this reasoning. A reversal of the conviction is the only remedy to such a gross miscarriage of justice.

3d 395, Firebrand Paper Products Corp. v. East Bay Union of Machinists (1964) 39 CR 64.

~~Petitioner is improperly sentenced according to Penal Code Section 1203.066(a)~~ and equal protection.

a. Supporting facts:

Petitioner was specifically sentenced to prison in step with PC Section 1203.066 (a) which prohibits probation if the subject has committed "section 288 or 288.5, has substantial sexual context with a victim who is under the age of 14 years of age. However, there is an exemption at 1203.066(c) that petitioner's ~~circumstances fit squarely into. It reads: "Paragraphs (7), (8), and (9)shall not apply when the courts make all of the following findings:~~

~~(1) The defendant is the victim's adoptive parent [and] has lived in the~~ victim's household. Petitioner lived with the victim.

(2) A grant of probation is in the best interest of the child. In the instant case petitioner, along with his family had already begun the restorative process prior to his arrest. Following his arrest petitioner participated in the reunification process along with court ordered parenting classes. He was visiting his natural born daughter with supervision and was benefiting substantial family ties from his community members.

(3) Rehabilitation of the defendant is feasible, the defendant is amendable to undergoing treatment, and the defendant is placed in a recognized treatment program designed to deal with child molestation immediately after the grant of probation or the suspension of execution of imposition of sentence. In the

b. Supporting cases, rules, or other authority:

U.S. Constitution, Amendment 8

instant case petitioner was already participating in a recognized treatment program (The Child Family Institute), parenting classes and willing to follow all orders by the court (see Exhibit I).

(4) The defendant is removed from the household of the victim until the court determines that the best interests of the victim would be served by returning the defendant to the household of the victim.  While removed from the household, the court shall prohibit contact by the defendant with the victim, except the court may permit the supervised contact, upon the request of the director of the court ordered supervised treatment program and with the agreement of the victim and the victim's parent or legal guardian, other than the defendant.  As used in this paragraph, "contact with the victim" includes all physical contact, being in the presence of the victim, communication by any means, communication by a third party on behalf of the defendant, and any gifts.  In the Instant case petitioner was already under such an agreement in full detail before the DA moved to and was successful at revoking bail for the petitioner.

(5) There is threat of physical harm to the child victim if probation is granted.  The court upon making its findings pursuant to this subdivision is not precluded from sentencing the defendant to jail or prison, but retains the discretion not to do so.  The court shall state its reasons on the record for whatever sentence is imposed on the defendant.  In the instant case petitioner's counsel, Brad Wishek, cited studies that have shown petitioner fits the category of the least risk of levels as his offense is described as an intramolest (see Exhibit I).

The court shall order the psychiatrist or psychologist which is appointed pursuant to Section 288.1 to include a consideration of the factors specified in paragraph (2), (3) and (4) in making his or her report to the court.

(d) The existence of any fact that would make a person ineligible for probation
under subdivision (1)(a) shall be alleged in the accusatory pleadings and
admitted by the defendant in open court or found to be true by the jury trying
the issue of guilt or by the court where guilt is established by plea of guilty
or nolo contendere or by trial by the court sitting without a jury."

Petitioner requests that he be resentenced in light of PC Section 1203.066(a).
Petitioner also adds Exhibit J, a declaration denying the force allegations
and declaring petitioner's suitability for treatment.

U.S. Constitution, Amendment 8

6. GROUND 10

State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

~~The court abused its discretion when it dismissed jurors, or allowed them to be~~

dismissed because they held unique views and experiences as a result of

experiences with "the system".

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

The court abused its discretion when it dismissed jurors, or allowed them to be

dismissed because they held unique views and experiences as a result of

experiences with "the system"; despite their stated ability to remain impartial.

This abuse of discretion was arbitrary and substantially impaired the defense.

The defense has a right to a fair, impartial jury composed of members of his

peers, be it peers of emotion, experiences, senses, thought process and etc.

Petitioner has the right to select a jury made up of a real cross section of his

community. Petitioner was denied that right. For this reason and the horrible

stench of such a miscarriage of justice this case should be reversed, not only on

behalf of petitioner, but for those jurors and potential jurors who have had

experiences with "the system."

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

U.S. Constitution, Amendment 5 and 6, U.S. v. Ellenbogen, 365 F. 2d 982.

7.

or Ground  11  (if applicable):

The purposeful detention of witness was until she testified was arbitrary to

defense.


a. Supporting facts:

The declarant was held against her will for fourteen days while being interviewed;

despite her protestations and constant requests to go home.  The declarant stated

that she did not like the rec. home during pretext calls, interviews and

counseling by various authority figures.  She repeatedly asked to go back to

school, presumably concerned about her status as class president and missing her

friends.  During this period of extra hardship on declarant she was interviewed

several times, and with each interview her vocabulary improved and her accusations

against petitioner grew in gravity.  The process for which she endured was

described by Dr. Coleman as filled with suggestions and cues damning to the

defense (see Exhibit C).


Finally, her vocabulary and accusations against petitioner elevated to words like

"rape," "intercourse," and oral copulation.  The declarant was released at this

point.  Petitioner was arrested.

During trial the court hearing dates grew further and dragged on while declarant

was again deprived from pursuing her wishes and isolated.  Declarant had high

hopes of moving to Montana, but could not due to dilatory maneuvers by the D.A.

The declarant's hostility grew towards petitioner.  Her accusations grew in

b. Supporting cases, rules, or other authority:
U.S. Constitution, Amendments 5 and 6, People v. Bolton (1979) 152 Cal. Rptr 141.

**PETITION FOR WRIT OF HABEAS CORPUS**

ferocity drastically more damning than at the outset of her interviews.
These actions by the D.A. were highly prejudicial to the defense and unfair. They
deprived petitioner of his due process rights and the right to a fair trial.
Precedent calls for a reversal in such instances "even if prosecutorial misconduct
is unintentional."

Petitioner was deprived of his due process rights when his counsel worked in a position of conflicting interests.

a. Supporting facts:

Michael D. Long, petitioner's trial counsel, worked worked vigorously in the criminal trial that proceeded his. In that case a question was raised concerning his integrity regarding evidence tampering. Petitioner believes that Long drastically toned down his efforts to defend him for fear of being further questioned about his integrity and performance. In comparison, petitioner's previous counsel, Mr. Brad Wishek, intensely defended petitioner — objecting to every courtroom aberration and adamantly preserving every conceivable right of petitioner without regard to the court's interests.

Long's passive defense starkly contrasted that of Mr. Wishek. Long failed to conduct simple investigations of main witnesses like Barbara Burks, petitioner's main civil nemesis. Long failed to object to a host of objectionable conduct by the D.A. Long conceded to a flawed consttutionally infirm jury instruction definition (see Exhibit Ground 3). He also failed to the follow very sound advice in pursuing the defense that was left for him by Mr. Wishek. Long failed to move to remove the trial judge who constantly interfered with the trial process; leaning towards the D.A. For these reasons this constitutionally defective case should be razed and reversed.

b. Supporting cases, rules, or other authority:

U.S. Constitution, Amendments 5 and 6, Manhalt v. Reed 847 F. 2d 576 (1998), Rose v. Hodges, 423 U.S. 19, Johnson v. Zerbst, 58 S. Ct. 1019 (1938).

**PETITION FOR WRIT OF HABEAS CORPUS**

State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Petitioner was subjected to malicious prosecution such that deprived him of his

right to due process and a fair trial.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did *exactly what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner has no prior convictions. He was described during trial as an asset to

his community. He was recommended for treatment and it was projected that he was

a good candidate for rehabilitation. Sheila Balkan, a sociologist and

criminologist, suggested he would do "very well" in treatment. (Please see

Exhibit F).

However, Molly Steber, the Deputy D.A., declined to allow petitioner to

participate in treatment via the Child Family Institute, for which he was

recommended; nor would Steber allow for individual counseling for help to reverse

an obvious problem.

Steber also misrepresented the facts regarding the desire of petitioner's wife to

participate in the reunification process in the presence of Justice J. Marlette.

Instead of allowing petitioner access to the help and opportunity for

rehabilitation he needed, Steber treated petitioner as if he were a notorious

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

U.S. Constitution 5th and 6th Amendments, People v. Bolton (1979) 152 Cal Rptr

141, People v. Reed (2006) DJDAR 8733

**PETITION FOR WRIT OF HABEAS CORPUS**

GROUND 13 continued

serial offender and recidivist; joking several times that she wanted to lock him up for 400 years (See Exhibit Exhibit I, page 190).

Steber also amended the criminal complaint, June 12, 1998, adding four counts of penal code 269, carrying life sentences, and which nullified his chances for treatment — on the day of arraignment. The defense, thus, had no opportunity to defend or prepare for a defense to the amendment, effectively closing his door to rehabilitation. Petitioner was benefiting from the intimate support of his family, visiting with his natural daughters and receiving support from his community. Petitioner was ordered to take parenting classes, along with the rest of the family; they did so. It was specifically noted that petitioner was viewed as "highly treatable" and no threat to the community (because it was an intrafamilial molest which studies show are the least threat to the public). Steber also took each individual act petitioner was accused of and punished him separately, stacking the counts, charges and offenses. However, the courts say "a person may be convicted of, although not punished for, more than one crime arising out of the same act or course of conduct." It is recommended by precedent that courts should consider only statutory elements in deciding whether defendant may be convicted of multiple charged offenses.

A much more favorable result would have occurred; that is that the family would have been reunified and petitioner treated absent the Steber's malicious prosecution. The D.A.'s conduct was grossly unfair and prejudicial and for this reason petitioner should be remanded and re-sentenced (see also Ground 9).

Petitioner was exposed to multiple punishments for a set of offenses rising out of the same conduct.

a. Supporting facts:

Petitioner was charged and convicted of fifty-four ambiguous different charges for a course of continuous conduct that stemmed and flowed as a whole of continuous activity. The D.A. then took that whole and divided it up into arbitrary bits and pieces with various and different punishments attached to each count. Not only did this "stacking" of the charges make it impossible to defend, as petitioner could not in good faith present some fifty alibis or counter positions to the charges against him, but also caused him to ultimately suffer various and different punishments that sum to some 360 years to life. By stacking the charges petitioner's due process rights were abridged and he was denied a fair trial. Petitioner requests of the court to reverse this injustice and once again give legs to his rights and the strength of protection he has in the U.S. and California Constitutions.

b. Supporting cases, rules, or other authority:
U.S. Constitution, Amendments 5th and 6th, People v. Reed (2006) 2006 DJDAR 8733, People v. Montoya (2004) 33 Cal. 4th 1031, 1034, People v. Ortega (1998) 19 Cal 4th 686, People v. Sanchez (2001) 24 cal. 3d 983, 988.

State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

Constant and consistent judicial interference prejudiced the petitioner and

deprived him of a fair trial protected by the pillar of due process.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

The trial court radically limited the voir dire process (see Ground 10) and

deprived petitioner of the right to a fair cross-section of the community and the

ability to have a fair minded selection of jurors of his peers examine the case

against him.  The trial court severely limited the questions and inquiries put

forth for his defense strategy and deprived petitioner of the sufficiency needed

to select a truly open minded and fair panel.

During the examination of petitioner's expert witness, Dr. Coleman, the trial

court cut of the examination and petitioner's trial counsel was forced to eke out

the rest of the evidence through re=buttal.  Petitioner's trial counsel was so

distracted by the courts interference that he failed to complete his examination

on suggestion techniques interviewers use to reveal how these techniques influence

memory, especially in young children.  The court's inference caused severe

prejudice to petitioner's defense because the use of force was monumental to the

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

U.S. Constitution, Amendments 5 and 6, Solbert v. Superior Court (1977) 19 C 3d

182, People v. Burns (1952) 109 CA 2d 524, People v. Mahoney (1927) 201 C 618,

Cooper v. Superior Court (1961) 55 C 2d. 291, People v. Srazzawski (1945) 27 C 2d.

7, People v. Black (1957) 150 CA 2d 494, People v. Robinson (1960) 179 CA 2d 624,

**PETITION FOR WRIT OF HABEAS CORPUS**

state's case and petitioner was prevented from the opportunity to unplug the holes
that were within reach to his defense.

The trial court also chastised petitioner's counsel in the presence of the jury on
several occasions.  In one instance the court chastised both advocates, but the
court's outburst could have been expressed at side bar.  Another out burst
detrimental to petitioner's defense was the court citing "the court's valuable
time and money" as if petitioner's defense was a waste of time or was not worth
its presentation.  Precedent has made clear that "reference to the expense and
inconvenience of a retrial is irrelevant" and impermissible.

When petitioner's trial counsel attempted to rebut testimony of Nurse Boyle in
regard to "pain" proportedly caused by petitioner the court intruded again.
Again, petitioner's counsel was so distracted he failed to call his planned expert
witness to impeach suggestive words pitched by Barbara Burks, the petitioner's
mother-in-law, Detective Bayles and paula Christensen, the county child
interviewer.

When Dr. Coleman was asked by the D.A. had he ever published articles in magazines
like Playboy and Hustler, petitioner's was not able to rehabilitate the
affirmative answer by showing that such morally and upright people like Jimmy
Carter also have published articles in this ilk of periodical, and not just the
stereotypical "Chester the Molester," as the D.A. alluded.

The court also questioned witnesses with inquiries that would more appropriately
been put forth by the D.A.

At times, it seemed, the court, in effect, acted like a surrogate prosecutor.
According to precedent, "[i]t is improper to show bias in favoring of prosecution
during the course of voir dire and it may be prejudicial error for the judge to

intervene ... extensively on behalf of either the defense or the prosecution."
These judicial interplays resulted in a miscarriage of justice and the denial of a
fair trial for the petitioner.   Petitioner suffers from a gross miscarriage of
justice due to the claims above and this conviction should be reversed as a result
of this fact.

Supporting cases continued

People v. Campbell, 82 CA 602, People v. Jackson (1955) 44 C 2d 511.

The court allowed petitioner to unnecessarily be exposed to prejudice as a result

of admission of imflamatory pictures.

a. Supporting facts:

The court allowed petitioner to unnecessarily be exposed to prejudice as a result

of admission of imflamatory pictures introduced to the jury. The pictures were of

the declarant's genitals. The probative value of this evidence was substantially

outweighed by the danger of unfair prejudice to petitioner. The pictures of this

child's genitals did not prove anything — as the court recognized after the fact.
And the use of nurse Boyle's notes would have been sufficient to show the very

same thing, that force by petitioner was not apparent or initially documented.

The court's abuse of discretion, the prosecutor's misconduct and petitioner's

ineffective trial counsel all amounted to an ambush on petitioner's right to a

fair trial and the protection of due process. It was critical that every effort

be made to "prevent the jury from focusing its attention on emotional aspects of

the case." For these reasons the instant conviction should be set aside in the

interest of justice.

b. Supporting cases, rules, or other authority:

U.S. Constitution, Amendments 5th and 6th, U.S. v. Hilt, 981 F. 2d. 422 (1992)

EXHIBIT B

SUPPLEMENTAL EXHIBIT IN CONJUNCTION WITH STATE FILING AND HEREIN EXHIBIT A

**CASE NAME:      PATRICK**

**HEARING DATE:  August 4, 1998**

I. **RECAPITULATION:**

DATE                              OUTCOME

February 12, 1998                 300 (b), (g) and (j) Petition filed in Sacramento
                                  Juvenile Court.

February 13, 1998                 Detention hearing.

March 16, 1998                    Jurisdictional/Dispositional hearing.  The minors,
                                  DANIELLE PATRICK, KATELYN PATRICK and
                                  SAVANNAH PATRICK were declared Dependent
                                  Children of Sacramento Juvenile Court on the basis of a
                                  sustained 300 (b) (c) (d) and (j) Petition.  The minors
                                  were ordered placed in out of home care.  The minor
                                  SAVANNAH PATRICK was placed in confidential
                                  placement. The minors DANIELLE and KATELYN
                                  PATRICK were placed with maternal grandmother,
                                  Barbara Burks.  Subsequent review hearing was set
                                  for October 20, 1998.  Mediation as scheduled for July
                                  20, 1998.

II. **ORIGINATING SITUATION:**

On July 7, 1998, the minors, DANIELLE PATRICK, age eleven months, and KATELYN

PATRICK, age three years, were placed into Protective Custody by placement social worker Debbie

Golden.  According to the Protective Custody Report, the minors are Dependent Children of the

Sacramento County Court and had been placed with the maternal grandmother, Barbara Burks.

However, during the past few months, the relationship between the maternal grandmother and the

minors' mother has been strained.  The maternal grandmother admitted that she argues with the

mother in the children's presence.  This behavior has become an obstacle to the reunification

1 │ process. Also, it was not in the best interests of the children to remain in the placement under the
2 │ circumstances of the ongoing conflict between the maternal grandmother and the mother.

3 │ III. **INVESTIGATION:**

4 │     Present at the Detention Hearing on July 10, 1998 were the mother. Debbie Patrick, and the
5 │ maternal grandmother, Barbara Burks.

6 │    **Parents**

7 │ The Mother, Debbie Patrick:

8 │     The mother, Debbie Patrick was interviewed regarding the allegations of the petition.

9 │     As to the allegations of the severe conflict between the mother Debbie Patrick and the maternal
10 │ grandmother Barbara Burks being detrimental to the well-being and posing an obstacle to the
11 │ reunification process. The mother reported "She makes me out to be this terrible, maniac person
12 │ who comes into her house." The mother further reported that the conflict between the mother and
13 │ the maternal grandmother was definitely a two way street. "I wasn't an angel all the time. She
14 │ doesn't treat me like an adult. She never has treated me like an adult. She thinks I had been
15 │ brainwashed by Scott. She lost control when I got married. " The mother further reported, "My
16 │ mom is usually not a person to swear but, for the last three months that's all she would do." The
17 │ mother further reported, " She would call the sheriff's' department over stupid, petty things. She
18 │ wouldn't give me a house key. She wouldn't let me stay in her house." ~~The mother further reported~~
19 │ ~~that her counselor at Child and Family Institute "felt my mom was hindering my reunification with~~
20 │ ~~my kids and too much of my counseling session were about my mom instead of the issues at hand."~~

21 │ The Father, Scott Patrick:

22 │     The father was not interviewed regarding the allegations of the Petition and the father's attorney
23 │ Brad Wishek, requested the undersigned to communicate with the father through legal counsel.

24 │ **Minors:**

25 │ KATELYN AND DANIELLE PATRICK:

26 │     The minors KATELYN and DANIELLE PATRICK were not interviewed regarding the
27 │ allegations of the Petition due to their age.

28 │

**COLLATERAL CONTACTS:**

Debra Golden-Family Reunification Social Worker:

Ms. Golden reported "The maternal grandmother, Barbara Burk, was clearly under much stress while the minors were placed with her. She was calling me daily and leaving lengthy messages. She would call on the weekends knowing I was not there, and would call up to four times in a row; (she would talk until the voice mail cut her off and call back to continue) complaining about her daughter, screaming at times, while the minors could be heard in the background. She has spoken to and counseled several times that this behavior was detrimental to the well-being of the minors. In my opinion, the minors should remain with the aunt and be allowed overnight visits with the paternal grandparents. The mother should be allowed to have unsupervised visits (she has completed parenting classes, continues with counseling and is cooperating with District Attorney) not to include overnights without a court order." Ms. Golden further reported, "no physical visit with the father while he is in jail."

As to the status of the parents progress, Ms. Golden reported, "Deborah Patrick has completed counseling and continues with individual counseling. She will also begin group counseling. Deborah had maintained her job as an R.N. at University of California Davis Medical Center and has recently taken a full time position. Deborah is cooperating with the D.A. and has provided testimony to the court. During the short time that this social worker has had this case, there have been some slight changes in Ms. Patrick's attitude. She is now able to verbalize a better understanding of sexual abuse although it is clear she continues to require counseling." Ms. Golden further reported, "Scott Patrick is currently incarcerated. Prior to his incarceration Mr. Patrick participated in supervised visitations. These visitations were supervised by the maternal grandmother, Barbara Burks. Ms. Burks stated to this social worker that Mr. Patrick was appropriate during his visits and that he was always on time. Mr. Patrick had not participated in counseling or parenting classes prior to being incarcerated."

Kim Lundquist-MSW Child and Family Institute:

Ms. Lundquist, therapist for the mother, Debbie Patrick. was interviewed regarding the allegations of the Petition. Ms. Lundquist reported she "firmly believed they were caught up in old conflicts. Debbie was not able to focus on the necessary issues. We were spending too much time on her issues with her mother. There were too many power-control issues."

Ms. Lundquist sent a letter to Debra Golden. Family Reunification Social Worker dated June 5. 1998. A copy of that letter is attached.

Barbara Burks-Maternal Grandmother:

Barbara Burks, the maternal grandmother, was interviewed regarding the allegations of the Petition. Ms. Burks reported, "She could never come into my home and not be angry. She can act very civil to everyone except me." The maternal grandmother reported," I do not think that my sister could care for the kids the way I did." I am upset that the children are where they are. I do not think that that is in their best interest." The maternal grandmother further reported, "do I feel penalized?" Yes I do. Do I feel I did anything wrong? No, I don't." Ms. Burks reported "because I shared honestly in that letter now they are going to write letters to the Referee and try to discredit me."

As to the allegation that the conflict between the mother and the maternal grandmother was severe, the maternal grandmother reported, "I would not call it severe. Debbie came in and needled, and needled, and needled, and pushed, and pushed, and pushed. Do I think that it was deliberate? Yes, I do. "The maternal grandmother further commented "no body ever helped me on my end. My daughter finagled my sister into taking the kids. I never initiated any of those problems." The maternal grandmother further reported "I won't disclose, but I could give a whole lot more information that would change the outcome. "The maternal grandmother further reported, "the system failed this placement." The maternal grandmother reported, "when my daughter was here, she wanted to be the mom. I gave the baby that antibiotic every morning. When Debbie was here she forgot to give it to her every day. " The maternal grandmother described the conflict between

-4-

1  the mother and the maternal grandmother by saying, "this was a very sick game on my daughter's
2  part. I did react back. She did not make it easy."

3    Brad Wishek-Attorney for Scott Patrick:

4    Mr. Wishek was interviewed regarding the allegation of the Petition. As to the allegations that
5  the severe conflict between the mother Debra Patrick and maternal grandmother Barbara Burks was
6  detrimental to the minor's well-being and that the severe conflict posed an obstacle to the
7  reunification process. Mr. Wishek reported, " He (Scott Patrick) would agree with those statements"
8  and further reported "history would be consistent with that."

9    John Waterman, Maternal Great Uncle:

10   John Waterman was interviewed regarding the allegations of the Petition. Mr. Waterman
11 reported that his sister, Barbara Burks "does not interact with others well. Barbara does not interact
12 with anyone over a long period of time unless she is in control. I do not know anyone who interacts
13 well with Barbara." Mr. Waterman described the mother, Debra Patrick is "a victim and now she is
14 becoming victimized by her mother. I can't imagine her (the other) doing all those things Barbara is
15 accusing her of." As to the placement of the minors with the maternal great aunt Carol Beemis, Mr.
16 Waterman reported, "Carol is very even tempered. Debbie and Carol interact very well. Carol is a
17 very calming influence." Mr. Waterman reported that the mother spends the night at his home when
18 she is visiting the minors at the maternal great aunts home. Mr. Waterman's home is on the same
19 street as the maternal great aunt's home.

20   Carol Bemis, Maternal Great Aunt:

21   Carol Bemis was interviewed regarding the allegations of the Petition. Ms. Bemis described her
22 sister, Barbara Brooks as "a controlling contriving, nagging person." Ms. Bemis has written a letter
23 to the Court, dated July 10, 1998; in response to the letter written by the maternal grandmother,
24 Barbara Burks, dated July 9, 1998, which was presented to the Court at the Detention Hearing. In
25 brief, Ms. Bemis' letter addresses issues raised by Ms. Burks regarding Ms. Bemis' character. A
26 copy of the letter of the maternal great aunt is attached to the report.

27
28

**EXHIBIT B**

**DETECTIVE BAYLES SUGGESTING WORDS LIKE "FORCE"**

**SACRAMENTO COUNTY SHERIFF'S DEPARTMENT**
**CONTINUATION REPORT**

| A | B | C | D | E |
| F | G | H | I | J |

98-11817
REPORT NUMBER

| AUTHORITY PC 288(a) | | SECTION | FEL X | MISD *F* | INTERVIEW: | MONTH | DAY | YEAR | TIME |

COMPLAINANT/VICTIM (LIST FIRST VICTIM IF MORE THAN ONE)
Doe, Savannah

| PERSON INTERVIEWED (LAST, FIRST MIDDLE) Doe, Savannah | V/R/W/S # V-1 | LOCATION OF INTERVIEW Residence |

| TIME/DATE | REPORT INFORMATION IN CHRONOLOGICAL ORDER. |

Ass t o the Cremaio of Molly Skeber

1  6-9-98: 1630 hrs; I, detective Bayles #652, responded to victim Savannah

2  Doe's residence and made contact with victim Doe. As I spoke with

3  victim Doe I informed her that I had recently reviewed the statements she

4  had made regarding this investigation, and that I had a question regarding

5  a portion of her statement.

7  I then advised victim Doe that I needed for her to tell me what she

8  believes the term "sexual intercourse" means. Victim Doe then stated the

9  following, in summary;

10

    I'm a little bit embarrassed to say it, it's when the male puts his

12  penis into the female's vagina.

13

14  I then asked victim Doe if that would be the act that she would be

15  describing if she were to use the term "sexual intercourse". Victim Doe

16  responded "yes". I asked victim Doe if, to the best of her recollection,

17  she had ever used the term "sexual intercourse" to describe any other act,

18  she replied "no".

19

20

21

22        End Of Statement

23

24

67

WB

| INVESTIGATING OFFICER Bayles | BADGE 652 | DIV. C.A.B. | APPROVING SUPERVISOR | PAGE 1/1 |

| A | B | C | D | E |
|---|---|---|---|---|
| F | G | H | I | J |

**98-011817**
REPORT NUMBER

| AUTHORITY | | SECTION | FEL | MISD | | DAY | YEAR | TIME |
|---|---|---|---|---|---|---|---|---|
| PC 288(a) | | | X | | | | | |

COMPLAINANT/VICTIM (LIST FIRST VICTIM IF MORE THAN ONE)
DOE, Savannah

PERSON INTERVIEWED (LAST, FIRST MIDDLE)          VRMS #    LOCATION OF INTERVIEW
          Beginning of suggested questions

TIME/DATE          REPORT INFORMATION IN CHRONOLOGICAL ORDER.

See pp 61-62 of written notes - Det writes out statements & Quest for Sav.

1   **1635 hrs., 02/09/98:** Victim DOE then made telephone contact with her
2   mother, witness Deborah PATRICK. As victim DOE spoke with witness PATRICK,
3   victim DOE advised witness PATRICK that she desired that she be assured
4   that suspect Scott PATRICK would never again "do anything to her." As
5   victim DOE spoke with witness PATRICK, witness PATRICK indicated that
6   suspect PATRICK had in fact made such a promise to victim DOE in the past.
7   (See attached summary of pretext telephone call between victim DOE and
8   witness Deborah PATRICK.)   See pp. 40-48 of typed Det Notes
9                                   & pp 45-49 of written notes
10  The aforementioned pretext telephone calls were audio-recorded, the audio
11  tapes will be retained in the Sheriff's Department Child Abuse Bureau until
12  needed.
13  next day
14  **1000 hrs., (02/10/98:)** I responded to M.D.I.C., where victim Savannah DOE
15  would be interviewed regarding the allegations of sexual molestation she
16  had made against her father, suspect Scott PATRICK. The interview of
17  victim DOE was conducted by Interview Specialist Paula CHRISTIAN. The
18  interview was monitored by Deputy District Attorney Molly STEBER, Dependent
19  Intake Social Worker Dianne BURRELL, and me. The interview was videotaped,
20  the videotape will be retained in the Child Abuse Bureau until needed.
21  See pp 8-? of written notes      See pp. 13-21 of typed notes and audio ...
22  During the course of the M.D.I.C. interview, victim Savannah DOE disclosed
23  that suspect Scott PATRICK had sexually molested her by touching her on her
24  genital area, forcing her to engage in oral copulation, and forcing her to
25  engage in sexual intercourse, on numerous occasions over the past four
26  years. (See attached statement of victim DOE.)
27

| INVESTIGATING OFFICER | BADGE | DIV | APPROVING SUPERVISOR | PAGE |
|---|---|---|---|---|
| DET. W. BAYLES | 652 | C.A.B. | | 4/48 |

Transcribed: 02/23/98 11:57pm                                              dlb

EXHIBIT C

TRANSCRIPTS OF THE CASE OF LIGHTFOOT WITH
DR. COLEMAN ON THE STAND EXPLAINING SUGGESTIVE TECHNIQUES DURING
INTERVIEWS

 1  A.    That's my recollection.

 2  Q.    And would it be correct that within the materials

 3  which you have reviewed, Youth Pastor Hackney created a

 4  note confirming the statement of Amber Rose as he

 5  understood it to include simply accusations of repeatedly

 6  being raped each week?

 7  A.    I'd have to refresh my recollection to answer that.

 8  Q.    Call your attention to Exhibit L at page sixty-one,

 9  sir.  See if that refreshes your recollection.

10  A.    Yes, it does.  That's indeed what it says.  And I

11  have read this previously.

12  Q.    Sir, I want to go back to the transcript of the

13  MDIC interview, Defendant's Exhibit M, calling your

14  attention to page thirteen beginning at line twenty-four:

15              "Christian:  Always in your

16          parents' room.  Okay.  How about did he

17          ever touch you anywhere else on your body?

18              "Amber:  Yeah.

19              "Christian:  Okay.  Tell me about

20          that."

21  A.    Excuse me.  What was the page again?

22  Q.    I'm sorry, page thirteen.

23  A.    Thirteen.  Okay.

24        THE COURT:  That's back in M?

25        MR. WISHEK:  Yes, Your Honor.

26        THE COURT:  Okay.

27  Q.    (By Mr. Wishek)  Now, at the top of page fourteen,

28  Doctor, when you've finished the bottom of thirteen.

1    A.      Uh-huh.

2    Q.              "Um, one day he touched me down

3            in my private areas and, um, sometimes he

4            would just touch me there.  I mean,

5            sometimes he would, sometimes he

6            wouldn't --

7                    "Christian:  Okay.

8                    "Amber:  -- but most of the time he

9            didn't."

10   To your recollection in your review of the records,

11   to your recollection, is this the first time that Amber

12   Rose brings up the accusation of a touching of the vaginal

13   area?

14   A.      I would not be able to answer that without going

15   back over specifically looking for that particular thing.

16   Q.      All right.  With regard to the same Exhibit M, page

17   twenty-one, beginning at line fourteen:

18                   "Christian:  Okay.  All right.

19           Well, what do you think about all this?

20           What do you think about this guy?

21                   "Amber:  I just want him arrested

22           and in jail.  I don't want to see him out

23           hurting anybody else --

24                   "Christian:  Inaudible.

25                   "Amber:  -- 'cause I know he's done

26           it to other people, too."

27   Would that statement by Amber Rose McDonald in

28   connection with the other information you have in this

1    case create any concerns about suggestive influence?

2    A.    Yes.

3    Q.    And how so, sir?

4    A.    Well, it shows that she's absorbed opinions of

5    other people about Mr. Lightfoot, and is not limiting

6    herself to what she knows of her own direct experience.

7    And that's, of course, the kind of additional input which

8    can influence somebody's recollection of what their own

9    experiences have been.  That's what all the data shows.

10   Q.    Could that be said within the labels identified

11   .in the Michaels diagnosis to be a possible indicator of

12   the vilification of the defendant?

13   A.    Yes.

14   Q.    In the statement provided by Mr. Hackney, the youth

15   pastor that we referred to earlier -- and to refresh your

16   recollection, you are looking at Defendant's Exhibit L,

17   pages fifty-nine and sixty -- is there any indication in

18   Mr. Hackney's notes or statements to Detective Feuillard

19   that indicates that there have been discussions between

20   Amber Rose and her sister, Jennifer M.?

21   A.    Yes.

22   Q.    And what would that indication be, Doctor?

23   A.    That the two sisters had talked.  And that as they

24   say in the report here, Janet Doe had been talking to Jane

25   Doe.  And Janet, as far as Jane knew, Janet, her sister,

26   had been molested, but did not have physical intercourse,

27   fondling or touching only.  And that Jane, the one who has

28   heard about it from her sister, feels that the activity

**EXHIBIT D**

**NURSE BOYLE'S NOTES OF FEBRUARY 10, 1998**

**INDICATING AN ABSENCE OF THE USE OF FORCE**

**A. Acts described by patient and/or other historian**

| | Described by patient | | | Described by historian | | |
|---|---|---|---|---|---|---|
| | Yes | No | Unk | Yes | No | Unk |
| **Vaginal contact** | | | | | | |
| Penis | | | | | | |
| Finger | ☒ | | | | | |
| Foreign object | | | | | | |
| Describe the object | | | | | | |
| **Anal contact** | | | | | | |
| Penis | | | | | | |
| Finger | ☒ | | | | | |
| Foreign object | | | | | | |
| Describe the object | | | | | | |
| **Oral copulation of genitals** | | | | | | |
| of victim by assailant | ☒ | | | | | |
| of assailant by victim | | | | | | |
| **Oral copulation of anus** | | | | | | |
| of victim by assailant | ☒ | | | | | |
| of assailant by victim | | | | | | |
| **Masturbation** | | | | | | |
| of victim by assailant | | | | | | |
| of assailant by victim | | | | | | |
| other | | | | | | |
| **Did ejaculation occur** | | | | | | |
| outside a body orifice? | | ☒ | | | | |
| If yes, describe the location on the body: | | | | | | |
| Foam, jelly, or condom used (circle) | | | | | | |
| Lubricant used | | ☒ | | | | |
| (Fondling) (Licking) or kissing (circle) | | | | | | |
| If yes, describe the location on the body: | | | | | | |

Other acts _ABove + Below waist_

Was force used upon patient?
If yes, describe: _Nothing listed here ↑_

**B. Symptoms described by patient and/or other historian**

| | Described by patient | | | Described by historian | | |
|---|---|---|---|---|---|---|
| | Yes | No | Unk | Yes | No | Unk |
| **Physical symptoms** | | | | | | |
| Abdominal/pelvic pain | | | | | | |
| Vulvar discomfort or pain | | | | | | |
| Dysuria | | | | | | |
| Urinary tract infections | | | | | | |
| Enuresis (daytime or nighttime) | | | | | | |
| Vaginal itching | | | | | | |
| Vaginal discharge | | | | | | |
| Describe color, odor and amount below. | | | | | | |
| Vaginal bleeding | | | | | | |
| Rectal pain | | | | | | |
| Rectal bleeding | | | | | | |
| Rectal discharge | | | | | | |
| Constipation | | | | | | |
| Incontinent of stool (daytime or nighttime) | | | | | | |
| Lapse of consciousness | | | | | | |
| Vomiting | | | | | | |
| Physical injuries, pain, or tenderness. Describe below. | | | | | | |
| **Behavioral/emotional symptoms** | | | | | | |
| Sleep disturbances. | | | | | | |
| Eating disorders | | | | | | |
| School | | | | | | |
| Sexual acting out | | | | | | |
| Fear | | | | | | |
| Anger | | | | | | |
| Depression | | | | | | |
| Other symptoms | | | | | | |

Additional information

---

MDIC INTERVIEW DATE; _2-10-98_          SLAN DATE; _2-11-98_

CHILD'S NAME; _Savannah Patrick_ D.O.B.; _5-2-85_

RACE; _W_          GENDER; _F_

DETECTIVE; _Bayles_          DEPT; _SSD_

SUSPECTS NAME; _Patrick Savannah_ D.O.B.; _30's_

RACE; _W_          GENDER; _M_

RELATIONSHIP TO CHILD; _Adopted Father_

SECRETARY FILLED THIS OUT. ADDITIONAL INFO; _Many incidents_
_Promises, Gifts, Seduction._

**1. Name of person providing history**
~ Savannah Patrick

**Relationship to child** Self

**Address** Receiving Home

Agency | State | Phone (W) (H)

**2. Chief complaint(s) of person providing history**
suspected sexual abuse

**3. Chief complaint(s) in child's own words**

**4.** ☐ Less than 72 hours since incident(s) took place
Date/time/location

☑ Over 72 hours since incident(s) took place
Date(s) or time frame/location   Last contact 2/10/99

**5. Identity of alleged perpetrator(s), if known**
Scott Patrick

**Age** approx 30y | **Sex** ♂ | **Race** Cauc | **Relationship to child** adopted father

**6. Acts described by patient and/or other historian**
Per MDIC form
dated 2/10/98

| | Described by patient | | | Described by historian | | |
|---|---|---|---|---|---|---|
| | Yes | No | Unk | Yes | No | Unk |
| **Vaginal contact** | | | | | | |
| Penis | X | | | | | |
| Finger | X | | | | | |
| Foreign object | | | | | | |
| Describe the object | | | | | | |
| **Anal contact** | | | | | | |
| Penis | | | | X | | |
| Finger | | | | | | |
| Foreign object | | | | | | |
| Describe the object | | | | | | |
| **Oral copulation of genitals** | | | | | | |
| of victim by assailant | X | | | | | |
| of assailant by victim | X | | | | | |
| **Oral copulation of anus** | | | | | | |
| of victim by assailant | | | | X | | |
| of assailant by victim | | | | | | |
| **Masturbation** | | | | | | |
| of victim by assailant | | | | | | |
| of assailant by victim | | | | | | |
| other | | | | | | |
| **Did ejaculation occur** | | | | | | |
| outside a body orifice? | | X | | | | |
| If yes, describe the location on the body: | | | | | | |
| Foam, jelly, or condom used (circle) | | | | | | |
| Lubricant used | | | | | | |
| Fondling, licking or kissing (circle) | X | | | | | |

If yes, describe the location
on the body:   Above and below
waist.

Other acts:

Was force used upon patient?
If yes, describe:

**8. Symptoms described by patient and/or other historian**

| | Described by patient | | | Described by historian | |
|---|---|---|---|---|---|
| | Yes | No | Unk | Yes | No |
| **Physical symptoms** | | | | | |
| Abdominal/pelvic pain | ✓ | | | | |
| Vulvar discomfort or pain | ✓ | | | | |
| Dysuria | | ✓ | | | |
| Urinary tract infections x1 4 5yrs | ✓ | | | | |
| Enuresis (daytime or nighttime) | ✓ | | | | |
| Vaginal itching | ✓ | | | | |
| Vaginal discharge | | | | | |
| Describe color, odor and amount below. | | | | | |
| Vaginal bleeding | ✓ | ✓? | | | |
| Rectal pain | | ✓ | | | |
| Rectal bleeding | | ✓ | | | |
| Rectal discharge | | ✓ | | | |
| Constipation | ✓ | | | | |
| Incontinent of stool (daytime or nighttime) | | ✓ | | | |
| Lapse of consciousness | | | | | |
| Vomiting | | | | | |
| Physical injuries, pain, or tenderness. Describe below. | | | | | |
| **Behavioral/emotional symptoms** | | | | | |
| Sleep disturbances | ✓ | | | | |
| Eating disorders | | ✓ | | | |
| School   N/A | | | | | |
| Sexual acting out | ✓ | | | | |
| Fear | ✓ | | | | |
| Anger | ✓ | | | | |
| Depression | ✓ | | | | |
| Other symptoms | | | | | |

Additional information:

**7. Post-assault hygiene/activity**
( X ) Not applicable if over 72 hours

| | Described by patient | | | Described by historian | | |
|---|---|---|---|---|---|---|
| | Yes | No | Unk | Yes | No | Unk |
| Urinated | | | | | | |
| Defecated | | | | | | |
| Genital wipe/wash | | | | | | |
| Bath/shower | | | | | | |
| Douche | | | | | | |
| Removed/inserted tampon | | | | | | |
| Brushed teeth | | | | | | |
| Oral gargle/swish | | | | | | |
| Changed clothing | | | | | | |

B

HOSPITAL IDENTIFICATION INFORMATION

102 33 77 3   40-35820502
PATRICK , SAVANNAH
F   05/02/85   916-689-2670
                                    MD
I   SAC CO-CASE MANAGED

OCJP 925

**EXHIBIT E**

**JURY REQUEST OF DEFINITIONS**

In the Superior Court of the State of California
In and For the County of Sacramento

People _____

CASE NO. 98- F02697

vs

Scott Patrick

DEPARTMENT 23

FILED

FEB 4 1000

We, the jury in the above-entitled cause, request the following:

Definition of "menace", ~~"threats"~~.

Definition of "forcible" as it pertains to 269.

Definition of "substantial force".

Definition of "physical force".

Does holding the head down to the penis
constitute substantial force?

Dated: 2/4/99

7
(Seat # of Foreperson)

0388

92

**EXHIBIT F**

**PROFILE OF PETITIONER BY**

**SOCIOLOGIST AND CRIMINOLOGIST SHEILA BALKAN**

SHEILA BALKAN Ph.D.

CRIMINOLOGIST

MAIN STREET LAW BUILDING

2115 MAIN STREET

SANTA MONICA CA 90405

## PROFILE

I hold a doctoral degree in Sociology from the University of California at Los Angeles, which I received in 1983. My academic specialization was in criminology and deviant behavior. The topic of my dissertation thesis addressed the effectiveness of the juvenile probation camps in Los Angeles county. Related academic work included teaching Sociology courses at UCLA and Los Angeles Valley College, as well as eight years as a researcher through UCLA, in areas of crime, delinquency, and mental health. Professional experience has included extensive work in the areas of alcohol and drug addiction, gambling addiction, sexual deviance, psychological assessment and referral, and development of a variety of voluntary community service projects and activities.

My work as a criminologist in private practice began in 1981, and, after sixteen years, I have consulted on over 2,000 criminal cases throughout the country in federal, state and juvenile courts. Services have included alternative sentencing plans, comprehensive social profiles and assessments, and topical research for presentation in bail modification, preplea reports, sentencing proceedings, and penalty phase work in capital cases. Alternative sentencing plans have contained components such as innovative community service projects, including a nationwide anti-drug advertising campaign, domestic violence video, and placement in chemical dependency and psychological treatment programs.

I have testified as an expert witness in the field of criminology. Publications include co-authorship of a college textbook entitled Crime and Deviance in America (Belmont: Wadsworth, 1980), and social science journal articles concerning violent offenders and juvenile delinquency. Recent articles on sentencing considerations have appeared in Trial Talk, the journal of the Colorado Trial Lawyers Association (May 1990), Trial Magazine, a publication of the Association of Trial Lawyers of America (March 1993, Oct.1996), and the Complex Crimes Journal of the American Bar Association (1993).

I have served as a research consultant for the Los Angeles County Probation Department, the Los Angeles Department of Mental Health Social Services, and the "gang unit" for Los Angeles County. I also hold a private investigator's license in the State of California, No. AA 010357.

SHEILA BALKAN, PH.D.

**SHEILA BALKAN Ph.D.**
**CRIMINOLOGIST**
**MAIN STREET LAW BUILDING**
**2115 MAIN STREET**
**SANTA MONICA CA 90405**

July 15, 1998

Bradley Wishek
Rothschild, Wishek & Sands
901 F. Street, Suite 200
Sacramento, CA  95814

### Re:  **Scott Benson Patrick**

Dear Mr. Wishek,

The following is a comprehensive background report on Scott
Patrick, which is being submitted for consideration in his
criminal court matter.  Mr. Patrick has been charged with
multiple counts of sexual molestation of a child involving
his adopted daughter Savannah Patrick.  He has no prior
record.

Notwithstanding the seriousness of the charges, Mr.
Patrick's background has been one of positive achievement.
He has completed medical school and maintained an eight-
year marriage despite serious instability and incest in the
family in which he grew up.  While he was still very young,
Mr. Patrick's parents divorced and married into new
families with numerous stepsiblings and pervasive role
confusion between members.  Amid the chaos and abuse in his
home, the ill-defined sexual roles of various family
members created a childhood in which Mr. Patrick obtained
little security and never fully gained a sense of the
limits that exist between siblings and parents and
children.

While the patterns in Mr. Patrick's extended family had
much to do with his offense behavior, it did not deter him
from succeeding in school and establishing a strong
foundation for his future.  In spite of his background, Mr.
Patrick persevered to achieve more than anyone else in his
family.  Had he not encountered the factors that led to his
conduct in this case, he undoubtedly would be well-settled
in contributing to his family and community today.

Re: Scott Benson Patrick
July 15, 1998
Page 2

In any case of this nature, there exists the unavoidable question of what is best for the family and whether the defendant is at all likely to offend again. Mr. Patrick's history shows that his confused family background, rather than psychopathology or an uncontrollable compulsion, led to his incestuous conduct. In Mr. Patrick's case, treatment is available to address both his dysfunction and that of his family system. In cases such as this, the prognosis for successful treatment of not only the offender, but also the victim and the family, is very good.

The information presented here is based on interviews with Scott Patrick, his parents, Marilyn Ann Bail Patrick Christenson, age 51, and James Richard Patrick, age 54, his brothers, James Patrick Jr., age 33, and Mark Emerson Patrick, 27, and his wife, Deborah Lynn Patrick, age 30.

I have also reviewed legal case file documents and other records associated with this case. As the topic of incest has increasingly become the subject of research in recent years, I have examined literature on the subject.

### Family Background

Scott Patrick grew up in households where family members kept changing, relationships were unclear and incest was a repeated part of the generational fabric. In his life, the limits that are supposed to be understood and taken for granted were distorted or even obscured by a family system in which violations of personal boundaries and sexuality were commonplace.

According to researchers, James W. Maddock, Ph.D., and Noel R. Larson, Ph.D., in their book, Incestuous Families (Norton 1995), the family system in which Scott grew up is highly significant to both understanding and treating his behavior. The authors stress a therapy model in which all of the members of an incestuous family participate and explain that someone like Scott can easily be seen as the product of the dysfunctional environment that formed his childhood. Maddock and Larson state, "[V]irtually everyone in incest families internalizes perpetration/victimization patterns. Therefore, there are no uninvolved family members." For Scott, who was raised with terribly confusing messages about family structure and sexual

July 15, 1998
Page 3

relationships, his conduct represents a problem that has existed for generations and has never been addressed.

As far back as there is information concerning Scott's family, incest and molestation have been factors. His mother, Marilyn, reports that Scott's maternal grandmother, now 75, was molested by Scott's great-great-grandfather. The youngest of six children, two of Scott's grandmother's older sisters reportedly had the same experience.

This pattern of abuse continued with Marilyn's generation. Marilyn was the middle child of three girls. Although Marilyn's natural father abandoned his family when Marilyn was two, he had already been physically abusive to Marilyn's sister, Nita, who was only two years older than Marilyn. When Marilyn's mother remarried two years later, her new husband had three children, two boys and a girl, who were all several years older than Marilyn and her siblings. Marilyn's stepfather had gained custody of his children after his ex-wife had been institutionalized for psychiatric problems and had molested her daughter, Diane.

Marilyn's stepfather and children moved in with her mother on the family farm outside of Bozeman, Montana. Marilyn relates that living about two miles outside a town of 20,000 people, there wasn't much opportunity for playing games or visiting other children. The children did chores and were regularly churchgoers. The family always ate together and, apart from school, the children had little contact with other children.

Marilyn recalls that shortly after her mother remarried, her stepbrother, John, who was five years older than Marilyn, began sexually abusing Nita. Marilyn remembers that her stepfather found out what was going on and beat her sister for allowing it to happen. She states that she recalls comforting Nita in the bed that they shared and seeing that Nita had been so severely whipped that her shoulders were raw.

The memory of what had happened to her sister remained with Marilyn vividly when John and a neighborhood boy forced her into a barn and molested her the next year. Marilyn reports...

**EXHIBIT G**

**TWO DECLARATIONS OF SEXUAL ASSAULTS**

**WITH VAGUE TIMELINES OUT OF FIFTY-FOUR COUNTS**

| A | B | C | D | E |
|---|---|---|---|---|
| F | G | H | I | J |

**98-11817**
REPORT NUMBER

| AUTHORITY PC 288(a) | SECTION | FEL X | MISD | INTERVIEW: | MONTH | DAY | YEAR | TIME |
|---|---|---|---|---|---|---|---|---|

COMPLAINANT/VICTIM (LIST FIRST VICTIM IF MORE THAN ONE)
**Doe, Savannah**

| PERSON INTERVIEWED (LAST, FIRST MIDDLE) | V/R/W/S # | LOCATION OF INTERVIEW |
|---|---|---|

| TIME/DATE | REPORT INFORMATION IN CHRONOLOGICAL ORDER. |
|---|---|

1  that Suspect Patrick had committed acts of sexual intercourse against her,
2  as well as acts of oral copulation, kissing her, and touching her, all of
3  which had been accomplished against her will.

5  I then asked Victim Doe to provide me with the details concerning a
6  specific act of sexual intercourse which Victim Doe recalled had been
7  accomplished against her will. Victim Doe then described an incident which
8  she stated had occurred approximately 6 months to 1 year earlier, in which
9  she had attempted to physically resist Suspect Patrick's efforts to engage
10 in sexual intercourse with her. Victim Doe was able to provide me with a
11 detailed account of her actions, as well as the actions of Suspect Patrick,
12 as she recounted this event, as well as other incidents of sexual
13 molestation which Suspect Patrick had forcibly committed against Victim Doe
14 (see attached statement of Victim Doe).

WB

| INVESTIGATING OFFICER Bayles | BADGE 652 | DIV. CAB | APPROVING SUPERVISOR | PAGE 11/48 |
|---|---|---|---|---|

4

| A | B | C | D | E | | | | | | | | 98-011817 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F | G | H | I | J | | | | | | | | REPORT NUMBER |

| AUTHORITY | | SECTION | FEL | MISD | INTERVIEW | MONTH | DAY | YEAR | TIME |
|---|---|---|---|---|---|---|---|---|---|
| PC 288(a) | | | X | | | 02 | 10 | 98 | 1025 |

COMPLAINANT/VICTIM (LIST FIRST VICTIM IF MORE THAN ONE)
DOE, SAVANNAH

| PERSON INTERVIEWED (LAST, FIRST MIDDLE) | | VR/MB # | LOCATION OF INTERVIEW |
|---|---|---|---|
| DOE, SAVANNAH | | V-1 | M.D.I.C. |

| TIME/DATE | REPORT INFORMATION IN CHRONOLOGICAL ORDER. |
|---|---|

1  He also started having intercourse with me then.  The intercourse
2  started last summer in 1997.

4  Every once in a while, my dad makes me take a pregnancy test,
5  like the tests that he gets from work.

7  One time, I was in his room after I took a shower, and he started
8  kissing on me and going farther and farther.  Most of the time,
9  it ended with me getting mad enough at him so that he would leave
10  me alone.  It mostly happened when I would be getting ready to
11  take a shower, he would just come in and start doing stuff to me.
12  I would try to hit him or kick him and he would fight back with
13  me.  I tried to run from him, but he would have the door locked.

15  Sometimes, it happened when I was on his bed, laying on my
16  stomach, he would be on his knees next to me and he would be
1  kissing me.

19  When my dad was going to have intercourse with me, I would be on
20  the bed laying on my back and he would get on top of me.  The
21  intercourse happened in my dad's bedroom.

23  One night, I started to tell my mom what my father was doing,
24  after I told him that I was going to tell her.  I guess my dad
25  heard me because then he called me out to where he was at and
26  said,
27

"Don't tell her."

| INVESTIGATING OFFICER | BADGE | DIV. | APPROVING SUPERVISOR | PAGE |
|---|---|---|---|---|
| DETECTIVE BAYLES | #652 | CAB | | 1/9/98 |

Transcribed: 02/10/98 7:16pm
lim

**EXHIBIT H**


**ARRAY OF DESCRIPTIVE ACTIONS**

**IN PENAL CODE 288(b) UNCONSTITUTIONALLY VAGUE**

COUNT THIRTY-FIVE

For a further and separate cause of action, being a different offense of the same class of crimes and offenses as the charges set forth in Counts One through Thirty-Four hereof, and connected in its commission defendant, SCOTT BENSON PATRICK, is accused by this complaint of the crime of <u>violation of Section 288(b) of the Penal Code</u>, a felony, committed as follows: That on or about and between the 1st day of August, 1993, and the 31st day of January, 1998, at and in the County of Sacramento, State of California, the defendant then and there before the filing of this complaint, did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of SAVANNAH P., a child under the age of fourteen years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant and the said child, by use of force, violence, duress, menace, and threat of great bodily harm.

It is further alleged that the above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)(6).

It is further alleged that in the commission of the above offense(s), said defendant, SCOTT BENSON PATRICK, engaged in substantial sexual conduct, said victim being a child under the age of fourteen years, within the meaning of Penal Code Section 1203.066(a)(8).

It is further alleged that the defendant, SCOTT BENSON PATRICK, committed the above offense(s) by the use of force, violence, duress, menace and fear of immediate and unlawful bodily injury on SAVANNAH P., within the meaning of Penal Code Section 1203.066(a)(1).

COUNT THIRTY-SIX

For a further and separate cause of action, being a different offense of the same class of crimes and offenses as the charges set forth in Counts One through Thirty-Five hereof, and connected in its commission defendant, SCOTT BENSON PATRICK, is accused by this complaint of the crime of <u>violation of Section 288(b) of the Penal Code</u>, a felony, committed as follows: That on or about and between the 1st day of

A9803251.020                    (29)                    0104

EXHIBIT I


PRELIMINARY TRANSCRIPT OF PETITIONER'S CHARACTER,
POTENTIAL AND RECEPTIVENESS TO TREATMENT PROGRAMS

1   finds that the unusual circumstance means asking this bail

2   be set at this point at no bail.

3       THE COURT: Okay, 269 is a presumptive no bail.

4       Mr. Wishek, you want to be heard on that?

5       MR. WISHEK: Yes, your Honor.

6       Mr. Patrick voluntarily surrendered in this action, your

7   Honor.  And for a period of some number of weeks, probably

8   about two months, made court appearances.  In fact, the first

9   appearance there was no complaint that had been filed.

10  Voluntarily appeared again until a complaint was filed.  And

11  at the last court appearance when this preliminary hearing was

12  scheduled, Miss Steber, without prior notice other than about

13  ten minutes before the case was called, made a bail motion

14  before Judge Pat Marlett who was notably the head, one time,

15  of the SACA unit a short time before he was on the bench.

16      I asked two days notice which is required by the Code.

17  Judge Marlett continued the case for two days.  I filed

18  written opposition.  At that time, after extensive argument,

19  the Court doubled the bail from $25,000 to $50,000.  There was

20  extensive argument.  Among the issues that were argued was

21  that Judge Marlett had indicated that he wanted to know the

22  status of -- or, umm, interest that Deborah Patrick might

23  have.  And I know that when I mentioned that word Miss Steber

24  probably cringes.  There's been no discussion to my knowledge

25  at any time of this case being diverted.  But Judge Marlett

26  inquired about that.  Miss Steber represented to the Court

27  that there was no interest in it.  The fact of the matter is I

28  have since that time talked to Mr. Hintz who represents Miss

1   Patrick. To my knowledge, there's still been no discussion.

2   But to my knowledge there is a great interest in that option,

3   whether it's going to happen or not. And Judge Marlett only

4   deviated at that time, as I understood his ruling, from

5   leaving the bail at $25,000 and finding it to be unusual that

6   the family had no interest in diversion.

7       Fact of the matter is this defendant has continued to

8   appear. As Miss Steber advised Judge Marlett at the time of

9   the last bail motion just several weeks ago, she said, "I

10  fully intend to put this man in prison for somewhere on the

11  order of 400 years." So notwithstanding what the presumptive

12  bail might be in this case, Mr. Patrick has continued to

13  cooperate with me in this defense, has continued to come to

14  court, has continued to obey all orders of the juvenile court.

15  There has been a separate 300 proceeding that has occurred in

16  this case, your Honor. Mr. Patrick was ordered in that 300

17  proceeding to have no contact with Savannah Patrick, and he

18  has not.

19      Mr. Patrick was given limited visitation and supervision

20  with his daughter and that continues to be accomplished.

21  There was a reunification order in that case. And this entire

22  family, Deborah Patrick, Scott Patrick, and Savannah Patrick

23  were referred for counseling. And this entire family has been

24  in counseling. So at the time that the bail was initially

25  set, it was set at 25,000. After careful consideration just

26  several weeks ago, it was set at $50,000. And there is no

27  reason that the bail should not remain as it was set.

28      There are no new facts in this case from when this matter

SACRAMENTO OFFICIAL COURT REPORTERS (916) 440-5781

190

1   was brought up before Judge Marlett just several weeks ago.

2   And in fact, it was represented on the record by Miss Steber

3   at that time that this amounted to a rape of a child who was

4   under the age of 14. And I see no reason for the court at

5   this time to change the bail from where it's currently set.

6   The two main considerations, as this Court well knows,

7   are the likelihood that this defendant will continue to

8   appear. Again, this has all been argued before Judge Marlett.

9   He has substantial family ties in this community, he has

10  stopped working as a physician because of the contact he would

11  have with minors. He is working in an automobile repair shop

12  with family, promptly got a job. He's obeying all orders with

13  the juvenile court, he's obeying all orders with this Court.

14  There's really no serious concern about him failing to appear,

15  since he's known for some time what his sentencing exposure

16  would be.

17  Aside from that, what it comes to public safety, this is

18  commonly known as a intrafamilial molest. These are the kinds

19  of cases the research would indicate, and again, your Honor

20  this is in the Court file, it was cited to Judge Marlett when

21  I had notice about this issue. These are highly treatable

22  cases. They are not cases where one would have an expectation

23  of reasonable belief that this defendant represents a danger

24  to the public. I offered at that time to have, umm, Mr.

25  Patrick monitored under an ankle monitor to allay any concerns

26  there might be, and Judge Marlett asked. I had him already

27  approved for a program, if Miss Steber wanted after the bail

28  was enhanced to $50,000, to have him on that program and she

2       So since this matter has recently been reviewed, since I
3   think the Court can be assured that this defendant possess no
4   danger to the community, and has every intention of continuing
5   to appear in court, the case he's charged with, I would ask
6   court to leave bail as set.

7       THE COURT:  Well, what about the 1275(e) issue that
8   requires a finding of unusual circumstances?  How would you --
9   what circumstances would you say in this case are unusual?

10      MR. WISHEK:  Well, I think there's a number of
11  circumstances that are unusual.  The first thing is, your
12  Honor, that perhaps it's an anomaly in the bail schedule, but
13  the bail schedule is a presumptive kind of a document.  That
14  bail schedule, to my knowledge, has not changed much since the
15  time that certain of these offenses have been added.  When
16  there's a presumptive bail set at no bail for an offense that
17  carries a potential term of life, the irony is that this is an
18  offense where now that Miss Steber has charged the 269, it's a
19  life offense.  That offense on its face will carry less
20  sentencing exposure for Mr. Patrick than the prior 50 counts
21  that he was facing of 288 subdivision (b).  And I think that
22  the unusual factors in this case are that things -- if the
23  Court can take into account this is an intrafamilial
24  situation.  There's a 300 feeling where there's certain orders
25  made he was required to comply with under that court order and
26  has continued to comply with those, that he has voluntarily
27  surrendered.  Basically, your Honor, each of those factors
28  taken together I have already indicated to the Court and Judge

2          THE COURT:  You know, we just changed the -- made some

3    changes to the bail schedule within the last month and, umm, I

4    don't recall at all if 269 was one that we changed within the

5    last month or so.  Because frankly, I wasn't paying that much

6    attention to 269 offenses at the time.

7          Let me ask you this  -- first of all, umm, who's the

8    Judge that's overseeing the reunification?

9          MS. STEBER:  Your Honor, first of all, I -- this idea of

10   reunification.

11         THE COURT:  Yes.

12         MS. STEBER:  Savannah Patrick, victim in this case, wants

13   no contact at this point with her mother or with this

14   defendant.

15         THE COURT:  Okay.

16         MS. STEBER:  So as far as reunification, that would be

17   under the 300 proceedings.  Is that what you mean?

18         THE COURT:  Yeah.

19         MS. STEBER:  Okay.  Because that's something totally

20   different than what, umm, anything with regard to diversion.

21         THE COURT:  Well, I understand that, but who's --

22         MR. WISHEK:  Your Honor, I have to say that the initial

23   order was made by commissioner.

24         THE COURT:  Commissioner Shepard?

25         MR. WISHEK:  Mr. Patrick recalls it to be Commissioner

26   Shepard, your Honor.

27         THE COURT:  Well, the tough thing for me is that while I

28   understand all that, umm, that you're saying, umm, but under

1    1275 . . . that some of the usual things that the Court might look
2    at, for example, his history of attendance at court is not an
3    issue.  And his law abiding-ness is not an issue, either,
4    under 1275.

5        And, umm, when you think about 269, obviously it was
6    meant to apply to both the intrafamilial cases and, umm, the
7    cases where an outright stranger is the potential victim,
8    there.  And, umm, so the fact that it is an intrafamilial
9    case, I don't know would make -- I'm not pursuaded that the
10   legislature would intend that to have been an unusual
11   circumstance in the context of this particular, umm -- this
12   particular type of offense.  And, umm, it may be -- I'll just
13   say that, umm, it appears to me that I'm reuired to follow the
14   presumptive bail schedule that the judges have established,
15   unless there's something different than merely an
16   intrafamilial case.  So whatever I would think otherwise, umm,
17   I think that the statute is fairly clear.  So I'm going to
18   order the defendant held on no bail as to, umm, the alleged
19   violation of Penal Code Section 269.

20       MS. STEBER:  Thank you, your Honor.

21       THE COURT:  All right.

22                 (Proceedings adjourned.)

23

24

25

26

27

28

EXHIBIT J

DECLARATION OF PETITIONER REGARDING

FORCE AND SUITABILITY FOR TREATMENT

## DECLARATION OF SCOTT PATRICK

I, SCOTT PATRICK, declare:

1.  The matters set forth in this declaration are true of my own knowledge, and, if called upon to do so, I could and would competently testify to them.

2.  I am the Petitioner in this case.

3  I was employed as a resident physician at the U.C.D. Medical Center where I have been working since July of 1995. I have served in the United States Army from 1986 to 1991, attained the rank of Captain and went to college on an ROTC scholarship. I was commissioned a Second Lieutenant and was granted an educational delay so I could attend medical school and do my residency. I was scheduled to serve three years active duty beginning July of 1998, in the Army Medical Corps.

4.  On January 13, 1998, my adopted daughter, Savannha Patrick, disclosed to my wife, Deborah Patrick, that I had been molesting her without any force or threat of force. This disclosure took place after Savannah and Deborah had been arguing about Savannah's homework, and her not wanting to stay at my brother's, Mark Patrick, home while Deborah and I went out to dinner in celebration our wedding anniversary.

5.  When Deborah confronted me, I admitted that I had been molesting Savannah without any force or threat of force over a period of several years.

6.  I started with simple touching and then began showering together with Savannah, and eventually progressed to oral copulation, and then began having intercourse with Savannah by the Spring of 1997.



1

During this period, Deborah was having severe behavioral problems with Savannah. Savannah eventually had to go and stay in Montana for six (6) months, from March until August of 1996, in order to give both Deborah and Savannah a break from each other.

8.     When Savannah's return to California, I continued to molest her and her behavioral problems still continued.

9.     I was deceived by my situation in that Savannah's reactions during the molestation ranged from passive acceptance to active participation and even experimentation, which included dressing herself in special clothes.

10.    In the Fall of 1997, Savannah began to show some resistance to my advances. Her responses, however, were inconsistent ranging from flat refusal to active participation and experimentation, to everything in between.

11.    I totally misinterpreted Savannah's natural desire for fatherly affection as an invitation for sexual advances.

12.    Sometimes at the beginning or in the middle of an event Savannah would become resistant to my advances, sometimes at the beginning or in the middle of an event Savannah would become resistant to my advances. Each time that this happened, I stopped whatever it was I was doing to her, and I never once hit her, nor did I threaten her.

13.    When I realized that Savannah was not enjoying what I was doing to her I quit molesting her immediately. From November thru most of December, I only made a couple sexual advances toward her that were immediately rebuffed, so I did not pursue them.

14.    Because of my honesty in admitting the molestation to my wife and my sincerity of my desire to stop molesting Savannah, Deborah did not immediately report me to the authorities.

$\overset{2}{(\mathcal{W}}$

15.     Deborah and I set up safeguards to ensure that Savannah would never be left alone with me, and Deborah started doing some research regarding my problem.

16.     I joined a men's group at church that dealt with sexual problems and we continued to safeguard against my ever being left alone with Savannah.

17.     During this time, Savannah was adjusting pretty well, doing well in school, participating in sports and student council, and making plenty of friends.

18.     Deborah and I decided that our marriage would continue despite my problems, and we celebrated our wedding anniversary, which had been disrupted by Savannah's disclosure. We left our children in San Leandro with Deborah's mother, Barbara Burks, during the weekend of February 7-8, 1998.

19.     Barbara was not particularly fond of Savannah due to what she felt was the undue stress that Savannah's behavioral problems placed on Deborah. Savannah also did not like staying at Barbara's home since she was not liked.

20.     During the evening of February 7, 1998, Savannah told Barbara about the molestation, after Barbara had fought with Savannah calling Savannah "the child from hell" and threatening to turn her into Juvenile Hall.

21.     Since Barbara had disliked me from the time Deborah and I got married, and since Barbara had always wanted to disrupt our marriage, Barbara called Deborah and demanded that she leave me and turn me into the authorities.

22.     Deborah told Barbara that we were working things out and did not plan on turning me in to the authorities right away. When Barbara could not convince Deborah to do her will, Barbara notified Deborah's childhood pastor and spoke with him regarding th molestation without any force or threat of force. The pastor recommend that I be given a week to find a lawyer and to

3 

...was having severe behavioral problems with Savannah. Savannah eventually had to go and stay in Montana for six (6) months, from March until August of 1996, in order to give both Deborah and Savannah a break from each other.

8. When Savannah's return to California, I continued to molest her and her behavioral problems still continued.

9. I was deceived by my situation in that Savannah's reactions during the molestation ranged from passive acceptance to active participation and even experimentation, which included dressing herself in special clothes.

10. In the Fall of 1997, Savannah began to show some resistance to my advances. Her responses, however, were inconsistent ranging from flat refusal to active participation and experimentation, to everything in between.

11. I totally misinterpreted Savannah's natural desire for fatherly affection as an invitation for sexual advances.

12. Sometimes at the beginning or in the middle of an event Savannah would become resistant to my advances, sometimes at the beginning or in the middle of an event Savannah would become resistant to my advances. Each time that this happened, I stopped whatever it was I was doing to her, and I never once hit her, nor did I threaten her.

13. When I realized that Savannah was not enjoying what I was doing to her I quit molesting her immediately. From November thru most of December, I only made a couple sexual advances toward her that were immediately rebuffed, so I did not pursue them.

14. Because of my honesty in admitting the molestation to my wife and my sincerity of my desire to stop molesting Savannah, Deborah did not immediately report me to the authorities.

15. Deborah and I set up safeguards to ensure that Savannah would never be left alone with me, and Deborah started doing some research regarding my problem.

16. I joined a men's group at church that dealt with sexual problems and we continued to safeguard against my ever being left alone with Savannah.

17. During this time, Savannah was adjusting pretty well, doing well in school, participating in sports and student council, and making plenty of friends.

18. Deborah and I decided that our marriage would continue despite my problems, and we celebrated our wedding anniversary, which had been disrupted by Savannah's disclosure. We left our children in San Leandro with Deborah's mother, Barbara Burks, during the weekend of February 7-8, 1998.

19. Barbara was not particularly fond of Savannah due to what she felt was the undue stress that Savannah's behavioral problems placed on Deborah. Savannah also did not like staying at Barbara's home since she was not liked.

20. During the evening of February 7, 1998, Savannah told Barbara about the molestation, after Barbara had fought with Savannah calling Savannah "the child from hell" and threatening to turn her into Juvenile Hall.

21. Since Barbara had disliked me from the time Deborah and I got married, and since Barbara had always wanted to disrupt our marriage, Barbara called Deborah and demanded that she leave me and turn me into the authorities.

22. Deborah told Barbara that we were working things out and did not plan on turning me in to the authorities right away. When Barbara could not convince Deborah to do her will, Barbara notified Deborah's childhood pastor and spoke with him regarding th molestation without any force or threat of force. The pastor recommend that I be given a week to find a lawyer and to

3  28

turn *myself in* to *the police.* During a conference call on February 8, 1998, Deborah, Barbara and the pastor agreed to this plan.

23.     Due to her extreme hatred of me, and rather than abide by the plan set forth by Deborah, the pastor and herself, Barbara reported me to CPS on the morning of February 9, 1998. Deborah's sister, Kim Burks, called Deborah to warn her that CPS was on its way to take our children away from Deborah. I immediately, met with my attorney, Bradley Wishek.

24.     A CPS social worker and a policeman arrived at Savannah's school, Capitol Christian, and questioned her as to the molestation. At no time did Savannah make any statement regarding my use of force or threat of force in any of our moments together. Savannah was then taken into custody and placed in a receiving home.

25.     A police detective, who was assigned to the case, had Savannah make a pretext telephone call to me at 3:00PM or 4:00PM on February 9, 1998 at Mr. Wiskek's office. I tried to reassure her that we were trying to get her back home, and she told me that she was scared and I told her that I understood, but could not do anything.

26.     On February 10, 1998, Savannah was questioned by Paula Christian in a videotaped interview that was highly suggestive. Two or three of the initial interviewers were men, and because this was a very embarrassing situation for Savannah, Savannah figured out that the more face-saving answer to their questions, "Didn't you resist him?", was the "yes" answer, the answer they wanted to hear.

27.     Savannah was also made to agree that I had "made" or "forced" her to do sexual things. Additionally, the interview was hampered by inexact anatomical descriptions, which allowed the misperception that I touched Savannah "inside" her vagina. This gave the impression that I placed my fingers up into her vaginal canal, which I did not do. Rather, I touched only her external vaginal structures (the labia majora, minora, and clitoris).

4

28.   Barbara Burks in consultation with a paralegal regarding the possible disposition of my case, made multiple statements to the detectives and CPS investigator. Each statement was progressively worse and calculated to ensure that the element of force was added to my charges thereby ensuring a maximum penalty.

29.   I believe that it is possible that in order to protect herself from further scorn by the "grandmother who already despised her and treated her hatefully", Savannah may have invented the story of force while being questioned by Barbara. Barbara, I believe, encouraged it as well.

31.   I believe that Barbara may have encouraged Savannah's story of "force". During her own interviews with police, Barbara was careful not to contradict herself by asking the detective who was questioning her to read back her previous statements prior to giving additional statements against me.

32.   Barbara was also in direct contact with the District Attorney, Molly Steber. Barbara made allegations that I had threatened Savannah, so the District Attorney instructed the detective to re-interview Savannah. This was about three weeks into the investigation. At this time, Savannah was house in a receiving home and prevented from any significant contact with family members.

33.   During the re-interview of Savannah, I believe Savannah was forced into making the statements that I had used forced, and even the statement that I had raped her. Savannah never testified to this at trial, nor was such a statement ever repeated by her. The District Attorney did not call the detective to the stand during trial. I never used force or threat of force during our moments together, nor did I ever rape my daughter Savannah.

34.   Due to the forced statements in Savannah's re-interview, the District Attorney filed the more serious charges of 288(b) rather than 288(a), as well as, added several enhancements to my indictment.

5

35.     Upon the advice of my attorney, Mr. Wishek, I moved out of our home, immediately after making bail. Upon my arrest I was able to make bail through the help of my attorney, Mr. Wishek's intervention.

36.     Barbara Burk further ensured that Deborah would not get approval of regaining custody of our girls by stating that Deborah would allow me to have unauthorized visits with our own children, and that we might try to take them and run away.

37.     Additionally, Barbara slandered my other family members in town, and pushed for Deborah to divorce me and wanted my children as weapon to manipulate Deborah into agreeing with her.

38.     After having successfully manipulate the CPS, the younger girls were placed with Barbara. This lasted for only a couple of months before another social worker realized how Barbara was tormenting and manipulating Deborah by using our girls, and was trying to sabotage the girls' reunification with Deborah.

39.     Our girls were then placed with Deborah's aunt, Carol Bemis, and the reunification process went smoothly, other than delaying its completion until my trial was over and Deborah had testified against me at both my preliminary hearing and my trial. Deborah did this because she was threatened with charges to be brought against her, as well as, the threat of not seeing our children again.

40.     I was evaluated by Dr. Ralph Johnston, a forensic Psychologist specializing in molestation cases and enrolled in his weekly group therapy sessions. Dr. Johnston recommended probation only in my case.

41.     I was also evaluated by Shiela Balken, a criminologist, who also was prepared to testify favorably in my case.



42. Sandra Baker, the head of the Child Family Institute where Savannah and Deborah were undergoing counseling also told Mr. Wishek that I was amenable to therapy.

43. During the preliminary hearing, a brand new inexperienced judge who had just been appointed and had previously been counsel for the fish and game department presided. A more experienced judge may not have allowed the late additional charges of 269. This charge was tacked on by Ms. Steber after her frustration at my being able to make bail at my arraignment. 269 carries a life sentence, so bail was not available.

44. Deborah was threatened with bogus charges of child endangerment if she did not cooperate, this would have resulted in permanent loss of custody of all our children and a felony conviction would cause her to lose her Registered Nursing License, leaving her jobless and destitute.

7

I, *Scott Patrick*, declare under penalty of perjury, under the laws of the United States and the state of California, that the foregoing is true and correct.

Executed on June ___27___, 2001, at Soledad, California.

*Scott Patrick*

Scott Patrick

PREVIOUS FILINGS

1  MICHAEL D. LONG (State Bar #149475)
2  1006 4th Street, Suite 305
   Sacramento, CA 95814
3  (916) 448-1708

FEB 8

SACRAMENTO COUNTY
DISTRICT ATTORNEY

By B. WILSON, Deputy

F:B 8 1999

4  ATTORNEY FOR SCOTT PATRICK

5           SACRAMENTO SUPERIOR COURT DISTRICT
6            COUNTY OF SACRAMENTO, STATE OF CALIFORNIA

7  THE PEOPLE OF THE STATE              )  No. 98F02647
   OF CALIFORNIA,                       )
8                                       )  **DEFENDANT'S MOTION FOR A NEW**
                         Plaintiff,     )  **TRIAL AND REQUEST FOR NEW COUNSEL**
9         v.                            )  **TO FILE SAID MOTION; DECLARATIONS**
                                        )  **OF DEFENDANT AND COUNSEL**
10                                      )
11 SCOTT PATRICK                        )  Date: 3-5-99
                                        )  Time: 11:00 a.m.
12                     Defendant.       )  Dept: 23
                                        )
13 ═══════════════════════════════════════
14 To:    To the District Attorney, County of Sacramento, and Molly Steber, Deputy District Attorney

15         NOTICE IS HEREBY GIVEN that on Friday, March 5, 1999, at 11:00 a.m., or as soon
16 thereafter as the matter may be heard, in Department 23 of the above-entitled court, the defendant will
17 move for an order granting him a new trial, or, in the alternative, for an order appointing new counsel
18 who will file a more complete motion for a new trial.

19         Defendant's motion is brought pursuant to Penal Code section 1181, subdivision (5), on the
20 ground that the court misdirected the jury in responding to the jury's written query to the court
21
22 concerning how to define the word "substantial" or "substantially" in the context of the Penal Code
23 section 288(b)(1) and section 269 charges. Defendant will also argue that his counsel, Michael Long,
24 was ineffective for agreeing with the court to define "substantial" with its denotative[1] meaning of "real,

25
26
27
28 [1] "Denotation." "The meaning, especially the exact, literal meaning: The denotation of 'home' is 'place where one lives,' but it has many connotations." (The World Book Dictionary, 1976 Edition, page 557.)

1   not illusory."   Counsel should have requested that "substantial" be defined with its connotative[2]

2   meaning of "significant."

3       The motion will be based on this Notice of Motion, the attached declaration, the court file, and

4   the arguments presented at the hearing.

5

6   Dated: February 8, 1999

7                                   Respectfully submitted,

8

9                                   Michael D. Long

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   [2] "Connotation."  "What is suggested in addition to the simple or literal meaning."  (The World Book Dictionary, 1976 Edition, page 441.)

2

1  MICHAEL D. LONG (State Bar #149475)
   1006 4th Street, Suite 305
2  Sacramento, CA 95814
3  (916) 448-1708

4              SACRAMENTO SUPERIOR COURT DISTRICT
              COUNTY OF SACRAMENTO, STATE OF CALIFORNIA
5

6  THE PEOPLE OF THE STATE              ) No. 98F02647
   OF CALIFORNIA,                       )
7                                       ) DECLARATION OF MICHAEL D. LONG
                        Plaintiff,      ) IN SUPPORT OF MOTION FOR NEW TRIAL
8            v.                         )
                                        )
9  SCOTT PATRICK,                       )
                                        )
10                      Defendant.      )
11 ══════════════════════════════════════)

12      I, Michael D. Long, declare as follows:

13 1.   I was counsel of record during Dr. Patrick's jury trial.

14 2.   On February 4, 1999, after the jury began its deliberations, I was called several times by
15

16 the court's staff in response to queries by the jury. One of the questions was how to define the

17 word "substantial." "Substantially" appears in the definition of the term "force" in CALJIC 10.42.

18 CALJIC 10.42 defines "force" for the Penal Code section 288(b)(1) charges. However, as no

19 definition of "forcible" appears in CALJIC 10.55, the jury's query could apply to the Penal Code

20 section 269 charges defined in CALJIC 10.55.
21

22 3.   The court's clerk stated that the court planned on defining "substantial" as "real, not

23 illusory," based on a dictionary defintion. I looked up the word "substantial" in The World Book

24 Dictionary (1976 edition, pages 2088-89). The first definition given was "having substance, real,

25 actual." Thus, even though I had thought "substantial" was better defined as "significant, not

26 insignificant" based on the context in CALJIC 10.42, I acquiesced to the court's intended

27 definition because I believed my dictionary's definition must be the proper definition.
28

                              3

4.      After the jury verdicts of guilty on all counts, prosecuting attorney Steber and I were conversing with the jury.  Several jurors mentioned how helpful the court's definition of "substantial" was.  They had had some debate over the term "substantial," with some or many of them believing the term to mean "significant."  Once the court defined the term as merely "real, not illusory," the verdicts were much easier to reach.

5.      After returning to my office, I thought about the court's definition of "substantial" and asked numerous people what they thought the word meant.  Almost every person said "significant," or words to that effect.  I then typed "substantial" and "substantially" into the "Lawdesk" CD-ROM database.  I have attached excerpts of many cases in which a court either tried to define "substantial" or used the term in context.  In the cases attached as "Exhibit 'A'", the word substantial appears to be best defined as "significant."  The definition "real, not illusory" is not an incorrect definition.  It is the literal, connotative, meaning.  However, when "substantial" is used in the context of modifying the term "force," the literal meaning falls short of properly defining "substantial."  In the context of defining "force" in CALJIC 10.42, the court's definition would be: "The term 'force' means physical force that is **real, not illusory'** when compared to the force necessary to accomplish the lewd act itself."  The proper definition should have been "The term 'force' means physical force that is '**significantly**' different or '**significantly**' greater than that necessary to accomplish the lewd act itself."  Real, not illusory, force appears to be less force than force that is significantly different or significantly greater than that necessary to accomplish the lewd act itself.

6.      As I was hired to zealously advocate on defendant's behalf, I should have done my legal research concerning the term "substantial" before, not after, I agreed with the court's proposed definition of "real, not illusory."  I believe the "real, not illusory" definition misdirected the jury and that it is highly probable that the misdirection affected the jury's verdicts as it reduced the

1 | amount of force necessary to commit the crimes defined in Penal Code sections 288(b)(1) and

2 | 269. The court should either grant a new trial or appoint new counsel to fully brief the issue of

3 | whether the court's definition of "substantial" should result in a new trial.

4 |

5 |     I declare under the penalty of perjury that the above is true and correct.  Executed at

6 | Sacramento, California, on February 8, 1999.

7 |                     Respectfully submitted,

8 |

9 |                     Michael D. Long
                    Attorney for Dr. Scott Patrick

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Exhibit "A"

["**Bold**" added to texts]

[People v. Superior Court (Jones) (1998) 18 Cal.4th 667, page 681]
Findings of fact are reviewed under a "substantial evidence" standard. (Crocker National Bank v. City and County of San Francisco (1989) 49 Cal.3d 881, 888.) The standard is deferential: "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination ...." (Bowers v. Bernards (1984) 150 Cal.App.3d 870, 873-874, original italics.) 3

FOOTNOTE 3. As we explained in People v. Bassett (1968) 69 Cal.2d 122, 138-139 [70 Cal.Rptr. 193, 443 P.2d 777]: " **'The critical word in the definition is "substantial"; it is a door which can lead as readily to abuse as to practical or enlightened justice.' Seeking to determine the meaning of 'substantial' in this connection, the court in Estate of Teed (1952) 112 Cal.App.2d 638, 644, canvassed dictionary and judicial definitions and concluded that the term 'clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' "** (Original italics.)

[In re Robbins (1998) 18 Cal.4th 770, page 817]
FOOTNOTE 3. The procedural bar of untimeliness is "indeterminate at [its] very core." (In re Clark, supra, 5 Cal.4th at p. 802 (conc. and dis. opn. of Mosk, J.).) Its operative phrases are "substantial delay" and "good cause." (See, e.g., maj. opn., ante, at p. 779.) Of course, its application to any given claim may yield varying results, as reasonable persons differ as to whether the claim in question has been presented without "substantial delay" and, if not, whether "good cause" exists for any such delay. But, worse yet, its very meaning is vague, as such persons attempt to discern the sense of "substantial delay" and "good cause." And its meaning will become vaguer still, if they are called on to consider whether a claim that is timely should somehow be deemed untimely because of a "societal interest[] in finality." (Id. at p. 794.) The majority assert that the procedural bar of untimeliness has caused petitioners to file their petitions more expeditiously. But they cannot deny that it has caused us to dispose of such petitions at an altogether different pace.

[People v. Rayford (1994) 9 Cal.4th 1, page 14]
(4) The asportation requirement for simple kidnapping is less stringent than that for aggravated kidnapping, and less clear. We have stated that certain factors other than the actual distance a victim is moved are not to be considered. (People v. Caudillo, supra, 21 Cal.3d at p. 574.) However, we have resisted setting a specific number of feet as the required minimum distance, and have further required that the movement must be "substantial in character," while offering little guidance as to what that term means. (Id. at p. 573; People v. Stanworth (1974) 11 Cal.3d 588, 601.) As one Court of Appeal has observed, "Jury confusion is understandable. **Without a frame of reference, 'substantial' has little or no meaning.**" (People v. Daniels (1993) 18 Cal.App.4th 1046, 1053, fn. 5.)

[People v. Rayford (1994) 9 Cal.4th 1, page 18]

We observed: "The People seek to introduce considerations—other than actual distance—as determinative of what constitutes 'sufficient movement' of the victim to constitute the offense of" section 207 kidnapping. (People v. Caudillo, supra, 21 Cal.3d at p. 574.) The People claimed "we should consider Maria's movement substantial because defendant moved Maria to the storage room to avoid detection, thereby increasing her danger, and then waited 20 minutes before he moved her to her apartment." (Ibid.) We rejected this argument stating, "Neither the incidental nature of the movement, the defendant's motivation to escape detection, nor the possible enhancement of danger to the victim resulting from the movement is a factor to be considered in the determination of substantiality of movement for the offense of [simple] kidnaping." (Ibid.) We concluded that "the judgment of conviction of simple kidnaping must fall for lack of evidentiary support." (Id. at p. 575.)

FOOTNOTE 10. It is apparent that Bradley reviewed the sufficiency of the evidence of asportation for simple kidnapping on bases arguably inconsistent with People v. Caudillo, supra, 21 Cal.3d 562. Perhaps in response to the frustration of not having an articulable standard for the meaning of **"substantial distance,"** we note that other Court of Appeal opinions have also reviewed the sufficiency of the evidence for simple kidnapping on similarly inconsistent bases. In People v. Daly (1992) 8 Cal.App.4th 47, the victim was moved "approximately 40 feet across a parking structure in [defendant's] unsuccessful effort to get her into his van." (Id. at p. 57.) The Court of Appeal noted that "The entire movement was within the parking structure and we cannot say on this record the risk of harm to the victim was increased by the movement of this short distance." (Ibid., italics added.) The court concluded that the evidence of asportation was insufficient to support a simple kidnapping conviction. (Id. at pp. 56-57.)

[People v. Harris (1994) 9 Cal.4th 407, page 418]

We could not determine from the record whether the jury had based its verdict on either of the "legally insufficient segments of [People v. Harris (1994) 9 Cal.4th 407, page 419][the victim's] asportation." (Green, supra, 27 Cal.3d at p. 67, italics added.) **The jury instruction the court had given regarding the definition of asportation for kidnapping advised the jury only that the asportation of the victim had to be " 'for a substantial distance, that is, a distance more than slight or trivial.' "** (Green, supra, 27 Cal.3d at p. 68, quoting People v. Stanworth (1974) 11 Cal.3d 588, 601.)

[People v. Simon (1995) 9 Cal.4th 493, page 519]

FOOTNOTE 17. In United States v. Freed, supra, 401 U.S. 601, the court upheld conviction under a regulatory statute which did not require scienter and did carry a **substantial** term of imprisonment (10 years). The law regulated transfer, registration, and taxation of "firearms" which the law defined to include destructive devices and hand grenades. The defendant possessed the latter in violation of the law. The court reversed a district court order dismissing the indictment for failure to allege scienter, holding that the law was "a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." (401 U.S. at p. 609 [28 L.Ed.2d at p. 362], fn. omitted.)

[People v. Leahy (1994) 8 Cal.4th 587, page 609]
But the conclusions of those decisions and studies are by no means unchallenged, for there appears to exist **substantial** opposing authority. (See Witte, supra, 836 P.2d at pp. 1119-1121, citing numerous articles and studies; Cissne, supra, 865 P.2d at p. 568, and fn. 5.)

[College Hospital, Inc. v. Superior Court (1994) 8 Cal.4th 704, page 715]
A superficial reading of the statute might support this view. Section 425.13(a) speaks in terms of "a **substantial** probability" that the punitive damages claim "will prevail" under Civil Code section 3294. The noun "probability" commonly suggests a relative likelihood that a particular outcome will occur. By referring to whether the claim "will prevail," the statute might be read to require an assessment of the plaintiff's chances of recovering punitive damages at trial. Further narrowing of the class of permissible claims might be inferred from use of the adjective "**substantial**" to qualify "probability."
Read in context, however, the statutory language hardly compels this unusual interpretation. Section 425.13(a) does not expressly instruct the trial court to "weigh" evidence or make an "independent" assessment of its relative strength. The "affidavit" format described by the statute is a truncated one, reminiscent of summary judgment procedure. It is not well suited to predicting how the jury would react to a full-blown case at trial.
The phrase "**substantial** probability," standing alone, is particularly ambiguous. These and similar words are widely used in California law under circumstances which indicate that their meaning depends entirely upon the particular context.
(4) For example, trial error is usually deemed harmless in California unless there is a "reasonabl[e] probab[ility]" that it affected the verdict. (People v. Watson (1956) 46 Cal.2d 818, 836.) We have made clear that a "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. (Id., at p. 837; cf. Strickland v. Washington (1984) 466 U.S. 668, 693-694, 697, 698 [80 L.Ed.2d 674, 697-700, 104 S.Ct. 2052] ["reasonable probability" does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome"].) (5) **By the same token, a judgment will not be disturbed for lack of evidence if the evidence in support of the judgment is "substantial," that is, enough to allow a reasonable jury to have reached the challenged result.** (Crawford v. Southern Pacific Co. (1935) 3 Cal.2d 427, 429.)

[In re Pedro T. (1994) 8 Cal.4th 1041, page 1054]
FOOTNOTE 3. The rule of Estrada has not been limited to cases involving a mitigation of punishment but has been invoked in a wide variety of circumstances ranging from complete or **substantial** decriminalization of conduct (see, e.g., People v. Collins (1978) 21 Cal.3d 208, 212-213.)

[Weil v. Federal Kemper Life Assurance Co. (1994) 7 Cal.4th 125, page 150]
This evidence, considered with proof that a substantial amount of cocaine was present in Mr. Weil's system, that a sample (presumably taken from the blue dish) tested positive for cocaine, and that there was no external or internal trauma to the body (except those consistent with an overdose of cocaine), precludes any conclusive finding that Mr. Weil's death resulted solely from external means or from any agency other than his own voluntary and intentional ingestion of a

**substantial quantity** of cocaine. Accordingly, plaintiffs are not entitled to summary judgment on the theory that death occurred by "accidental means."

[People v. Whitfield (1994) 7 Cal.4th 437, page 468]
[B]ecause the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise **substantial deference** to legislative judgments in this area... ." (505 U.S. at p. _____ [120 L.Ed.2d at p. 363].)

[Lundquist v. Reusser (1994) 7 Cal.4th 1193, page 1203]
For purposes of the law of defamation, "publication" does not require dissemination to a **substantial number** of individuals; it suffices that the defamatory matter " 'is communicated to a single individual other than the one defamed.' " (Brown, supra, 48 Cal.3d at 723, fn. 6, quoting Rest.2d Torts, § 577, com. b, p. 202; Cunningham v. Simpson (1969) 1 Cal.3d 301, 306-307; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 476, p. 561.)

[Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965, page 1004]
(13) Of course, even though the heightened threshold is not applicable in intentional infliction actions, it must nevertheless be established that the plaintiff's fear of cancer is reasonable, that is, that the fear is based upon medically or scientifically corroborated knowledge that the defendant's conduct has significantly increased the plaintiff's risk of cancer and that the plaintiff's actual risk of the threatened cancer is significant. Reasonableness of the fear is required because in intentional infliction actions, recovery is allowed only for "severe or extreme emotional distress." (Christensen, supra, 54 Cal.3d at p. 903.) Severe emotional distress means " 'emotional distress of such **substantial quality** or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " (Girard v. Ball (1981) 125 Cal.App.3d 772, 787-788, citing Fletcher v. Western Life Ins. Co. (1970) 10 Cal.App.3d 376, 397; see Rest.2d Torts, § 46, com. j, p. 78 ["distress must be reasonable and justified under the circumstances"].)

[Laurel Heights Improvement Assn. v. Regents of University of California (1993) 6 Cal.4th 1112, page 1123]
With certain limited exceptions, a public agency must prepare an EIR whenever **substantial evidence** supports a fair argument that a proposed project "may have a significant effect on the environment." (§§ 21100, 21151, 21080, 21082.2 [fair argument standard]; Guidelines, §§ 15002, subd. (f)(1), (2), 15063; No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 75 [fair argument standard of review].) " 'Significant effect on the environment' means a substantial, or potentially **substantial**, adverse change in the environment." (§ 21068; see also Guidelines, § 15382.)
FOOTNOTE 9. Guidelines section 15382 reads in full: " 'Significant effect on the environment' means a **substantial, or potentially substantial**, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historical or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change

related to a physical change may be considered in determining whether the physical change is significant."

[People v. Noguera (1992) 4 Cal.4th 599, page 634]
(14)  Fixing on the dual character of the motive alleged by the prosecution for Jovita's murder—eliminating the chief obstacle to the relationship between defendant and Dominique and acquiring the principal assets of her [People v. Noguera (1992) 4 Cal.4th 599, page 635]estate—defendant argues that the failure of the standard CALJIC instruction to require the jury to find that the financial gain motive was (variously) a **"dominant," "substantial," or "significant" motive** for the murder violated the federal Eighth Amendment requirement that capital offenses be narrowly defined to encompass the limited class of crimes that morally justify imposition of the death penalty.  (See, e.g., McCleskey v. Kemp (1987) 481 U.S. 279, 305 [95 L.Ed.2d 262, 286, 107 S.Ct. 1756].)

[Brown v. Poway Unified School Dist. (1993) 4 Cal.4th 820, page 831]
FOOTNOTE 4. " 'Dangerous condition' means a condition of property that creates a **substantial (as distinguished from a minor, trivial or insignificant) risk of injury** when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."  (§ 830, subd. (a)**.**)

[People v. Ceja (1993) 4 Cal.4th 1134, page 1148, Mosk. J., dissenting]
At the prosecution's request, the trial court instructed the jury on first degree murder "perpetrated by means of ... willful, deliberate, and premeditated killing." (Pen. Code, § 189.)  I shall assume for argument's sake that the evidence on this theory was **substantial**.
Also at the prosecution's request, but over defendant's objection, the trial court instructed the jury on first degree murder "perpetrated by means of ... lying in wait." (Pen. Code, § 189.)  On this theory, however, the evidence was not substantial.  Individually, the elements require waiting, watching, and concealment.

[People v. Diaz (1992) 3 Cal.4th 495, page 534]
The significance of the lidocaine concentrations found in the patients' tissues was hotly contested at trial.  This dispute, however, was properly one for the trier of fact, not the reviewing court, to resolve.  (9a)  As a reviewing court, our role is limited to determining whether there is substantial evidence to support the decision of the trier of fact.  **Substantial evidence is defined as "evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."**  (People v. Johnson (1980) 26 Cal.3d 557, 578.)

[People v. Escobar (1992) 3 Cal.4th 740, page 745]
1. The Meaning of Great Bodily Injury
The question we address is whether the evidence as set forth above is sufficient to sustain the jury's finding that defendant inflicted "great bodily injury" within the meaning of section 12022.7.  In resolving this question, we do not write on a clean slate.  The Legislature has specifically defined the term "great bodily injury," and case law—particularly this court's decision in People v.

Caudillo, supra, 21 Cal.3d 562—has superimposed **substantial** judicially created baggage on that definition. Our analysis begins, therefore, with a review of the pertinent authorities.

[People v. Escobar (1992) 3 Cal.4th 740, page 746]

"[T]he Legislature indicated an intent that rape by force or violence was not synonymous with rape by means of great and immediate bodily harm." (21 Cal.3d at p. 583, original italics.) Thus, although the victim in Caudillo, supra, was raped, sodomized and forced to orally copulate the defendant, the court concluded that the resulting physical effects—gagging, vomiting, defecation and superficial cuts—did not constitute **"substantial or significant injury** 'in addition to that which must be present in every case of rape.' " (Id. at p. 585, quoting from People v. Richardson (1972) 23 Cal.App.3d 403, 412.)

To this point, the court's reasoning was unremarkable. That the Legislature had intended a **substantial injury beyond that inherent in the offense** [People v. Escobar (1992) 3 Cal.4th 740, page 747]itself was fairly apparent, and several Court of Appeal decisions, notably People v. Richardson, supra, 23 Cal.App.3d 403, and People v. Wells (1971) 14 Cal.App.3d 348, had so held. However, the Caudillo court went on to observe that the Legislature had recently enacted section 12022.7, which "supplant[ed] the specific great-bodily-injury provisions of Penal Code sections 213, 264, and 461 with their [separate] great-bodily-injury enhancement provisions, and [was] made applicable to all felonies which do not necessarily involve such injury." (21 Cal.3d at pp. 580-581.) It was here, in construing section 12022.7 for whatever light it might shed on section 461, that the court encountered difficulty.

The analysis began by noting, correctly, that the original version of section 12022.7 "spelled out in some detail" the level of injury necessary to trigger the three-year enhancement: " 'As used in this section, "great bodily injury" means a serious impairment of physical condition, which includes any of the following: [¶] (a) Prolonged loss of consciousness. [¶] (b) Severe concussion. [¶] (c) Protracted loss of any bodily member or organ. [¶] (d) Protracted impairment of function of any bodily member or organ or bone. [¶] (e) A wound or wounds requiring extensive suturing. [¶] (f) Serious disfigurement. [¶] (g) Severe physical pain inflicted by torture.' " (People v. Caudillo, supra, 21 Cal.3d at p. 581; Stats. 1976, ch. 1139, § 306, pp. 5162-5163.)

This version of the statute, however, never became law. The effective date of the Determinate Sentencing Act was July 1, 1977. Prior to that date, urgency legislation was introduced to make changes in the act. Among these changes were a number of significant alterations to the definition of great bodily injury in section 12022.7. On April 12, 1977, the amending legislation was itself amended in the Assembly by deleting the detailed enumeration of injuries which defined great bodily injury. (Assem. Amend. to Assem. Bill No. 476 (1977-1978 Reg. Sess.) Apr. 12, 1977.) One week later, the bill was further amended in the Assembly by changing the remaining definition of "great bodily injury" from a **"serious impairment of physical condition" to "a significant or substantial physical injury**." (Assem. Amend. to Assem. Bill No. 476 (1977-1978 Reg. Sess.) Apr. 19, 1977.) This was the version ultimately enacted into law. (Stats. 1977, ch. 165, § 94, p. 679.)

...

The test for great bodily injury articulated in Caudillo, supra, 21 Cal.3d 562, also proved to be dispositive in the case at bar. Here, however, it persuaded the Court of Appeal to reverse the jury's finding of great bodily injury. While acknowledging that Maria "suffered injuries not

routinely associated with rape," the Court of Appeal nevertheless concluded that her bruises, scrapes, stiff neck and sore vagina constituted only "transitory bodily distress." "They do not amount," the court stated, "to the 'severe and protracted' type of harm which meets the definition of **'significant or substantial** physical injury' specified by the Legislature and defined in Caudillo."

We cannot fault the Court of Appeal for deferring to Caudillo, supra, 21 Cal.3d 562. As explained above, however, Caudillo erred in concluding that the Legislature intended no change in the definition of "great bodily injury" [People v. Escobar (1992) 3 Cal.4th 740, page 750]when it discarded the specific criteria set forth in the original version of section 12022.7 and substituted the more general "significant or substantial physical injury" test then in use. Clearly, the latter standard contains no specific requirement that the victim suffer "permanent," "prolonged" or "protracted" disfigurement, impairment, or loss of bodily function. Indeed, nothing in the statutory definition precludes a jury from finding great bodily injury based on precisely the quantum of evidence presented here: extensive bruises and abrasions over the victim's legs, knees and elbows, injury to her neck and soreness in her vaginal area of such severity that it significantly impaired her ability to walk. As the Court of Appeal correctly concluded, these are not the type of injuries "routinely associated with rape," but reflect a degree of brutality and violence substantially beyond that necessarily present in the offense.

[People v. Escobar (1992) 3 Cal.4th 740, page 754, concurring, Mosk.J.]
"Penal Code section 12022.7 was amended in 1977 to strike out the detailed definition of 'great bodily injury' and substitute the following definition: 'As used in this section, great bodily injury means a **significant or substantial physical injury.**' (Italics added.)
"Thus it may be seen that the Legislature, while changing its mind with respect to a detailed definition of 'great bodily injury' before that definition became effective, has now adopted a definition of 'great bodily injury' that requires that the injury constitute a 'significant or substantial physical injury,' the definition approved in [People v.] Wells [(1971) 14 Cal.App.3d 348] and [People v.] Richardson [(1972) 23 Cal.App.3d 403]." (People v. Caudillo, supra, 21 Cal.3d at pp. 580-581, citations and fn. omitted.).

[People v. Thomas (1992) 2 Cal.4th 489, page 545]
To be sufficient, evidence must of course be substantial. (See, e.g., People v. Morris (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843] [decided impliedly under the due process clauses of U.S. Const., Amend. XIV, and Cal. Const., art. I, § 15].) It is such only if it " 'reasonably inspires confidence and is of "solid value." ' " (People v. Morris, supra, at p. 19.) By definition, **"substantial evidence" requires evidence and not mere speculation.** In any given case, one "may speculate about any number of scenarios that may have occurred .... A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. ... A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence." (Id. at p. 21, italics in original, paragraph sign and internal quotation marks omitted.)
Further, the evidence must be capable of supporting a finding as to every fact required for conviction beyond a reasonable doubt. Any such doubt must, of course, be "reasonable"—but nothing more. **It plainly need not be "grave" or even "substantial."** (Cage v. Louisiana (1990) 498 U.S. 39, ___ [112 L.Ed.2d 339, 342, 111 S.Ct. 328, 329] [decided under the due

process clause of U.S. Const., Amend. XIV] (per curiam).)  What is required, in a word, is "near certainty" (People v. Hall (1964) 62 Cal.2d 104, 112 [decided under general principles of law]) or "evidentiary certainty" (Cage v. Louisiana, supra, at p. ___ [112 L.Ed.2d at p. 342, 111 S.Ct. at p. 330] (per curiam)).

A state-court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason.  (Jackson v. Virginia, supra, 443 U.S. at pp. 313-324 [61 L.Ed.2d at pp. 569-577].)  In my view, a California conviction without adequate support separately and independently offends, and falls under, the due process clause of article I, section 15.

[People v. Krantz (1998) 67 Cal.App.4th 13, page 24]

An entrapment defense is not inconsistent with appellant's theory offered at the trial that he did not believe he was doing anything illegal. It would not have subverted his defense theory to also argue that the law enforcement conduct directed at him constituted entrapment. (People v. Barraza, supra, 23 Cal.3d at pp. 690-691.) (4) A defendant need not admit his guilt in order to raise the issue of entrapment. (Id., at p. 691.)

(1d) Nevertheless, did appellant's testimony constitute **substantial evidence** of an entrapment theory? No.

(5) **"Substantial evidence," in the context of determining whether certain evidence warranted a requested instruction, is defined as evidence which was sufficient to deserve consideration by the jury, that is, evidence from which a reasonable jury could have concluded that the particular facts underlying the instruction did exist.** (People v. Lemus (1988) 203 Cal.App.3d 470, 477.) Defendant's testimony alone may constitute substantial evidence to warrant a requested instruction. (Ibid.; People v. Sullivan (1989) 215 Cal.App.3d 1446, 1450.)

1 JAN SCULLY

2 DISTRICT ATTORNEY Case 2:07-cr-00582-GEB-GGH   Document 1   Filed 03/26/07   Page 106 of 121

3 901 G STREET                                    TEAM 1TU (SACA)

4 SACRAMENTO, CALIFORNIA 95814

5 Phone: (916) 874-6637          *Jane 26 - 63 - retard /Lwyer /e/re*

6                                      Xref: 3403369

7                                      VL#

8

9           **SACRAMENTO SUPERIOR AND MUNICIPAL COURT DISTRICT**

10

11              **COUNTY OF SACRAMENTO, STATE OF CALIFORNIA**           *Trial scheduled fo*

12                                                                       *Aug. 10*

13 THE PEOPLE OF THE STATE OF CALIFORNIA,)   AMENDED COMPLAINT

14                  vs.                   )   NO. 98F02647

15 SCOTT BENSON PATRICK                   )

16                                        )

17                  Defendant.            )

18 _____)       *63  Jury 7 - PNC*

19 The People of the State of California upon oath of the undersigned

20 complain against the defendant above named for the crime of <u>violation of</u>

21 <u>Section 288(b) of the Penal Code</u>, a felony, committed as follows:  That

22 on or about and between the 1st day of August, 1993, and the 31st day of

23 January, 1998, at and in the County of Sacramento, State of California,

24 the defendant, SCOTT BENSON PATRICK, then and there before the filing of

25 this complaint, did willfully, unlawfully, and lewdly commit a lewd and

26 lascivious act upon and with the body and certain parts and members

27 thereof of SAVANNAH P., a child under the age of fourteen years, with

28 the intent of arousing, appealing to, and gratifying the lust, passions,

29 and sexual desires of the said defendant and the said child, by use of

30 force, violence, duress, menace, and threat of great bodily harm.

31

32 It is further alleged that the above offense is a serious felony within

33 the meaning of Penal Code Section 1192.7(c)(6).

34

35 It is further alleged that in the commission of the above offense(s),

36 said defendant, SCOTT BENSON PATRICK, engaged in substantial sexual

37 conduct, said victim being a child under the age of fourteen years,

38 within the meaning of Penal Code Section 1203.066(a)(8).

39

40

41 A9803251.020                    (1)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,** ) | Court of Appeal |
| ) | No. C032053 |
| Plaintiff and Respondent, ) | |
| ) | |
| v. ) | Superior Court |
| ) | No. 98F02647 |
| **SCOTT PATRICK,** ) | (Sacramento County) |
| ) | |
| Defendant and Appellant, ) | |
| ) | |

APPEAL FROM THE SUPERIOR COURT OF SACRAMENTO COUNTY

Honorable James T. Ford, Judge

### APPELLANT'S OPENING BRIEF

Steven Schorr
Attorney and Counselor

P.O. Box 910496
San Diego, California 92191-0496
(619) 695-3831
State Bar No. 126312

By appointment of Court of Appeal
under Central California Appellate
Program independent-case system

Attorney for Defendant and
Appellant Scott Patrick

VI. THE AGGREGATE, CONSECUTIVE SENTENCE WHICH APPELLANT
MUST SERVE BY OPERATION OF THE PROVISIONS OF SECTION
667.6(d) VIOLATES THE CONSTITUTIONAL BAN ON CRUEL
AND UNUSUAL PUNISHMENT                                        69

CONCLUSION                                                       74

Case 2:07-cv-00582-GEB-GGH    Document 1    Filed 03/26/07    Page 109 of 121

ROBERT L. LISTON
CLERK/ADMINISTRATOR

DEENA C. FAWCETT
ASSISTANT CLERK/ADMINISTRATOR

DEPUTIES:

NORMAN H. HAREBOTTLE    GAYLE KELLY
DARLENE A. WARNOCK      LINDA L. WEBB
D. BRUCE KORDENBROCK    CLAUDIA PALMER
ANITA L. KENNER         GRACE M. EMERO
SANDY LOREE             JUNE N. HARRIS
LINDA M. SMITH          KAREN L. RODRIGUEZ

**OFFICE OF THE CLERK**

𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑

**THIRD APPELLATE DISTRICT**

STATE OF CALIFORNIA

LIBRARY AND COURTS ANNEX
900 N STREET, ROOM 400
SACRAMENTO, CA 95814-4869
(916) 654-0209

May 5, 1999

Scott Benson Patrick
05/10/68
Deuel Vocational Institution
P.O. Box 600
Tracy, CA 95376

   Re: The People v. Patrick
     C032053
     Sacramento County
     No. 98F02647

Dear Mr. Patrick:

   The record on appeal has been filed this day and assigned the above number. Your appellant's opening brief is to be served and filed on or before June 14, 1999.

   A request for extension of time for the filing of a brief may be denied if it is not supported by a detailed, factual showing of unusual circumstances. The enclosed request for extension of time is provided for your use if it is impossible to file your brief within the time provided in this letter.

   Please inform the court and your appointed counsel of any change of address. Failure to do so may result in dismissal of your appeal.

       Very truly yours,

       ROBERT L. LISTON
       Clerk/Administrator

       By:
       Deputy Clerk

cc: See Mailing List

Court of Appeal, Third Appellate District - No. C032053
**S087998**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Respondent,

v.

SCOTT PATRICK, Appellant.

**SUPREME COURT
FILED**

**JUL 1 2 2000**

**Frederick K. Ohlrich Clerk**

**DEPUTY**

Petition for review DENIED.

**GEORGE**

Chief Justice



COPY

1
2
3
4
5
6
7
8

9                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                         **COUNTY OF SACRAMENTO**
10

11   **In re**                      **No. 05F07685   Dept. 41**

12
   **SCOTT PATRICK,**            **ORDER GRANTING RECONSIDERATION ON**
13                           **ONE ISSUE, ISSUING ORDER TO SHOW**
                              **CAUSE ON THAT ISSUE, AND ORDERING**
14                           **RETURN AND TRAVERSE**

   **On Habeas Corpus.**
15   _____/

16

17   **TO:**   WARDEN CHARLES HARRISON, CALIFORNIA STATE PRISON AT LOS
             ANGELES COUNTY (CSP-LAC), AT LANCASTER, CALIFORNIA,
18        BILL LOCKYER, THE ATTORNEY GENERAL OF THE STATE OF
             CALIFORNIA, and
19        SCOTT PATRICK, PETITIONER

20

21       Petitioner filed the instant habeas corpus petition on

22   August 23, 2005, seeking the following relief:  (1) return of

23   moneys to him from his previous habeas corpus counsel, Mr.

24   Richard Dangler, that had been paid to that counsel for the

25   previous habeas corpus services, and (2) leave to file a new

habeas corpus petition in this court that would not be subject

to the procedural bar of In re Robbins (1998) 18 Cal.4th 770,

811-812, 812 fn. 32 and In re Clark (1993) 5 Cal.4th 750, 774-

775, for being a successive and untimely petition, due to an

alleged mishandling of his previous habeas petition by Mr.

Dangler and in light of the Third District Court of Appeal

decision in In re White (2004) 121 Cal.App.4th 1453.

This court denied both claims on October 7, 2005.

Petitioner now files a motion for reconsideration.

The court hereby GRANTS RECONSIDERATION on the second

issue, of whether petitioner should be given leave to now file a

new petition for writ of habeas corpus that would not be subject

to the procedural bars of Robbins/Clark for being successive and

untimely.   The court DENIES RECONSIDERATION on the first issue,

regarding the return of moneys from Mr. Dangler, a matter that

remains noncognizable on habeas corpus as specified in the

court's denial order of October 7, 2005.

Therefore, good cause appearing on petitioner's second

claim, that petitioner should be given leave to now file a

new petition for writ of habeas corpus that would not be subject

to the procedural bars of Robbins/Clark for being successive and

untimely,

IT IS HEREBY ORDERED that respondents show cause before

this Court why the second issue, specified above, in the writ of

habeas corpus prayed for in the accompanying petition, should not issue.  Respondents, or any of them, shall file a return to the accompanying petition on or before 30 days from the issuance of this order.  Petitioner shall file a traverse to such return within 30 days after its service upon petitioner.

Petitioner may request appointment of counsel to represent him on this single claim.  If the court receives such a request, counsel will be appointed pursuant to Cal. Rules of Ct., Rule 4.551(c)(2)).  If counsel is appointed before the time period expires for filing the traverse, the traverse is to be filed by that counsel, on petitioner's behalf.

After the filing of the traverse or after expiration of the time in which to do so, the Court will rule on the matter or, if necessary, will set a date for hearing.

DATED: 3/8/06

JUDGE OF THE SUPERIOR COURT

GARY S. MULLEN

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO

**In re**                                    **Case Number: 05F07685**

**SCOTT BENSON PATRICK**

**On Habeas Corpus**

## CERTIFICATE OF SERVICE BY MAILING
### (C.C.P. Sec. 1013a(3))

I, the Clerk of the Superior Court of California, County of Sacramento, certify that I am not a party to this cause, and on the date shown below I served the foregoing ORDER GRANTING RECONSIDERATION ON ONE ISSUE, ISSUING ORDER TO SHOW CAUSE ON THAT ISSUE, AND ORDERING RETURN AND TRAVERSE by depositing true copies thereof, enclosed in separate, sealed envelopes with the postage fully prepaid, in the United States Mail at Sacramento, California, each of which envelopes was addressed respectively to the persons and addresses shown below:

PATRICK SCOTT
CSP-LANCASTER
PO BOX 4430
LANCASTER, CA 93539
CDC# P-31664

WARDEN CHARLES HARRISON
CSP-LOS ANGELES COUNTY
44750 – 60TH STREET, WEST
LANCASTER, CA 93536-7620

OFFICE OF THE DISTRICT ATTORNEY
901 G STREET
SACRAMENTO, CA 95814

ATTORNEY GENERAL'S OFFICE
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

I, the undersigned Deputy Clerk, declare under penalty of perjury that the foregoing is true and correct.

Dated: March 28, 2006

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

By:   J. Zgraggen,
        Deputy Clerk

| | | | | |
|---|---|---|---|---|
| **DATE & TIME:** | OCOTBER 7, 2005 | **DEPT. NO.:** | 41 | |
| **JUDGE** : | GARY S. MULLEN | **CLERK** : | J. COTTER | |
| **REPORTER** : | NCR | **BAILIFF** : | J. PRATCHEN | |

**IN RE: SCOTT PATRICK**                    **05F07685**

*Order Denying Motion*

NATURE OF PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS - **ORDER**

The petition for writ of habeas corpus has been filed and considered.

IT IS ORDERED that the petition for writ of habeas corpus is DENIED.

Petitioner, incarcerated at CSP-LAC at Lancaster, California, for a conviction from Sacramento County Superior Court Case No. 98F02647, seeks habeas corpus relief to allow him to late-file another habeas corpus petition to challenge that judgment and to order a refund of moneys to him from his attorney on his first habeas petition. ·

Petitioner appealed the judgment in Case No. 98F02647 to the Third District Court of Appeal, which affirmed the judgment in an opinion dated March 28, 2000. The remittitur issued on July 17, 2000, rendering the judgment final.

Petitioner then filed a first habeas corpus petition on July 6, 2001, just days before one year passed since the judgment had become final. The petition was drafted by counsel representing petitioner, Richard Dangler.

The petition was treated as being timely. Nevertheless, all of the claims were frivolous, and the petition was denied on August 21, 2001, with the following language in the last paragraph of the denial order:

"Petitioner's claims are all **completely baseless**. Many are procedurally barred, as noted above. Nor does petitioner attempt to attach any reasonably available documentation to support his generalized, conclusory claims that require such documentation. This is **inexcusable** when a habeas petitioner is being represented by an attorney licensed to practice law in this State, as is this petitioner."

Petitioner did not thereafter file any habeas corpus petition in the Third District Court of Appeal or in the California Supreme Court, which would have been the proper method for review of his claims upon the denial

| | | |
|---|---|---|
| **BOOK** : | 41 | |
| **PAGE** : | | **SACRAMENTO COURTS** |
| **DATE** : | 10/07/05 | |
| **CASE NO.** : | 05F07685 | |
| **CASE TITLE:** | In re Scott Patrick | |
| **DISTRIB.** : | Petn'r, DA, JIMS | **BY** _____ **Deputy** |

TITLE:__SCOTT PATRICK

NATURE OF PROCEEDINGS:____HABEAS CORPUS

Petitioner has had two years in which to attempt to recover the copy of transcripts of his case from his former attorneys. Petitioner fails to detail any specific attempts that have been made or when those attempts began.

Nor has petitioner made any attempt to obtain another free copy of trial transcript in the entire year that the instant matter has been pending before this court. That is not due diligence.

It is obvious to the court that petitioner had never drafted a new habeas petition, at the time he filed the instant habeas petition over one year ago. It is obvious to the court that petitioner had never even attempted to begin to draft the new petition, until the court issued its order on August 22, 2006, requiring petitioner to lodge a new petition with the court.

As a general matter, an indigent defendant is constitutionally entitled to a free transcript of a prior criminal case only when the transcript is needed for an effective defense or appeal (Britt v. North Carolina (1971) 404 U.S. 226, 227), or when the transcript is needed for a habeas corpus action to challenge a conviction when a specific need is affirmatively shown (Miller v. Hamm (1970) 9 Cal.App.3d 860, 871; McGarry v. Fogliani (9th Cir. 1966) 370 F.2d 42, 44). No such need for the transcripts is shown in this case, when petitioner does not detail what claims he seeks to raise in his new habeas petition and how the transcripts would support those claims, or that the claims would not be subject to other procedural bars.

It is obvious to the court that petitioner has not acted with due diligence on this matter, in failing to have drafted his new petition and filed it together with the instant habeas petition over one year ago, and in failing to earlier seek another free copy of the transcripts upon a showing of due diligence in attempting to retrieve his already-received free copy from Mr. Dangler and Mr. Rector.

```
BOOK      :  9
PAGE      :                          SACRAMENTO COURTS
DATE      :  10/25/06
CASE NO.  :  05F07685
CASE TITLE:  Scott Patrick                    J. COTTER
DISTRIB.  :  Petn'r & atty, AG, DA        BY_____Deputy
```

As such,

IT IS HEREBY ORDERED that the motion for free transcripts from Case No. 98F02647 is DENIED.

IT IS FURTHER ORDERED the order to show cause is DISCHARGED as having been IMPROVIDENTLY GRANTED, and that the petition for writ of habeas corpus is DENIED.

DATED: /0/26/06

_____

GARY S. MULLEN

| BOOK        | : | 9                        |
| PAGE        | : |                          |
| DATE        | : | 10/25/06                 |
| CASE NO.    | : | 05F07685                 |
| CASE TITLE: |   | Scott Patrick            |
| DISTRIB.    | : | Petn'r & atty, AG, DA    |

SACRAMENTO COURTS

J. CUTTER

BY_____Deputy

TITLE:   SCOTT PATRICK

NATURE OF PROCEEDINGS:   HABEAS CORPUS

Petitioner claims that as was ordered in White, he too should be entitled to a court order that Dangler refund $6500 to his brother Mark Patrick, which is the amount of money he claims that petitioner's brother paid Dangler to retain him to file the habeas petitions necessary. Petitioner also claims that he, also, should be allowed to file a new writ of habeas corpus in the superior court, without counting of any of the time that passed between the date he retained Dangler and the date upon which White became final, toward any delay in filing a new habeas petition in superior court.   Petitioner also seeks reasonable time to seek and retain new counsel, so as to protect his right to timely file a federal habeas corpus petition should he be unsuccessful in any new attempt at state habeas corpus relief.

Petitioner attaches documentation that supports his factual assertions regarding the representation by Dangler and Rector.

Petitioner, however, is not entitled to the relief he seeks, at least in the forum of the instant habeas corpus petition.

First of all, the procedural posture is different from that in the White case.   In White, the Third District Court of Appeal was able to impose monetary sanctions and direct refunds of moneys paid to Dangler by the inmates whose petitions were at issue, because Dangler had actually filed habeas petitions with the Third District and it was those very habeas petitions that were pending before the Third District that were ruled on by the court in the opinion.   The Third District relied upon Cal. Rules of Ct., Rule 27(e), in imposing the monetary sanctions and directions.

Rule 27(e), however, applies only to appellate courts.   It does not apply to the superior court.   Nor is the actual habeas petition that Dangler filed on behalf of petitioner still pending before this court. Rather, it was denied in 2001.

Petitioner cites no authority that would allow this court, at this time, to impose any type of monetary sanction on Mr. Dangler, or to direct Mr. Dangler to return moneys to petitioner that petitioner had paid for habeas corpus services.   Indeed, monetary relief is not an available remedy on habeas corpus at all (see Younan v. Castro (1996) 51 Cal.App.4th 401,

| BOOK | : | 41 | | | |
|------|---|-----|---|---|---|
| PAGE | : | | SACRAMENTO COURTS | | |
| DATE | : | 10/07/05 | | | |
| CASE NO. | : | 05F07685 | | | |
| CASE TITLE: | | In re Scott Patrick | | | |
| DISTRIB. | : | | BY | J. COTTER | Deputy |

TITLE:  SCOTT PATRICK

NATURE OF PROCEEDINGS:  HABEAS CORPUS

sanctions should be imposed sparingly, in only the most
egregious case, so as not to discourage use of the Great
Writ.

"These are such egregious cases.  Consequently, we will
sanction the attorney, Richard H. Dangler, Jr., by ordering
him (1) to return to the clients who retained him the amount
of money he received to file petitions for writs of habeas
corpus in state courts on behalf of the three inmates, and
(2) to pay monetary sanctions to this court to compensate it
in part for the cost of processing, reviewing, and deciding
the writ petitions and the orders that we issued directing
Dangler to show cause why sanctions should not be imposed."

The Third District found that the three habeas petitions at issue in
White were indisputably meritless, and provided in its order for an
exception to the timeliness bar for the time period in which each
petitioner had been represented by Dangler, so as to allow each the
opportunity to file what would then be deemed a timely habeas petition:

"Having found that the petitions for writs of habeas corpus
in In re White, C045684, In re Pena, C046271, and In re
Harris-Anderson, C046677, fail to state a prima facie case
for relief, we deny them without prejudice.  We further
order that each petitioner may file a new petition for writ
of habeas corpus in the superior court, and that the period
of time between the date the petitioner retained Dangler and
the date upon which this decision becomes final will not be
counted against the petitioner with respect to the delay in
filing a new habeas corpus petition in the superior court."

On August 8, 2005, more than 10 months after the White case had become
final and nearly 11 months after the opinion in White had first issued,
petitioner signed the instant habeas corpus petition.  It was formally
filed on August 23, 2005, but is deemed submitted to prison authorities as
of August 8, 2005.

BOOK       :  41
PAGE       :                         SACRAMENTO COURTS
DATE       :  10/07/05
CASE NO.   :  05F07685
CASE TITLE:  In re Scott Patrick          J. COTTER
DISTRIB.   :               BY_____Deputy

TITLE:  SCOTT PATRICK

NATURE OF PROCEEDINGS:  HABEAS CORPUS

CONTINUATION PAGE OF _4 of 7__|

In the current habeas petition, petitioner does not challenge the judgment in Sacramento County Superior Court Case No. 98F02647. Rather, he seeks an order from the court that would allow him to late-file a second habeas corpus petition to challenge that judgment, based on the White decision.  He also seeks an order for a refund of moneys, as further discussed below.

As noted above, on petitioner's first habeas petition (Case No. 01F05313) to challenge the judgment in Sacramento County Superior Court Case No. 98F02647, petitioner was represented by Richard Dangler, the same attorney who was at issue in the White case.

Petitioner claims that on May 18, 2001, his brother retained Richard Dangler on petitioner's behalf, to prepare and file a habeas corpus petition in the Sacramento County Superior Court, and up through to the California Supreme Court if that became necessary.  He claims that Dangler filed a petition in this court on July 6, 2001, that had many deficiencies and that was openly criticized by this court in its denial opinion. Petitioner claims that Dangler then assured him that that had only been a preliminary writ filed to stop the tolling of the clock for a federal habeas petition, and that Dangler was preparing a more comprehensive writ to file in the court of appeal.  Petitioner claims that despite many letters and phone calls, Dangler and his associates did not file any subsequent writ, although Dangler continued to assure petitioner that Dangler was working on the writ and that time constraints were not an issue.

Petitioner further claims that in June 2004, he received a letter from Dangler, announcing Dangler's retirement and intention to turn over his law practice to his partner, C. Roman Rector, who would take over petitioner's case pending petitioner's approval.  Petitioner claims he agreed to this, but that Rector wrote him a letter on September 14, 2004, stating his intention to drop petitioner's case.  Petitioner claims that he wrote Rector back protesting that.  Nevertheless, petitioner claims, neither Dangler nor Rector ever filed any legitimate and meritorious writ in the superior court or on up to the California Supreme Court, nor has the money been refunded to petitioner that was used to originally retain Dangler.

| | | | |
|---|---|---|---|
| BOOK | : | 41 | |
| PAGE | : | | SACRAMENTO COURTS |
| DATE | : | 10/07/05 | |
| CASE NO. | : | 05F07685 | |
| CASE TITLE: | In re Scott Patrick | | |
| DISTRIB. | : | BY | J. COFFIN        Deputy |

1

## PROOF OF SERVICE BY MAIL

2

### (CCP §§1013(a), 2015.5; 28 U.S.C. §1746)

3

4    I, ___Scott Patrick___, hereby declare that I am over the age of 18, I am the

5    petitioner in the above-entitled cause of action, and my legal mailing address CSP/LAC – A__ -

6    233__ , P.O. BOX 8457, Lancaster, CA 93539-8457.

7    On __3/21/07_____, I delegated to prison officials the task of mailing, via the

8    institution's internal mail system (*Houston v. Lack*, 487 US 266 [101 L.Ed.2d 245; 108 S.Ct.

9    2379] (1988)), the below entitled legal document(s):   habeas corpus

10

11

12

13

14

15    by placing said documents in a properly addressed and sealed envelope, with postage fully pre-

16    paid, in the United States Mail, deposited in the manner provided by CSP/LAC, and addressed

17    as follows:

18    United States District Court
      Eastern District of california
      501 I Street #4-200

19    Sacramento, CA 95814

20

21

22

23    I further declare under penalty of perjury that the foregoing is true and correct to the best

24    of my knowledge. Executed this _31_ day of _March_____ 200_7_ at California State

25    Prison – Los Angeles County.

26

27

28    _Scott Patrick_
      Scott Patrick, Pro se