1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SCOTT PATRICK,                          No.  2:07-cv-0582 GEB GGH

12                  Petitioner,

13          v.                               FINDINGS AND RECOMMDNEATIONS

14   SUSAN HUBBARD, Warden,

15                  Respondent.

16

17          *Introduction and Summary*

18          Petitioner, Scott Patrick, was convicted of 50 counts of lewd acts on a child (his adopted

19   daughter) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily

20   injury (Cal Penal Code section 288, subd, (b)), and four counts of aggravated sexual assault of a

21   child (Cal. Penal Code section 269).  He was sentenced to a determinate term of 300 years on the

22   lewd acts charges as well as a consecutive term of 60 years to life on the sexual assault charges.

23          The petition in this case was filed on March 26, 2007.  However, the operative petition in

24   this case is the First Amended Petition filed June 23, 2008.[1]  The claims identified therein are:

25          1.      Ineffective Assistance of Counsel (failure to adequately prepare for trial including

26

27   ───────────────
     [1]  This case was only recently reassigned to the undersigned and Judge Burrell in 2014 as it had
     previously been assigned to a visiting judge since 2009.  See Order of September 5, 2014.
28

                                                1

failure to investigate potential witnesses; failure to develop a viable defense; failure to

properly contest the duress aspect of the prosecution; conceding petitioner's guilt to the

number of counts of sexual misconduct (54 in total); failure to call a critical witness (Det.

Bayles); failure to object to the supplemental instruction involving the word "substantial;"

failure to retain an expert "in an effort to provide a counter to the technical evidence of the

accident (sic) in the prosecution's case.")[2]

2.      Insufficient Evidence regarding force or duress for the lewd act charges as well as

the acts which constituted aggravated sexual assault.

3.      Petitioner's Right to be Present at Trial was violated.

4.      Erroneous Instruction (definition of the word "substantial" in a supplemental

instruction).

Previously, the undersigned issued an order declining to expand the record on the issue of

ineffective assistance of counsel with respect to the sub-claims of: failure to adequately prepare

for trial including failure to investigate potential witnesses, failure to develop a viable defense,

conceding petitioner's guilt to the number of counts of sexual misconduct (54).  In the motion to

expand the record, petitioner presented evidence by way of declaration.  Petitioner discussed

some of his meetings with trial counsel; declared that he refused to testify because his former

counsel believed this to be ill advised, and that he would have taken a plea offer of 35 years to life

if he had known about it.  Other declarations included those of his wife, Deborah (detailing that

with her work schedule and petitioner's residency training, very little time (if any) existed when

petitioner was alone with his adopted daughter/victim [hereafter "S"]); (also that petitioner

admitted acts of molestation of S to her); declaration of S's grandmother (recounting how S had

not told her about any molestations occurring and that S had stayed at her residence for 6 months

during the overall time period in which the molestations occurred); declaration of trial counsel

---

[2]  In highlighting the claims on page 4 of the First Amended Petition, petitioner sets forth the claim that counsel was ineffective because of trial counsel's "failure to retain an expert 'in an effort to provide a counter to the technical evidence of the accident (sic) in the prosecution's case.'"  Whatever this means, counsel did not define it at all in the fleshed out points and authorities, and the undersigned deems it a non-issue.

2

1  (detailing the "whys" of his trial strategy and some factual details about his meetings with

2  petitioner and attempts at a plea bargain).

3         The Motion to Expand the Record was filed in conjunction with the traverse in this case.

4  No request to expand the record was made with respect to those ineffective assistance sub-claims

5  not mentioned immediately above, nor was any request to expand made with respect to any other

6  of the issues in the case.  Thus, with the denial of the Motion, the undersigned finds that further

7  outside-the-record evidence may not be sought to be produced in this case, assuming any could be

8  produced.

9         For the reasons set forth below, the petition for habeas corpus, although raising serious

10  issues, should be denied.

11         *Factual Background*

12         Because in the AEDPA environment the decision(s) of the state court constitutes the

13  lynchpin of the analysis, that background is given here.

> Section 288, subdivisions (a) and (b), inter alia, make it a felony to commit a lewd act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury," upon the body of a child under the age of 14 with the intent of arousing sexual desires. Section 269 (aggravated sexual assault), in pertinent part, and in effect increases the penalty for such conduct when the lewd act is oral copulation or sexual intercourse and the victim is 10 or more years younger than the perpetrator.
>
> The charged offenses arise out of a hundred and more incidents in which the defendant committed lewd acts on his adopted daughter during the period between her eighth and twelfth birthdays.
>
> The defendant conceded at trial that the charged acts occurred but denied they were accomplished by force, violence, duress, menace, or fear of immediate or unlawful bodily injury.
>
> The prosecutrix gave the following general account of the defendant's depraved conduct.  When she was eight, a few months after she was adopted, the defendant, naked, began entering the shower with her and washing her hair when her adoptive mother was at work.  When they moved to a new house the defendant's conduct escalated to washing her entire body including her genitalia.  She was then nine or ten.  Eventually defendant had his daughter sit on his lap on a stool while he engaged in behavior such as kissing her body and inserting his fingers into her vagina.
>
> Sometimes she would try to escape, but he would prevent her from leaving the bathroom by locking the door and blocking with his

3

hands so that she could not unlock it and leave. Then he would take her hand and lead her back into the shower. Sometimes he would "corner" her before or after a shower, push her down on the bed, strip her and commit lewd acts, including oral copulation. On occasion she resisted by trying to choke him, she also pushed him and kicked him, to no avail, "[h]e would just continue on like nothing happened." When she tried to escape he would pull and sometimes drag her back to the bed. He sometimes ordered her to orally copulate him and would push her head down to his penis "so [she] couldn't get it back up." His digital violations of her vagina caused her "sharp pain." Defendant told her that if she disclosed these depredations it would not do her any good because she would lose her home.

When she was ten or eleven, the family moved again. The same conduct occurred in the new home. There was a hiatus when she was out of the home for six months, living in Montana with her grandparents. After she returned to the defendant's home his conduct escalated to a higher level, "doing more and more things." This included probably 50 occasions on which he required her to orally copulate him in the shower by putting his hands on her head and "hold[ing] it there so [she] couldn't really move it." The escalated behavior included coitus. This felt "sharp, and it was a very painful, kind of burning." She tried to fight him off on each of the 30 or so occasions when he engaged in coitus. Her struggles were usually ineffective, but she conceded that "every once in a while" she was able to frustrate him.

The defendant did not testify. His wife was called as a witness by the prosecution. She testified, inter alia, that after her daughter accused the defendant he conceded the sex acts occurred. She said when she confronted him with her daughter's assertions that she had resisted by hitting at him or trying to choke him he said: if she did that to him, that he would immediately stop and nothing else would happen."

People v. Scott Patrick, ECF No. 35, Resp't's Lod. Doc. 4 at 2-5.

*Issues*

The issues are encompassed within the petition, but certain issues will overlap in their discussion despite being separately put forth in different claims. For ease of analysis and reading, the undersigned assigns the issues in the following order:

1.  Whether the trial court erred in its supplemental instruction to the jury regarding "substantial force" (includes the claim of ineffective assistance of counsel for failure to object to the supplemental instruction);

2.  Insufficient evidence regarding force or duress for the lewd act charges as well as the acts which constituted aggravated sexual assault;

4

1    3.  Petitioner's right to be present at trial was violated;

2    4.  Miscellaneous ineffective assistance of counsel issues other than the failure to object to

3        the supplemental instruction.

4    *Discussion*

5        A.  AEDPA Standards

6        The AEDPA standards are well known, but will nevertheless be repeated here.

7    The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state

8    custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

9    Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

10   
11       An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

12   
13       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

14   
15       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16   

17       As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

18   2254(d) does not require a state court to give reasons before its decision can be deemed to have

19   been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).

20   Rather, "when a federal claim has been presented to a state court and the state court has denied

21   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

22   of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

23   v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when

24   it is unclear whether a decision appearing to rest on federal grounds was decided on another

25   basis).  "The presumption may be overcome when there is reason to think some other explanation

26   for the state court's decision is more likely."  Id. at 785.

27       The Supreme Court has set forth the operative standard for federal habeas review of state

28   court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

5

1    application of federal law is different from an *incorrect* application of federal law.'" <u>Harrington</u>,

2    supra, 131 S.Ct. at 785, citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).  "A

3    state court's determination that a claim lacks merit precludes federal habeas relief so long as

4    'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Id.</u> at 786,

5    citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

6        Accordingly, "a habeas court must determine what arguments or theories supported or . .

7    could have supported[] the state court's decision; and then it must ask whether it is possible

8    fairminded jurists could disagree that those arguments or theories are inconsistent with the

9    holding in a prior decision of this Court." <u>Id.</u>  "Evaluating whether a rule application was

10    unreasonable requires considering the rule's specificity.  The more general the rule, the more

11    leeway courts have in reaching outcomes in case-by-case determinations.'" <u>Id.</u>  Emphasizing the

12    stringency of this standard, which "stops short of imposing a complete bar of federal court

13    relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

14    cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

15    was unreasonable." <u>Id.</u>, citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

16        The undersigned also finds that the same deference is paid to the factual determinations of

17    state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

18    subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

19    decision that was based on an unreasonable determination of the facts in light of the evidence

20    presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

21    2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

22    factual error must be so apparent that "fairminded jurists" examining the same record could not

23    abide by the state court factual determination.  A petitioner must show clearly and convincingly

24    that the factual determination is unreasonable.  <u>See</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338, 126 S.Ct.

25    969, 974 (2006).

26        The habeas corpus petitioner bears the burden of demonstrating the objectively

27    unreasonable nature of the state court decision in light of controlling Supreme Court authority.

28    <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

6

1   show that the state court's ruling on the claim being presented in federal court was so lacking in

2   justification that there was an error well understood and comprehended in existing law beyond

3   any possibility for fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787. "Clearly

4   established" law is law that has been "squarely addressed" by the United States Supreme Court.

5   Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of

6   settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

7   Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

8   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

9   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

10  established law when spectators' conduct is the alleged cause of bias injection). The established

11  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

12  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

13  federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

14       The state courts need not have cited to federal authority, or even have indicated awareness

15  of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8, 123 S.Ct. at 365.

16  Where the state courts have not addressed the constitutional issue in dispute in any reasoned

17  opinion, the federal court will independently review the record in adjudication of that issue.

18  "Independent review of the record is not de novo review of the constitutional issue, but rather, the

19  only method by which we can determine whether a silent state court decision is objectively

20  unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

21       Finally, if the state courts have not adjudicated the merits of the federal issue, no

22  AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

23  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a

24  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

25  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

26  merits. Johnson v. Williams, ___ U.S. ___, 133 S.Ct. 1088, 1091 (2013).

27       B.  The "Substantial Force" Supplemental Jury Instruction

28       Although it spent no time analyzing the correctness *per se* of the supplemental instruction

7

1    at issue, neither did the Court of Appeal disagree that the supplemental instruction was an

2    incorrect statement of California law; the supplemental instruction tracked neither statute nor case

3    law.  Indeed, the only actual holding of the Court of Appeal was that petitioner was not

4    prejudiced by its submission to the jury (along with the initial instructions).

5           The appellate opinion concisely sets forth the pertinent facts.

6                   The jury was instructed on the statutory meaning of force by means
                    of CALJIC No. 10.42.  Following *People v. Cicero* (1984) 157 Cal.
7                   App. 3d 465 it says: "The term 'force' means physical force that is
                    substantially greater than that necessary to accomplish the lewd act
8                   itself."  The jury also was instructed that aggravated sexual assault
                    under section 269, required forcible oral copulation or forcible
9                   sexual intercourse" with a victim under 14 years of age by a
                    perpetrator more than 10 years older.
10
                    During the first afternoon of jury deliberations the court received a
11                  note requesting a definition of "'forcible' as it pertains to [section]
                    269."  The court replied: "The term 'forcible' in the context of
12                  Penal Code [section] 269 means with physical force that is
                    substantially different from or substantially greater than [that]
13                  necessary to accomplish the acts alleged."  Soon thereafter the jury
                    sent another request: "Definition of 'substantial force', definition of
14                  'physical force.'  Does holding the head down to the penis
                    constitute substantial force?"  The court responded: "By
15                  'substantial' is meant real, not imaginary or illusory.  By 'physical'
                    is meant bodily, not mentally.  Whether any particular conduct
16                  described by the witness was 'substantial force' is a matter solely
                    within the province of the jury."
17
                    Shortly thereafter, the jury arrived at the verdicts of guilty as
18                  charged.

19   Court of Appeal Opinion at 6-7.

20          Petitioner argued before the Court of Appeal that the trial court's "real not imaginary"

21   supplemental instruction on substantial force completely diverted the jury's attention from the

22   central question of whether the force used to direct the minor's head was "substantially different"

23   in terms of nature or degree.  As such, the prosecution burden of proving every element beyond a

24   reasonable doubt had been impermissibly lessened.

25          The Court of Appeal in this case undertook a lengthy discussion of how "substantial"

26   modified "force," or more to the point, how it did not modify "force" in one of the two sexual

27   assault statutes at issue (section 269), but then again, if the forced used was "substantially

28   different in kind" from that normally inherent in the act of a section 288 violation, legally

1    adequate force was used. If this formulation of the appellate opinion appears confusing, that is

2    because the law in California on the nature/degree of requisite force is somewhat confusing.

3    Some cases find no distinction in the statutory definitions; other cases articulate a distinct

4    separation in the definitions of force.[3]

5           Despite articulating this distinction, the appellate court in this case also discussed its own

6    district's case of People v. Cicero, 157 Cal. App. 3d 465 (1984), a case which held that the force

7    _____

8    [3] See People v. Alvarez, 178 Cal. App. 4th 999, 1004 (2010), finding the same definition of force
     applies to both statutes:

9

10              By their terms, the offenses for which appellant was convicted
                required proof that, in committing the proscribed acts, he used
                force, violence, duress, menace, or fear of immediate and unlawful

11              bodily injury against the victim. (§§ 288, subd. (b)(1) [forcible lewd
                conduct], 269, subd. (a)(5) [defining aggravated sexual assault to

12              include forcible sexual penetration].) Force, in this context, means
                physical force that is 'substantially different from or substantially

13              greater than that necessary to accomplish the lewd act itself.'
                (People v. Cochran (2002) 103 Cal.App.4th 8, 13, 126 Cal.Rptr.2d

14              416.)

15   But see In re Asencio, 166 Cal. App. 4th 1195, 1204-1205 (2008) (recognizing a distinction in the
     definitions of requisite force: statutes in the 260 series simply require force sufficient enough to

16   overcome the victim's will).

17          It appears to the undersigned that People v. Griffin, 33 Cal. 4th 1015, 1027 (2004), had
     settled the matter when it held:

18

19              The Cicero court was clearly focusing on the distinctions between
                nonforcible lewd acts under section 288, subdivision (a), and

20              forcible lewd acts proscribed by former subdivision (b), now (b)(1),
                of that section. The court reasoned that in order for the statutory
                scheme of section 288 to make sense, the Legislature must have

21              intended that the "force" required to commit a forcible lewd act
                under subdivision (b) be substantially different from or

22              substantially greater than the physical force inherently necessary to
                commit a lewd act proscribed under subdivision (a).

23

24              That same distinction does not arise in the context of the rape
                statute. The element of force in forcible rape does not serve to
                differentiate between two forms of unlawful sexual contact as it

25              does under section 288.

26   Griffin went on to hold that the "force" in the sexual assault statute referenced acts which
     overcame a victim's will to resist the advance. Id. at 1027-1028.  See also People v. Soto, 51

27   Cal. 4th 229, 242-243 (2011) (contrasting the "force" applicable to section 288(b) cases as
     opposed to sexual assault statutes).

28

1   used in committing a lewd act had to be "substantially" different in kind or degree from that force

2   normally associated with the act.  Although engaging in a lengthy discussion of the nature of

3   force in these aggravated sexual misconduct cases, it seemingly, ultimately applied this definition

4   to *both* the section 269 and 288 offenses of conviction in this case despite its previous analysis.

5   The Court of Appeal went on to answer the jury's question that using the hands to direct the

6   minor's head to the penis, and keep it there, was force substantially different in kind from that

7   (undefined) force which is inherent in an act of oral copulation.

8        This Court of Appeal disagreed with two other published appellate cases that force beyond

9   that necessary to constitute the criminal sexual act really did mean something in addition to the

10   inherent force associated with the act.  See People v. Schulz, 2 Cal. App. 4th 999, 1004 (1992)

11   and People v. Senior, 3 Cal. App. 4th 765, 774 (1992).

12        The appellate court's final conclusion was that "[f]or all the foregoing reasons, we find no

13   *prejudicial* error in the giving of the instruc*tions* on force." (emphasis added).

14        With due respect to the Court of Appeal, it may have lost its way in the academic weeds

15   of attempting to justify the verdict on the basis of the *initial* force instructions, or *on law with*

16   *which the jury was not instructed at all*, without analysis of the concededly errant words of the

17   supplemental instruction, and whether *those words* unduly infected the jury's verdict.  Petitioner

18   as appellant, as petitioner does here, focused on the effect of the errant supplemental instruction

19   arguably diluting the definitions of the initial instruction on force, however correct under state

20   law, which had nevertheless been given for *both* the section 269 and 288 offenses.  The Court of

21   Appeal analyzed, at least at one point in its opinion, that the jury did not need to be given the

22   definition of force substantially different in kind or degree—although it certainly was.  Then,

23   what was the jury to base its verdict upon, if not the actual instructions given?  It is difficult to

24   understand the view that the jury was free to disregard the actual instructions given and replace

25   them by some standard the Court of Appeal was later to articulate.

26        However, the undersigned's duty here is not to determine the state law correctness of the

27   appellate court's decision, but to ascertain whether prejudicial federal law error occurred.  In

28   order to do this, one must first determine the nature of the claimed federal error, whether that

10

1    error occurred, and whether it was prejudicial.  The undersigned must also determine the standard

2    of review for the federal error—whether that claimed error was adjudicated on the merits in the

3    appellate decision (AEDPA deferential review), or whether the claimed federal error was missed

4    thereby initiating de novo review.

5            Petitioner argues that the erroneous, supplemental instruction was so incorrect and

6    prejudicial that it resulted in a fundamental unfairness—a due process violation.  That is, the

7    "real" versus "imaginary" or "illusory" distinction set forth a truism so basic, and so unrelated to

8    the jury instructions, that it completely undermined or removed the standard of guilt for the

9    "forcible" crimes of which petitioner was convicted, citing before the Court of Appeal, <u>Carella v.</u>

10   <u>California</u>, 491 U.S. 263, 265, 109 S.Ct. 2419 (1989)  Appellants Opening Brief (AOB) at 32, and

11   in the petition, <u>In re Winship</u>, 397 U.S. 358, 364 (1970), and <u>Estelle v. McGuire</u>, 502 U.S. 62, 72

12   (1991).  It is difficult to conceive of any criminal law violations in whatever context which do not

13   require "real" facts as opposed to "imaginary" facts, i.e., facts having no basis in reality or totally

14   contrived facts.  Petitioner also argued before the appellate court that the supplemental jury

15   instruction was prejudicial because it was unlikely that the jury chose the alternative theory of

16   petitioner committing the crime while the victim was under duress.  Thus, at the very least, a

17   federal claim is properly asserted.

18           The next issue becomes whether these federal claims received adjudication on their

19   merits, as such will give rise to the AEDPA review standards set forth previously.  This is

20   sometimes a difficult determination to make, but a presumption lies that the merits were

21   adjudicated.

22               Because the Court of Appeals thus rejected the state hearsay claims
                 on the merits, its failure to treat the federal constitutional argument
23               separately requires that under Chambers, we presume that the
                 federal claim was also rejected on the merits. See *Johnson v.*
24               *Williams*, ⸺ U.S. ⸺, 133 S.Ct. 1088, 1096, 185 L.Ed.2d 105
                 (2013) ("When a state court rejects a federal claim without
25               expressly addressing that claim, a federal habeas court must
                 presume that the federal claim was adjudicated on the merits—but
26               that presumption can in some limited circumstances be rebutted.").

27   <u>Smith v. Oregon Bd. Of Parole</u>, 736 F.3d 857, 861 (9th Cir. 2013).

28

                                        11

1       That presumption is in full force here.  For any of petitioner's federal jury instruction

2 claims herein, ultimately, prejudice is a component of them.  See discussion of Hedgpeth v.

3 Pulido, 555 U.S. 57, 129 S.Ct. 530 (2008) below.  The prejudice discussion in the Court of

4 Appeal mirrors that of established Supreme Court federal law.  Finally, because a lack of

5 discussion of federal law in the state court opinion is insufficient to rebut the presumption, Early,

6 supra, petitioner has not demonstrated sufficient counter-presumption factors to warrant a

7 disregard of AEDPA.  Thus, the prejudice analysis of the Court of Appeal cannot be overturned

8 unless it is AEDPA unreasonable.

9       The undersigned need not be detained long in determining that the supplemental

10 instruction constituted federal constitutional error.  Departing from a requirement in the jury

11 instructions that in order for petitioner to be convicted of the higher tier sexual offenses, force

12 substantially different in degree or kind than inherently a part of the sex act itself must have been

13 employed, the trial court substituted a truism for the required element of force, i.e., that the force

14 merely needed to have been "real" and not "imaginary."  Petitioner is correct that the complete

15 dilution of this element of proof was Carella/Winship error.

16      In addition, there is no need to find the Court of Appeal unreasonable in the failure to find

17 error as it did so implicitly by not endorsing the trial court's substitution as an accurate statement

18 of California law.  The opinion contains no discussion how "real versus imaginary" is an

19 adequate substitute in California law for "substantially different in kind or degree."  And indeed,

20 the undersigned can find no statute of case law which so directs.  The Court of Appeal merely

21 held that the error was not prejudicial.[4]

22

---

23 [4]  The undersigned is puzzled, nevertheless, concerning the Court of Appeal's discussion about

24 how the jury was in error for having substituted in its question the adjective "substantial" before
force, as opposed to utilizing the adverb "substantially" to modify the type or degree of force
used.  It appears to the undersigned that the jury question simply used a shorthand expression to

25 set up the question—one which could easily have been used and still be consistent with the longer
adverbial expression.  But even if the jury had "substantially" misstated the law to the trial judge,

26 quaere why the trial judge would not have had the obligation to clarify the error instead of
compounding it.  In any event, the error at issue here is not the grammar of the jury, but the

27 dilution of the required element of force.

28

1    In determining the federal standard for prejudice of this non-structural error(s), the

2   established prejudice standard of <u>Hedgepeth v. Pulido</u> controls in that the jury was given a correct

3   way to view the element of force required, and an alternative incorrect view:

> Both *Stromberg* and *Yates* were decided before we concluded in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that constitutional errors can be harmless. Accordingly, neither *Stromberg* nor *Yates* had reason to address whether the instructional errors they identified could be reviewed for harmlessness, or instead required automatic reversal. In a series of post- *Chapman* cases, however, we concluded that various forms of instructional error are not structural but instead trial errors subject to harmless-error review. *See, e.g., Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (omission of an element of an offense); *California v. Roy*, 519 U.S. 2, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam) (erroneous aider and abettor instruction); *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (misstatement of an element of an offense); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (erroneous burden-shifting as to an element of an offense).
>
> Although these cases did not arise in the context of a jury instructed on multiple theories of guilt, one of which is improper, nothing in them suggests that a different harmless-error analysis should govern in that particular context. To the contrary, we emphasized in *Rose* that "while there are some errors to which [harmless-error analysis] does not apply, they are the exception and not the rule." *Id.*, at 578, 106 S.Ct. 3101. And *Neder* makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically " 'vitiat[e] all the jury's findings.'" 527 U.S., at 11, 119 S.Ct. 1827 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable-doubt instructions constitute structural error)). An instructional error arising in the context of multiple theories of guilt no more vitiates all the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted.
>
> In fact, drawing a distinction between alternative-theory error and the instructional errors in *Neder, Roy, Pope*, and *Rose* would be "patently illogical," given that such a distinction "'reduces to the strange claim that, because the jury ... received both a "good" charge and a "bad" charge on the issue, the error was somehow more pernicious than ... where the only charge on the critical issue was a mistaken one.'" 487 F.3d, at 677–678 (O'Scannlain, J., concurring specially) (quoting *Quigley v. Vose*, 834 F.2d 14, 16 (C.A.1 1987) (per curiam)); *see also Becht v. United States*, 403 F.3d 541, 548 (C.A.8 2005) (same), cert. denied, 546 U.S. 1177, 126 S.Ct. 1346, 164 L.Ed.2d 59 (2006).

<u>Hedgpeth v. Pulido</u>, 555 U.S. at 60-61.

1    Thus, whether the error here is viewed as singular in nature or on an alternative theory

2   basis, the prejudice standard is the same: whether the error had a substantial and injurious effect

3   on the verdict.  Hedgpeth applying Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710

4   (1993).

5    The Court of Appeal essentially found that the error had no such effect.  "That is shown

6   by the question the jury asked, whether 'holding the [child's] head down to the penis [to

7   accomplish fellatio] constitute[s] substantial force,' i.e., force different in kind or different in

8   degree from that inherent in the lewd act.  The answer, quite simply, is yes.  Using the force of

9   the hands to prevent the unwilling victim from avoiding oral genial contact is committing that

10   lewd act by force, force substantially different from that necessary to accomplish the lewd act."

11   Appellate Opinion at 11-12.  The California courts have found lesser or similar acts sufficient

12   force of "substantially different in type or degree" to permit conviction of a section 288(b)

13   forcible lewd act claim.  See People v. Babcock, 14 Cal. App. 4th 383 (1993) (overcoming a

14   child's resistance, pulling child back, preventing child from escaping sufficient force for a section

15   288(b) conviction).

16    The appellate court also found in its later discussion of duress that "the record does not

17   disclose the use of physical force by defendant in all instances in which he engaged in lewd acts."

18   Appellate Opinion at 13.  That is another way of saying that the evidence of force may have been

19   insufficient for most counts or many of them.  The Court of Appeal then went on to find that the

20   evidence of duress was sufficient for all counts.  Putting aside petitioner's claimed error that the

21   evidence of duress was insufficient, *see* the next section, it is clearly established Supreme Court

22   law that if the evidence is insufficient on one theory, but sufficient on another, the jury is

23   presumed to have correctly found the verdict in accordance with the sufficient ground.  Griffin v.

24   United States, 502 U.S. 46, 112 S.Ct. 466 (1991).  Thus, any claimed error in the supplemental

25   instruction was harmless for this reason as well.

26    The undersigned cannot find the appellate court AEDPA unreasonable in its harmless or

27   prejudicial error analysis.  It is one type of force to direct a victim's head to the genital area of

28   another, and quite different in kind or degree to further restrain effort by the victim to remove her

14

1     head from that area.  Moreover, with respect to the aggravated sexual assault, the supplemental

2     instruction given for those charges was precisely as petitioner had initially asked or agreed to.

3     As the jury had already been given, according to petitioner, the correct instruction initially as well

4     for all charges, it is difficult to comprehend that these definitions were totally eradicated from the

5     jury's thought process in arriving at the verdict because of the supplemental instruction.

6          Finally, assuming for purposes of this discussion (on the supplemental instruction error on

7     "force"), the correctness of the appellate court's factual finding on duress obtained from a review

8     of the record, it is more than a fair question to ask petitioner—what difference in terms of

9     prejudice could the error in the supplemental instruction have made.  One was as equally guilty of

10    the upper tier sexual offenses if duress was utilized than if "substantially different in kind or

11    degree" force was used.  One cannot find prejudicial error if the result would have been precisely

12    the same had only a duress theory been presented.

13         This is not to say that petitioner's prejudice arguments, especially the proximity of the

14    verdict to the defective instruction, does not have force.  It is to say that the Court of Appeal was

15    not AEDPA unreasonable in its analysis.

16         For all these reasons, petitioner's due process claim on jury instruction error should be

17    denied.  Because the "different outcome" i.e., undermines confidence in the verdict, prejudice

18    analysis for ineffective assistance of counsel required by Strickland v. Washington, 466 U.S. 668,

19    694, 104 S.Ct. 2052 (1984), is even more demanding than that under Brecht, Pirtle v. Morgan,

20    313 F.3d 1160, 1173 n. 8 (9th Cir. 2002), that ineffective assistance of counsel claim as it relates

21    to failure to object to the supplemental instruction should be denied as well.

22         C.  Sufficiency of the Evidence (Force and Duress)

23         Petitioner disputes that there exists insufficient evidence in the record to demonstrate that

24    the conceded acts of lewd and lascivious conduct, and perhaps the aggravated sexual assault as

25    well,[5] were performed with the requisite force or duress.  To make this argument petitioner

26    _____

27    [5]  The undersigned states "perhaps" because petitioner referenced "54" counts of lewd and
      lascivious conduct.  There were actually fifty such counts and four counts of aggravated sexual
      assault (the intercourse and oral copulation charges).

28

1   essentially ignores the appellate opinion in this case, and cites to other California published

2   opinions which favor somewhat petitioner's assertion of what acts are sufficient under California

3   law to constitute forcible lewd conduct and sexual assault.  Petitioner also criticizes that lack of

4   specificity in the victim's testimony regarding the use of force for specific incidents.

5   Petitioner's first assertion founders on the nearly impossible task of demonstrating that the

6   California appellate court in *his case* erroneously interpreted California law.  As has been held

7   many times, state courts are the final arbiters of state law, and it is not within the province of a

8   federal court sitting in habeas jurisdiction to make dispositive pronouncements on the contours of

9   state law.  Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475 (1991).  Even where the federal

10  judge is persuaded that the appellate court "got it wrong," only in the case where the state court at

11  issue strayed so far off the mark in its interpretation of state law that the only fair conclusion is

12  that the state court was acting sufficiently arbitrarily, may a federal court determine that a federal

13  due process violations has occurred.  Richmond v. Lewis, 506 U.S. 40, 50, 113 S.Ct. 528 (1992).

14  Petitioner's second assertion that the facts were insufficient fails in the main as discussed

15  below because, to be candid, not much in the way of "substantially different" force or duress is

16  necessary to differentiate lewd conduct from forcible lewd conduct under the stricter

17  interpretations of California law—including the law set forth in the appellate opinion in his case.

18  And indeed, not much in the way of specific linkage is required either.  However, to the extent

19  that the conviction partially rests upon incidents at the Walnut Ridge address, petitioner's point

20  has initial merit, only to ultimately fail because there were sufficient incidents, and then some, at

21  the Ayn Rand Court and at Dara Way residences to uphold the conviction.

22  The amended criminal complaint in this case charged, *inter alia*, 50 counts of forcible

23  lewd conduct and four counts of section 269 sexual assaults.  Each of the 50 counts is a repetition:

24  "That on or about and between the 1st day of August, 1993, and the 31st day of January, 1998

25  [petitioner committed a lewd act]…"by the use of force, violence, duress…."  Part of the Court of

26  Appeal's analysis for the sufficiency of the evidence for the 50 lewd acts counts was expressly

27  based upon its discussion of the force used in the supplemental jury instruction claim.  The Court

28  of Appeal continued:

The record does not disclose the use of physical force by defendant in all instances in which he engaged in lewd acts. However, as the prosecution argued to the jury, the force associated with the commission of some of the defendant's acts and all the circumstances surrounding them can be sufficient to show defendant accomplished all the acts charged by means of duress. [citation omitted]

The defendant makes no complaint concerning the definition of duress given to the jury…

The term 'duress' means a direct or applied [sic "implied"] threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to, one, perform an act which otherwise would not have been performed; or two, acquiesce in an act to which one otherwise would not have submitted…. The total circumstances, including the age of the victim and the relationship to the defendant are factors to consider in appraising the existence of duress."

Duress does not require the physical coercion of the victim. [citation omitted] Various considerations are pertinent to the inquiry whether the child participated in the acts unwillingly, because of duress; evidence that a long-standing relationship in which the child is particularly vulnerable to an exercise of authority by defendant; occurrence of the acts in an isolated setting out of the presence of other adults; a threat of humiliation or shame; overt coercion in some of the incidents of sexual molestation. "Where the defendant is a family member and the victim is young, other courts have also looked to factors such as the position of dominance and authority of the defendant and his continuous exploitation of the victim in determining the existence of force or fear." [citation omitted]

In the circumstances of this case, the age of the victim, the parental relationship, the isolation of the victim at the time of the acts, the threat that disclosure would destroy the home, the use of force to overcome resistance when displayed, and the long period of exploitation amply support a finding the lewd act offenses were committed by force or duress.

Court of Appeal Opinion at 13-15.

However, as quoted by the Court of Appeal, the law requires some type of threat, direct or implied, to be present before duress can be found.[6]

---

[6] A defendant commits a lewd act by use of duress if he or she accomplishes the act by making "'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' [citation omitted.]" Soto, supra, 51 Cal.4th at 246, (emphasis and footnote omitted). (continued…)

17

1    Petitioner's acts at the Walnut Ridge address, the less severe and first acts of lewd

2    conduct, i.e., the washing-in-the-shower acts, had no direct or implied threat associated with

3    them, and it would be unreasonable to so find.  The victim did not testify that she acted under

4    duress or fear.

5    Q.  Tell me what's your first memory of something bad happening at Walnut Ridge?

6    A.  Scott entering the showers while I was taking a shower.

7    Q.  How old were you, do you remember?

8    A.  Eight.

9                                                    ***

10   Q.  What do you remember about Scott Patrick getting in the shower with you when you

11   were eight years old?

12   A.  I remember it was kind of an awkward feeling, and I didn't know what to do.

13                                                   ***

14   Q.  Do you remember what went through your head when Scott Patrick gets in the shower

15   with you and you're eight years old and he's naked?

16   A.  This is odd.

17   Q.  Did he on that first occasion, did he touch your body in any way?

18   A.  Yeah.

19   Q.  What do you remember about that?

20   A.  He washed my hair.

21   _____

22   In determining the existence of duress or force, "factors such as the position of dominance and
     authority of the defendant and his continuous exploitations of the victim may be considered.

23   [citations omitted.]"  People v. Cardenas 21 Cal.App.4th 927, 940 (1994).  "Physical control can
     create 'duress' without constituting 'force.'"  People v. Schulz  2 Cal.App.4th 999, 1005 (1992);

24   People v. Espinoza 95 Cal.App.4th 1287, 1319 (2002).  "[D]uress involves psychological
     coercion. [citation omitted.] Duress can arise from various circumstances, including the

25   relationship between the defendant and the victim and their relative ages and sizes."  Schulz,
     supra, at 1005; Espinoza, supra, at 1319–1320.)  Moreover, "[a]s long as the total circumstances

26   support an inference that the victims' participation was impelled, at least partly, by an implied
     threat," the factual basis of duress is not eliminated by evidence of other motivating factors.

27   People v. Wilkerson  6 Cal.App.4th1571, 1580 (1992).

28

1    Q.  How did that incident end?

2    A.  Um—I got out of—I got out of the shower.

3                                         ***

4    Q.  And then what happened?

5    A.  Um—I went on with my life I guess.  I don't know.

6  RT 24-26.

7         This is the sum total of the acts alleged, and the victim's reaction, at the Walnut Ridge

8  residence.  Taking petitioner's concession that his naked washing of his daughter's hair was a

9  lewd act, any further conclusion that petitioner acted with substantially different force in degree

10 or kind is unreasonable.  So too is the conclusion of duress.  There cannot be found from this

11 record that any implied threat existed here, and that conclusion becomes crystal clear when

12 viewing the victim's reaction—this was odd, but she did not feel intimidated—she went on with

13 her life.  If it were to be found that the simple fact of parental relationship implied the threat *per*

14 *se*, then every case of parental molestation of a young child automatically qualifies for the higher

15 tier lewd act occasioned by "duress."  This is not the law in the appellate opinion at issue, or

16 generally.  Moreover, the only allegation about the number of times this lewd showering

17 occurred—"[a] few other times," lacks even the minimal specificity required by California law.

18 See People v. Jones, 51 Cal. 3d 294, 315-316 (1990).[7]

19

20 ───────────────

   [7]  Does the victim's failure to specify precise date, time, place or circumstance render generic
21 testimony insufficient?  Clearly not.  As many of the cases make clear, the particular details
   surrounding a child molestation charge are not elements of the offense and are unnecessary to
22 sustain a conviction.  (*People v. Moreno*, *supra*, 211 Cal.App.3d at p. 792; *People v. Avina*, supra,
   211 Cal.App.3d at pp. 56-57; *People v. Jeff*, *supra*, 204 Cal.App.3d at pp. 341-343.)
        The victim, of course, must describe the kind of act or acts committed with sufficient
23 specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between
   the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or
24 sodomy).  Moreover, the victim must describe the number of acts committed with sufficient
   certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a
25 month' or 'every time we went camping').  Finally, the victim must be able to describe the
   general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or
26 'during each Sunday morning after he came to live with us), to assure the acts were committed
   within the applicable limitation period. Additional details regarding the time, place or
27 circumstance of the various assaults may assist in assessing the credibility or substantiality of the
   victim's testimony, but are not essential to sustain a conviction.  <u>Id.</u>

28

                                            19

This brings the discussion to the incidents at Ayn Rand Court and Dara Way residences. The severity of the lewd acts escalated quite a bit, and so did the victim's reaction. At Ayn Rand, petitioner began washing and touching the victim in all areas, including the genital areas and breasts. The incidents included mouth to body contact, and finger to genital contact. The victim testified that this occurred while petitioner was sitting on a stool and she on his lap. This conduct occurred 20 times. RT 32. She testified for those twenty times that she would "run out of the shower and I would try to get out, but he would lock the door so it was kind of hard." RT 33. Petitioner would block the door so that she could not get out. Id. Petitioner would take her hand and lead her back into the shower. RT 34.

The victim also talked about another 20 times when petitioner would "corner her" in her bedroom before or after the time for shower. RT 34-40. Petitioner continued with the mouth to body contact. The victim also testified to having to kiss petitioner's genital area with her head being forcibly kept down. Petitioner would lay on her and ejaculate. The victim resisted this conduct, but to no avail. The prosecutor had the victim break down in terms of number of incidents, certain specific conduct, but it appears form the entire testimony that such were included within the 20 times previously testified to. The victim testified that "after the shower," petitioner told her that he did what he was doing because he had a problem growing up with ostensibly similar conduct, but that it would not do any good for her to tell anyone about this conduct with her "because I would go back and live with somebody else again." RT 46. Viewing the testimony as a whole, a reasonable fact finder could determine that force and/or duress was utilized from the first Ayn Rand incident on.

Petitioner and the victim then moved to Dara Way. This period of residence was divided by the victim's going to Montana to stay with her grandparents for six months. During the first period at Dara Way, the Ayn Rand type incidents continued. The victim testified to 10 to 15 incidents prior to the Montana visit. (RT 49.) It should not be subject to much dispute that even if only duress is considered, that duress was by this time omnipresent. At this point alone, the number of force/duress incidents testified met or exceeded the 50 counts in the amended complaint.

After the Montana visit, petitioner engaged in further lewd acts with force or duress incidents—about 50 (now totaling over 100).  RT 53.  The section 269 incidents—forcible oral copulations, and about *30* incidents of forcible rape were committed at this time.  The undersigned need not detail the crimes here, any reasonable reader of the transcript would understand that every incident was a forcible sexual assault, i.e., one in which the victim's will to resist was overborne.  RT 56-59.[8]

Petitioner criticizes the appellate opinion for extrapolating duress in connection with a specific "threat" to all of the acts; the undersigned has already determined no such threat(s) occurred at Walnut Ridge.  However, the victim did testify to petitioner's "guilt trip" on her and the fact that she might have to live elsewhere if she ever told anyone about the molestations at the inception of the sexual acts at the Ayn Rand residence.  Petitioner is correct that one California case held such extrapolation improper, and the "threat" for sufficient duress had to be directed to performing the acts themselves as opposed to some later disclosure:

> Alternatively, the People contend the evidence is sufficient to support the verdict on the theory that the November 1986 incident was accomplished by means of duress.  In *People v. Pitmon, supra*, 170 Cal.App.3d at page 50, the court explained that duress is "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*Accord People v. Bergschneider* (1989) 211 Cal.App.3d 144, 154 [259 Cal.Rptr. 219].) There was no evidence here that Hecker threatened Gail. Gail admitted she was never consciously afraid Hecker would harm her. She testified that with the exception of Hecker's pushing her head down during the act of oral copulation in November 1985, he never used physical force. Although Gail stated she felt "pressured psychologically" and "subconsciously afraid," there was no evidence Hecker was aware of and sought to take advantage of such fear. (*See People v. Bergschneider, supra*, 211 Cal.App.3d at p. 154, fn. 9.) "Psychological coercion" without more does not establish duress.  At a minimum there must be an implied threat of "force, violence, danger, hardship or retribution."FN7

---

[8]  The undersigned utilizes the correct standard here for the section 269 offenses, and not the more beneficial to petitioner, but errant "force substantially different in type or degree" lewd act standard.  However, as the Court of Appeal made clear, it does not really matter what standard was applied as both were met, indeed, exceeded.

1
2
3
4

> FN7 To support the claim of duress, the People seek to rely on Gail's testimony that Hecker urged Gail not to disclose the molestations because it would ruin his marriage and his naval career.  As we explained in *People v. Bergschneider*, however, such testimony establishes merely the threat of hardship directed at "later disclosure of the sex acts and not [the failure to perform] the sex acts themselves." (211 Cal.App.3d at p. 154, fn. 8.)

5

People v. Hecker, 219 Cal.App.3d 1238, 1250-51 (1990).

6

However, it is also true that a number of California appellate courts criticize and disagree

7

with Hecker on these points.  People v. Senior, supra, 3 Cal. App. 4th at 775-776; People v.

8

Cochran, 103 Cal. App. 4th 8, 14-15 (2002).  This court does not have the authority in habeas to

9

settle this apparent dispute in California law.

10

Thus, in accordance with the law set forth in petitioner's appellate case, the evidence was

11

sufficient to convict petitioner of 50 counts of lewd acts accompanied by force and/or duress as

12

well as the section 269 sexual assault charges.  And, it almost goes without saying that the Court

13

of Appeal was not unreasonable in finding so.

14

D.  Petitioner's Absence When The Supplemental Instruction was Discussed/Given

15

The only record concerning the discussion and giving of the supplemental instruction on

16

the meaning of "substantial force," appears in the Clerk's Transcript at 388-392.  That record

17

does not indicate petitioner's absence at the referenced time.  However, the parties agree that

18

petitioner was not present for the discussion and giving of the supplemental instruction, and the

19

court will consider this absence as an established fact.  The existing record does not therefore,

20

contain any discussion as to whether the absence was waived by defendant, nor does it explain

21

why petitioner was available to be in court for the giving of the verdict, but could not be present

22

for the instruction conference.  The verdict was read only a scant few hours after the giving of the

23

supplemental instruction.

24

The parties have chosen to address the matter, ultimately, as a harmless error issue.

25

However, the undersigned chooses to decide this matter on the *sine qua non* for AEDPA error—

26

whether the United States Supreme Court has clearly established a rule for the circumstances of

27

petitioner's absence at a supplemental jury instruction conference.

28

The Supreme Court has not established a rule that defendant's presence at a supplemental

22

1    instruction conference is a constitutional requirement *when counsel for defendant is present to*

2    *review the matter with the court.*  Moreover, the lower courts have spoken of this very issue

3    finding counsel's presence as a sufficient substitute for a defendant's presence, or at least not

4    constitutional error.

> Under the Constitution, the defendant's presence "is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). If the ex parte communication rises to the level of a constitutional violation, then the burden is on the prosecution to prove that the error was harmless beyond a reasonable doubt. *See United States v. Kupau*, 781 F.2d 740, 743 (9th Cir.1986).

> ***

> The Constitution does not guarantee that a criminal defendant be "present at all stages of the trial," but rather, only at "critical stage[s]." *La Crosse*, 244 F.3d at 707–08.  Neither the Supreme Court nor our own circuit has previously stated whether the delivery of a supplementary jury instruction constitutes a "critical stage" requiring the defendant's presence.

> Our circuit has found constitutional error subject to harmless error analysis where neither the defendant *nor his counsel* was aware of a read-back of a defendant's testimony to the jury, *see Fisher v. Roe*, 263 F.3d 906, 914–17 (9th Cir.2001); *Hegler v. Borg*, 50 F.3d 1472, 1474–76 (9th Cir.1995), and where a defendant was absent during sentencing, *see Hays v. Arave*, 977 F.2d 475, 478 (9th Cir.1992), overruled on other grounds by *Rice v. Wood*, 77 F.3d 1138, 1144 n. 8 (9th Cir.1996) (en banc).

> The Supreme Court has not found constitutional error, however, where the defendant was not present during a hearing to determine the competency of key witnesses for the prosecution, *see Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), an in camera examination of a juror who felt intimidated by the defendant, *see Gagnon*, 470 U.S. at 526–27, 105 S.Ct. 1482, or the jury's examination of the crime scene, *see Snyder*, 291 U.S. at 108–110, 122, 54 S.Ct. 330.

> As we noted in *Fisher*, in each of the three cited Supreme Court cases, while the defendant "had no right personally to be present ... at least one defense attorney was present at the proceeding from which the defendant was excluded." 263 F.3d at 915–16.  While the Supreme Court has stated that the "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow," *Stincer*, 482 U.S. at 745, 107 S.Ct. 2658 (internal quotation marks omitted), it has also required the lower courts to examine any possible violation of the right "in light of the whole

record." *Gagnon*, 470 U.S. at 526–27, 105 S.Ct. 1482.

> We cannot say that the defendant's presence *or at least that of his counsel* is useless when a trial court prepares a supplemental instruction to be read to a deliberating jury. Counsel might object to the instruction or may suggest an alternative manner of stating the message. This may not have made a difference in this case, and, in fact, we so hold, but because Rosales–Rodriguez's attorney was not aware of the preparation and delivery of the supplementary jury instruction, we find that the error rises to the level of a constitutional violation.

> Having found that the delivery of a supplementary jury instruction constitutes a "critical stage" of a trial for which the defendant's presence (*or that of his counsel*) is constitutionally required, it is clear that the defendant also had a statutory right to be present…..

United States v. Rosales-Rodriguez, 289 F.3d 1106, 1110 (9th Cir. 2002) (emphasis added).

In interpreting Fed. R. Crim. P 43, an analog to the constitutional right for a defendant to be present at all critical stages of a trial, the Supreme Court has stated that "[c]ases interpreting [this] Rule make it clear, if our decisions prior to the promulgation of the Rule left any doubt, that [a] jury's message should [be] answered in open court and that petitioner's counsel should [be] given an opportunity to be heard before the trial judge respond[s]."  Rogers v. United States, 422 U.S. 35, 39, 95 S.Ct. 209 (1975).  See also Rushen v. Spain, 464 U.S. 114, 119-120, 104 S.Ct. 453 (1983).

Therefore, the undersigned finds that a petitioner's non-presence at a conference, at which a matter of law is at issue, here, where a supplemental legal instruction is discussed at the request of the jury, *and in which his counsel participates*, does not contravene a Supreme Court clearly established constitutional right for a defendant to be present at all critical stages of his trial.[9] Petitioner's claim is therefore non-cognizable in federal habeas corpus.  Moreover, at the very least, given counsel's presence at the supplemental jury instruction conference, the state courts

---

[9]  The undersigned finds it inappropriate to independently determine whether Constitutional right to be present was violated by analyzing the general wording of Gagnon and the facts of this case. The precise issue here has been analyzed by the lower courts and analogously by the Supreme Court.  Given this backdrop, the level of specificity required by AEDPA for an established Supreme Court statement of violation of this constitutional right should be judged by the lack of authority specific to this case's issue.

1    were not AEDPA unreasonable in denying petitioner's habeas claim as reasonable jurists could

2    disagree with petitioner's position that he had an unqualified right to be present along with his

3    counsel at this legal discussion.  Rosalez-Rodrigues, supra.

4           E.   Miscellaneous Ineffective Assistance of Counsel Claims

5           Petitioner raises several ineffective assistance of counsel claims not related to the

6    supplemental instruction issue, determined supra.  Each of these several claims will be dealt with

7    individually below.  However, two related problems exist with all of petitioner's claims.  The

8    court has previously denied petitioner an evidentiary hearing to bring in outside-the-record

9    evidence.  Also, petitioner must realize the impact that his concession to lewd acts and sexual

10   assaults has on his ineffective assistance claims—*concessions he continues to make even in his*

11   *amended petition.*  These concessions and admissions to others as to the acts themselves made

12   any favorable-to-petitioner trial result a *very* difficult proposition for any counsel to pull off.

13   Moreover, petitioner possessed very little evidence to counter his adopted daughter's testimony,

14   at least evidence he was prepared to personally present, and the lack of that testimony essentially

15   left S's testimony unrebutted.  Even if petitioner were allowed to present extra-record testimony

16   at this point concerning the number of incidents in which he and his daughter were involved, as

17   the court remarked in its evidentiary hearing order:

18           Suffice it to say, however, that the uncertain evidence presented
             that petitioner was a very busy and tired person because of his
19           professional responsibilities as a young doctor at the time, with
             seemingly not much opportunity to have committed all of the
20           charged acts given his wife's frequent work absences necessitating
             family babysitting of S, is speculative indeed.  Petitioner to this day
21           does not contest that he committed some of the acts charged; he
             simply asks this court to guess how many, but keep the number
22           low.  Weak evidence indeed to base a petition to have his trial begin
             anew in state court.
23
     Order, filed October 28, 2014, ECF No. 56 at 9, n. 9.
24
25           The law regarding ineffective assistance of counsel is as follows:

26           Both parties agree that the Supreme Court's decision in *Strickland
             v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
27           (1984), constitutes "clearly established federal law" providing the
             proper framework for assessing Woods's IAC claims.  Under the
28           AEDPA, the primary issue is whether the state court adjudication of
             the *Strickland* claims was objectively reasonable. *Schriro v.*

                                              25

1

2

3

4

5

> *Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).  To prevail on an IAC claim under Strickland, a petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.  In evaluating IAC claims, "our cases require that ... [we] use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, —— U.S. ——, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting *Pinholster*, 131 S.Ct. at 1403).

6

7

8

9

10

11

12

13

> As to the first prong, a petitioner must prove that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.  The Supreme Court has instructed lower courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. 2052.  As to the second prong, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052.  Finally, even if Woods can satisfy both of those prongs, the AEDPA requires that a federal court find the state court's contrary conclusions are objectively unreasonable before granting habeas relief.  *See Landrigan*, 550 U.S. at 473, 127 S.Ct. 1933.

14

Woods v. Sinclair, 764 F.3d 1109, 1131-32 (9th Cir. 2014);

15

16

17

18

19

20

21

22

23

24

25

26

27

Petitioner's first claim is that trial counsel did not prepare a coherent defense.  That is, counsel focused on the use of force as a means to lower the severity of the crime (from a section 288(b) to a section 288(a), but forgot about duress.  But petitioner presents (and can present) no facts to counter S's testimony, no dispute with the jury instruction on duress, and insufficient law to demonstrate that the Court of Appeal misconstrued the manner in which duress should be viewed, i.e., most lewd acts between a parent and child will qualify as long as an implicit threat is communicated.  Importantly, the Court of Appeal held that duress could be imputed to later acts from earlier acts.  Although the undersigned has only found sufficient duress evidence from commencement of the Ayn Rand residence, and subsequent, there were more than enough acts for all section 288 charges to be sustained.  And, as it turned out, by virtue of the jury's questions concerning force, trial counsel had been quite successful in diverting the jury's attention to that issue.  Moreover, without petitioner specifically testifying to a certain number of acts or the impossibility of having committed as many acts as testified to by the victim, there was simply no

28

1    way to prepare a forceful defense to the number of acts alleged.[10]

2            Petitioner next contends that counsel was ineffective because he conceded on opening

3    statements that petitioner had committed some "bad acts," and that the focus of the defense was

4    going to be whether force was utilized with those acts.  Of course, defense counsel was hoping to

5    spare his client conviction on section 288(b) offenses, each of which would lead to many years

6    incarceration.[11]  Habeas counsel, the court supposes, believes a better defense would have been to

7    keep the jury guessing until late in the trial as to *any* viable defense, only to essentially accede to

8    the victim's testimony about the number of lewd acts and sexual assaults.  Trial counsel could

9    well have been termed inadequate if he had followed such a strategy.  Moreover, prejudice cannot

10   possibly exist, as defined below for AEDPA claims, in that to this very day, petitioner concedes

11   the commission of section 288(a) offenses: "Petitioner does not dispute the adequate evidence of

12   lewd and lascivious conduct [but disputes (without evidence) the number and elements of force

13   and/or duress]."  First Amended Petition at 30, ECF 29, (Points and Authorities).

14           Petitioner has cited the appropriate cases concerning when "confession for the purpose of

15   avoidance" will be viewed as appropriate.  See First Amended Petition, Points and Authorities at

16   16 including the citation to United States v. Fredman, 390 F.3d 1153, (9th Cir. 2004).[12]  When the

17   evidence of guilt is overwhelming, it is often wise not to tilt at windmills.  However, the

18

19   _____

     [10]  Because petitioner conceded to some of the acts alleged, if not most, placing petitioner on the
     stand to lower the number of separate count convictions might well appear quibbling at best and
20   devastating depending on the cross-examination.

     [11]  At the time of petitioner's conviction, the penalties for a section 288(a) violations and a section
21   288(b) violation were identical on their face, i.e., three, six or eight years.  However, consecutive
     sentences were *optional* for section 288(a), see Cal. Penal Code section 667.6(c) (1994 statutes);
22   People v. Rodriguez, 130 Cal. App. 4th 1257 (2005), but were *mandatory* for section 288(b)
     convictions.  See Cal. Penal Code 667.6(d) (1994 statutes); People v. Soto, 51 Cal. 4th 229, 237
23   (2011).  Thus, assuming the middle term would have been chosen for a section 288(a) violation as
     it was for the section 288(b) violation, the potential difference in actual time sentenced could be 6
24   years as opposed to 300 years.  Petitioner does not raise the practically useless point that for a
     year of the charged conduct, utilization of the above section 667 may well have been an *ex post*
25   *facto* violation.

     [12]  However, petitioner's belief that a concurrence in Fredman "limits" the majority opinion is not
26   correct.  A concurrence to a *majority* opinion is simply a non-authoritative opinion of the
     concurrence writer.
27

28

1   undersigned does not understand petitioner's contention that trial counsel was not focused on a

2   "lesser" charge when he conceded that some bad acts had taken place.  Trial counsel's entire

3   strategy was to eliminate a "force" finding that could give rise to the staggering consecutive

4   sentences.  From a practical standpoint, the potential difference in penalties between non-forcible,

5   or non-duress induced, lewd acts is night and day.  Footnote 13, <u>supra</u>.  In addition, the

6   prosecution had gone for all or nothing on the section 288(b) charges; no section 288(a) charge

7   was ever made.  Although a reference was made in the jury instructions to the fact that section

8   288(a) was a lesser offense to what was charged, the verdict forms in the record did not refer to a

9   lesser section 288(a) offense.  If the jury had found lack of force or duress, petitioner could have

10  been entirely acquitted for each count so found.

11          Petitioner also believes counsel to be deficient because he did not call Detective Bayles.

12  Without giving a specific reference, petitioner indicates that CT 126-321 (nearly the entirety of

13  the preliminary hearing) contains suggestions that the Detective's interrogation of the victim soon

14  after the initial report of molest was "suggestive" as to the force issue such that the interrogation

15  colored the victim's later testimony on that point.  According to petitioner, counsel should either

16  have introduced the Detective's notes at trial (hearsay), or called the Detective for the purpose of

17  impeachment.

18          As respondent points out in the Answer at 25, the aura of asserted "suggestiveness" did

19  not even last a day in that the videotaped interview a day after the Bayles interrogation contained

20  precious little in the way of descriptions of force.  In addition, the lack of merit in petitioner's

21  contention is underlain by the lack of any specific examples.  From a tactical standpoint and

22  assuming the victim was pressured into graphically describing violence in the acts performed by

23  petitioner, it would have been dangerous indeed, to lay this all before the jury (again) by

24  reiterating the details of the sexual acts soon after they heard the victim's testimony.  Why not use

25  an expert to talk about alleged suggestiveness—a much less problematic tactic and something

26  defense counsel did do.  Finally, in reading the victim's testimony, it is clear that she did not

27  utilize force hyperbole.  She related what happened, and what did not happen.  Indeed, one can

28  tell that the testimony was difficult for the victim and that she was, at many points, an

28

1   unenthusiastic witness.

2        Related to this attack on counsel is the assertion that counsel performed poorly on direct

3   examination of his witness, Dr. Coleman, i.e., counsel did not spend sufficient time with the

4   witness exploring "suggestiveness" to create false testimony in a witness, and that counsel strayed

5   into irrelevant matters (whether the lack of injury to the hymen was pertinent to show lack of

6   force).  Again for the reasons set forth by respondent at 18-20 of the Answer, the record does not

7   substantiate an assertion that Dr. Coleman did not get his suggestiveness point across.  The point

8   was made and in an understandable fashion.  To the extent that counsel then asked questions in an

9   area the parties had stipulated was not relevant, there was absolutely no harm from such a foray.

10  Indeed, to the extent that "force" was at issue, the testimony did make it appear that the lack of

11  injury to the hymen portrayed a lack of force, or rough violent contact.  This did not hurt the

12  petitioner's case.

13       This brings us back to the issue attempted to be raised by petitioner in the motion to

14  expand the record—counsel should have focused on reducing the number of acts for which

15  petitioner was convicted.  Petitioner, in this habeas case, attempted to produce evidence to negate

16  the uncontroverted-at-trial number of instances testified to by the victim.  The court has ruled

17  such extra-record evidence inappropriate. Also, as stated at the beginning of this section, such

18  nebulous, non-specific evidence lacks probative value: "I was a very busy person who would not

19  have had much time for such things," is hardly the evidence on which prejudice could be found.[13]

20       *Conclusion*

21       Accordingly, although petitioner's punishment for his misdeeds is severe, no federal,

22  prejudicial error exists which warrants the granting of the petition.  The undersigned

23

24  [13]  Petitioner also believes that the victim's grandmother should have been called as a witness for
    the purpose of testifying that the victim never complained about forcible sex acts by petitioner.
25  Such an assertion might have been relevant if the victim had told her grandmother *anything* about
    the lewd act.  If the victim did not disclose the conceded fact of abuse to anyone prior to this six
26  month visit out of embarrassment of fear of retribution, and did not disclose the fact of abuse to
    her grandmother during the visit, it is hardly surprising that she did not disclose details about it in
27  terms of numerosity or force to her grandmother.  The argument lacks probative weight.

28

1   RECOMMENDS that the petition be DENIED.

2        These findings and recommendations are submitted to the United States District Judge

3   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

4   after being served with these findings and recommendations, any party may file written

5   objections with the court and serve a copy on all parties.  Such a document should be captioned

6   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

7   shall be served and filed within fourteen days after service of the objections.  Failure to file

8   objections within the specified time may waive the right to appeal the District Court's order.

9   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

10  Dated: February 6, 2015

11                          /s/ Gregory G. Hollows

12                  UNITED STATES MAGISTRATE JUDGE